UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| In the Matter of B.F. and M.F., | |
| P.F. | No. 7:24-cv-02333-PMH |
| Petitioner, | |
| vs. | **RESPONDENT'S DECLARATION IN SUPPORT OF MOTION FOR PROTECTIVE ORDER** |
| Y.F. | |
| Respondent. | |

_____

I, Y.F., affirm the following statements under the penalty of perjury:

1. I am the Respondent in the above-captioned matter, and I am fully familiar with the facts set forth in this declaration, which is submitted in support of the instant motion for protective order.

2. I am the father of M.F. (my son) and B.F. (my daughter) and I submit this declaration in support of my motion for a protective order to prevent the release of my children's current address, school and medical information to their mother, Petitioner P.F. Based on her prior behavior, I believe disclosing this information would seriously endanger my children's education, medical care, and overall well-being. Disclosing our address may also lead to her contacting our landlord and jeopardizing our ability to rent an apartment in the area in which we currently live.

3. My children and I (as well as Petitioner) are members of the Hasidic Jewish community. Education in our tradition is closely tied to religious and communal trust. The schools and providers we rely on are private, religious institutions that often withdraw from situations involving conflict or legal risk, something the Petitioner heavily used in order to

1

obstruct the children's access to school and mental health care in the past. If the children's current school is disclosed and P.F. contacts them consistent with how she has in the past, I believe my children will be removed with no viable alternative. Similarly, I am concerned that if she contacts their current pediatrician they will be refused continued medical treatment with a provider that they have an excellent relationship with. consistent with what she has done in the past, I know for sure my kids will be removed, similarly they will lose their private and caring medical doctor with whom they've created a good and fully trusting relationship.

      4.      I am deeply concerned that the Petitioner will use information obtained through this litigation to damage our standing with neighbors and members of the community. This could directly jeopardize our ability to renew the lease on our current apartment, which is nearing expiration. Given how quickly word spreads in the community, it is likely that I would also face significant difficulty securing alternative housing in the area. In essence, any disruption caused by the Petitioner has the potential to unravel the fragile stability my children currently enjoy, triggering a domino effect that could dismantle the life we have worked hard to rebuild.

**I.      Background**

      5.      P.F. and I were married on November 2, 2011, in Bnei Brak, Israel. In October 2012, we relocated to New York due to the Petitioner's ongoing and intense conflicts with her family in Israel, which had become intolerable. We established our home in New York and began raising our family there. Our daughter, B.F., was born on May 1, 2014, and our son, M.F., was born on November 9, 2015. Both children were born in New York, and we resided there permanently from 2012 through 2019.

      6.      In July 2019, we temporarily relocated to Israel on a trial basis, with the hope and explicit understanding that we would only remain if the Petitioner's mental health improved. The

children struggled significantly during this period, as they were forced to change schools and residences multiple times and were never able to establish a stable routine. When the COVID-19 pandemic began, we returned to New York for several months. I was hesitant to go back to Israel, but at the urging of family and friends who believed the Petitioner deserved another chance, we returned later that year. Within a month, I deeply regretted the decision, as the Petitioner began initiating pre-divorce proceedings and the instability resumed almost immediately.

7. While in Israel, Petitioner was diagnosed with multiple psychiatric disorders, including major depressive disorder, anxiety, and ADHD. Throughout the relationship, she engaged in abusive behavior toward our children, including physical abuse and withholding food as punishment. Neighbors frequently found the children wandering in search of food, and when confronted, Petitioner told them not to feed the children because they were being disciplined. She also isolated me by locking me in a room, preventing me from intervening.

8. The most traumatic and telling incident occurred when I discovered the Petitioner actively choking our son, M.F. I had to physically intervene to stop the assault and protect him from what could have been a fatal outcome. I was only able to intervene in time because our daughter screamed for help. That moment remains seared in my memory and reinforces why returning the children to the Petitioner would pose an unacceptable risk to their safety and emotional health. It was a horrifying moment that made it unmistakably clear that the Petitioner's mental state was not improving and in fact it had dangerously deteriorated.

9. This incident prompted an investigation by Israeli Child Protection Services and confirmed beyond all doubt that our trial relocation to Israel had failed. We were living under constant threat, and the environment was not only unstable but outright dangerous. I had been the sole caregiver, and it was clear that placing the children with her in my absence would be unsafe.

Israeli Child Protective Services had explicitly warned me that if the children were found without me, we could permanently lose custody.

10. The only reason I remained in Israel at that time was because I feared for my children's safety and could not bring myself to leave them behind in such a volatile and potentially life-threatening situation.

11. On April 4, 2023, I traveled to New York with the children for Passover. This trip to New York was the Petitioner's idea. While we were away, I suffered from a flare-up of Chron's disease, requiring hospitalization. During this time, the Petitioner unilaterally disposed of all my belongings, vacated the family home, and moved into her parents' house in another district in Israel, leaving the children without a home or school enrollment. My understanding is that by September, our home it was already rented out to someone else.

12. Although it first became clear during our time in New York in April 2023 that, given the chaos, emotional harm, and abuse the children had previously endured, it was in their best interests to remain in the United States, I remained deeply conflicted throughout the summer about whether staying was the right long-term decision. That uncertainty quickly gave way to alarm. While I was still hospitalized, the Petitioner's verbal, emotional, and psychological harassment escalated dramatically. Instead of showing any concern for my health or the children's well-being, she aggressively pressured others to return the children to her despite having spent years claiming she could not manage them. This was especially disturbing in light of her past conduct, including the terrifying and traumatic incident in which she attempted to choke our son.

13. During our time in New York from April to September 2023, it became abundantly clear that there is no compelling reason for us to return to Israel. The circumstances

4

that had previously been settled or stabilized for us in Israel were upended by the Petitioner, who either disposed of or destroyed them. What remains there is a pattern of instability and conflict that poses a serious risk to our well-being.

14. By September 2023, when I discovered that the Petitioner had disposed of, sold, or given away all of our belongings and rented out the apartment to someone else, it was evident that there was nothing left for us in Israel except the same instability and trauma we had tried to escape. Instead, we were subjected to repeated disruptions, including the Petitioner summoning law enforcement during minor disputes and exhibiting behavior that caused us to fear for our safety. These included episodes of delusional thinking and extreme emotional outbursts. Although it was incredibly difficult to settle the children here in New York, I made the decision that it was in their best interest to invest my energy in building a stable and normal life for them here.

15. Given these circumstances, I made the decision to remain in New York permanently, in the interest of protecting my children and ensuring their safety and emotional well-being. We were living at the time at 80 Meron Road in Monsey, New York in a cramped two-room apartment, yet the children were visibly happier than they were in Israel because they were no longer exposed to the unpredictable and volatile environment created by the Petitioner. Their basic sense of safety was restored, and that alone had a profound impact on their emotional state. We now reside in a safe and stable apartment in New York, and while it is modest, it represents a return to normalcy and peace for our family.

II. Interference with Education

16. In May 2023, I arranged for M.F. to attend a Vizhnitz Hasidic[1] school during the summer term. At the time, the children and I were staying with my sister and brother-in-law, who are members of the Vizhnitz community. The school accepted M.F. only because of this.

17. When I tried to re-enroll M.F. for the new school year starting September 2023, the school board told me that I had to bring the matter directly to the Vizhnitz Grand Rabbi. I went to meet with the Grand Rabbi and brought M.F. with me.

18. The Grand Rabbi made it clear that he had been contacted by various people on the behalf of the Petitioner who were pressuring him to exclude the children from school. He said Petitioner had also contacted others in the Vizhnitz community and threatened legal action. He explained that he could not risk keeping the children enrolled unless there was a court order that either barred Petitioner from contacting the school or expressly allowed enrollment.

19. Later Petitioner actually disclosed to me that she worked very hard contact the Grand Rabbi personally to pressure him to exclude the children from school. Direct contact with a Grand Rabbi in our community is a rare and extreme measure usually reserved for only the most serious circumstances. Petitioner going directly to the head of the Vizhnitz community proved to me that she would stop at nothing to disrupt the children's lives.

20. The Grand Rabbi said he was not sure even a court order would be enough. He stated that unless they were completely protected, they could not afford to get involved in the situation and would not accept the Children into their school. He expressed that he did not want to expose the community to unnecessary legal problems.

---

[1] The Vizhnitz Hasidic school is affiliated with the Vizhnitz sect, commonly referred to within the community as a "dynasty." Enrollment in Vizhnitz schools typically requires affiliation with the sect or close ties to its leadership. I am not a member of the Vizhnitz dynasty and have no deep connections within that community, which made it extremely difficult to secure and maintain enrollment for the children. Their placement in the school was tenuous from the outset and implicitly contingent on not causing any problems for their community.

21. Despite this, M.F. remained enrolled through the end of August 2023 while discussions continued. However, by September he was not allowed to return.

22. During the same summer, B.F. was enrolled in a day camp affiliated with the New Square Hasidic community in Monsey. The camp and the school share a building but operate under separate administrations. The camp's administration is more lenient for summer enrollment, whereas the school's administration is much stricter for enrollment for the full school year. Having studied in this sect as a child, I hoped my background would encourage the administration to be more receptive to B.F.'s enrollment for the upcoming school year. However, despite my past affiliation, when I tried to transition B.F. into the affiliated school for the academic year, the administration denied her enrollment due to the harassment and intimidation Petitioner has caused the counselors and directors of the summer program.

23. Due to my personal background and family dynamics, including an uncommon transition from one Hasidic sect to another, I have not benefited from the customary communal support typically extended to members within a single sect. Although I have consistently remained affiliated with a Hasidic sect, the sect to which I currently belong is relatively small and lacks its own school system and infrastructure. As a result, when seeking school placements for my children, I am left out of the usual commitment that every sect has for its members. Moreover, securing school placements for my children has been particularly challenging due to the specific grades in which I am seeking enrollment: grades 2, 3, and 4. The classes for these grades typically have enrollment and logistical arrangements that are generally established well in advance and rarely altered from year to year.

24. Considering these challenges, I sought the assistance of my friend, Rabbi Kohn, who serves as the principal of a large boys' school for students aged 13 to 17. Rabbi Kohn has

extensive connections across a wide range of private schools affiliated with various Hasidic sects.

25. Rabbi Kohn became actively involved in assisting me with securing school placements for my children and tried to advocate for B.F.'s academic enrollment. He later told me that Petitioner had been calling the school demanding to speak with B.F., and that the school was unwilling to take on the complications associated with our situation. Further, Rabbi Kohn informed me that although there are schools affiliated with various Hasidic sects, including some that are considered neutral and not aligned with any specific sect, these institutions often collaborate closely, sharing information and supporting one another.

26. On several occasions when he would contact prospective schools, the administration would either tell him immediately or shortly thereafter that they were already aware of the "Felberbaum case" and were unwilling to become involved. Some schools explicitly stated that they did not want to risk repeated visits from law enforcement because of the Petitioner. Rabbi Kohn reported to me that he tried pleading with the schools and even offered to take full responsibility for any issues that might arise. Despite his efforts, he was unable to assure the schools that the Petitioner would not cause them legal trouble. He relayed this to me in September 2023, after the school year had already started.

27. At that time, both M.F. and B.F. were without school placements and no Hasidic school would accept them. As a result, I homeschooled the Children.

28. On November 21, 2023, I obtained a court order from the Rockland County Family Court which granted me temporary legal custody of the children for the purposes of enrolling them in school and stated that "[Petitioner] is directed to refrain from contacting the children's school or harassing school staff/personnel directly or through third parties." A copy of

the order is attached hereto as **Exhibit D**. From my understanding, Petitioner was served with this order, disregarded it, and continued to undermine the children's ability to enroll in school.

29. From November 2023 through mid-2024, both children attended BDY, a Hasidic school in Monsey that accepts children who have no other school placements. BDY consisted of two divisions: the girls' division, Bnos Derech Yisroel, and the boys' division, Cheder D'Monsey. Due to severe financial constraints, Bnos Derech Yisroel closed in May 2024, and Cheder D'Monsey remained open until the end of the 2024 academic year. However, for the 2024-2025 academic year, the school merged M.F.'s class with a younger class, effectively placing him two grades below his appropriate level. The administration informed Rabbi Kohn that this arrangement posed significant challenges, and as a result, M.F. was left without a viable school placement for the 2024-2025 academic year.

30. In the fall of 2024, my cousin helped me try to enroll them in six different schools. We were turned away by each one.

31. The Forshey Grand Rabbi (the head of another Hasidic dynasty) advised me to move the children to another community. He said Monsey was too close-knit and that the situation had become too well known. He believed that a different community would offer a better chance for stability.

32. We moved to our current residence and in November 2024, both M.F. and B.F. were enrolled on a trial basis into schools there. Thankfully, they are still enrolled today. The schools are relatively new, but the staff have been kind and willing to help.

33. Petitioner does not know where we live or where the children are enrolled in school. I have reason to believe that if she finds out, I fear she will again interfere and cause the

schools to remove them. We do not have other options. I cannot send my children to public school because it would conflict with our religious beliefs and way of life.

**III.     Interference with Therapy and Medical Care**

34. My children began therapy in January 2024 at an organization called Alley Valley. In May 2024, during a meeting with the children's therapist, I was told that Petitioner had called the therapist and made serious accusations that I had kidnapped the children and was refusing to let them speak with her. She discouraged the organization from being involved.

35. I was called to speak with the therapist and her supervisor. The head of the organization was also present. They were hostile towards me. After this call from Petitioner, their demeanor toward me changed and they became cautious and distant.

36. The therapist continued working with the children for a time but told me the organization would no longer deal with either parent directly. However, in September 2024, the therapist arranged a supervised phone call with Petitioner, which very quickly turned sour with screaming between my son and the Petitioner, Then, In March 2025, At the Petitioner's direction, the same therapist overseeing the supervised phone call went to pick up a package from an individual the Petitioner had sent. The package included a letter from the Petitioner. Although the therapist had previously assured me that she would not communicate with either parent in order to remain neutral, she and the organization continued to communicate with the Petitioner—apparently out of concern over potential legal consequences. This ongoing communication ultimately undermined the therapist's neutrality and negatively impacted her relationship with the children, including apparent attempts to influence them regarding the idea of traveling with to Israel to the Petitioner.

37. As a result of this experience, the children lost trust in the therapist and subsequently refused to continue therapy with her.

38. After that, regular therapy services stopped. The children have continued some involvement with programs at the organization, but their trust with their therapist was broken beyond repair.

39. The children also see a pediatrician that they have a great relationship with. I explained our situation to the doctor, who indirectly suggested that they would continue seeing the children as long as things remained quiet. If Petitioner causes problems, the children risk losing their pediatrician. It is important to note that my children's pediatrician is not a randomly selected provider. Given everything my children have been through, I was deliberate in choosing a medical practice that offers comprehensive, attentive care and supports their physical development and overall well-being. Rather than limiting visits to an annual check-up, I bring the children in more frequently to ensure that every aspect of their health is closely monitored and that they receive the highest standard of care.

40. On one visit to urgent care in Monsey, I began to explain the situation with Petitioner. The staff immediately told me to stop and that they did not want to be involved. approached the clinic director to confirm that it was appropriate for me to bring my children to the practice. When I began to explain that the children were currently in my care, he immediately interrupted and stated that it was not his concern why I was the one bringing them in. He emphasized that he was not obligated to inquire about the whereabouts of the other parent. However, he also warned that if any issues occurring outside the clinic were brought to the attention of clinic staff, it could jeopardize our ability to continue receiving care there. He made it clear that, for a variety of reasons, it was best not to discuss anything related to our family

11

situation within the clinic, and that as long as no concerns were raised, everything would proceed without issue.

41. The children also see a dentist. Like with their schools, I am worried that if Petitioner contacts the office, we will lose access and have no replacements if we are no longer able to continue with them. Before finding this provider, we had visited several dentists, but none were able to effectively treat my children. M.F. vomited during two visits, and B.F. was too anxious to remain calm in the chair. I felt increasing pressure to find someone who could provide proper dental care. Eventually, someone referred me to this current dentist, who is known for offering longer appointments and creating a more engaging, child-friendly environment. The children have now been there several times and actually look forward to going and they see it as a positive experience.

42. I fear that if Petitioner finds out where they are seen and contacts the dentist, the dentist will require a signed consent form from the Petitioner in order to continue treatment. That is not something I believe the Petitioner would ever provide. If that happens, my children will be left without a dentist. It would be a significant loss, as this provider gives the children unusually generous time and attention, making routine dental work something they feel safe and excited about which is something I have not found anywhere else.

**IV.    Housing and Community Disruption**

43. I previously rented a basement apartment in Monsey and paid three months' rent in advance. However, after the first month, the landlord began asking questions and informed me that the Petitioner had been contacting him. He claimed he was being harassed and said he could no longer deal with the disruption. He wanted us out of the apartment.

44. Due to my affiliation with a small Hasidic sect, I have often relied on others within the community to serve as points of contact for securing essentials such as housing and religious private education. These individuals have gone out of their way to help for the sake of the children, who are bright, kind, and deserve the opportunity to thrive. I left the Monsey apartment the day before formal eviction proceedings could begin. By that time, the smear campaign initiated by the Petitioner had become widely known within the community where I was trying to rebuild our lives. Combined with the existing difficulties I already faced as an outsider, this made it virtually impossible to secure stable housing or build lasting foundations. I was left with no choice but to rely on the support of a few generous individuals who stood by me during this extremely difficult period.

45. After leaving Monsey, I was unable to find any landlord in the area willing to rent to me. In order to secure my next place, Rabbi Kohn had to step in. He paid the deposit and personally assured the landlord that I would vacate by a specific date. Eventually, I was able to relocate to my current residence. Since moving to our current residence, we have finally experienced some stability. Petitioner does not know our address, and I strongly believe that revealing our location would again put the children at risk. Further, in January 2024, the Petitioner told me that her attorney, Mr. White, advised her to ensure that my children never become settled, and to actively undermine any support or stability we manage to establish. She claimed that if she succeeded in doing so, Mr. White would handle the rest and secure custody. This aligns with her continued efforts to interfere with our support network and also potential witnesses in this case. I believe her actions are not motivated by concern for the children, but rather by a strategy to destabilize our lives in hopes of gaining an advantage in this case.

**V.     Conclusion**

46. Petitioner has a clear pattern of contacting schools, medical providers, landlords, and family members to interfere with our lives. Her actions have caused my children to lose schooling and disrupted their well-being.

47. If she is given information about where we live, the children's current school or medical providers, I have every reason to believe she will do the same thing again. Several institutions have already made it clear to me without directly telling me that they will not remain involved if there is any legal disruption or parental conflict. My children finally have a stable life and are already accepted in the same school system for the upcoming 2025-2026 academic year, yet just one phone call from the Petitioner to their school or medical providers will have a detrimental effect and ruin that stability.

48. My children finally have a stable and happy life, thank God—they are thriving. Any disruption at this stage could trigger a domino effect, unraveling the stability we have worked so hard to achieve. Everything in their lives is tightly interconnected, and disturbing one element could have far-reaching consequences for their well-being.

49. Based on everything described above, I believe with certainty that if Petitioner gains access to the children's information, she will immediately resume the same pattern of interference that has already resulted in the loss of schools, disrupted therapy services, and housing for the children. The institutions currently supporting the children are small, private, and highly sensitive to outside conflict. If they are contacted or drawn into this litigation, there is a very real risk that they will disengage, leaving my children without education, without care, and without the stability they have only recently begun to experience for the most part of the last year. Disclosure of this information would expose my children to imminent and irreparable harm.

15

50. I respectfully request that the Court issue a protective order preventing disclosure of the children's current address, school and medical information to Petitioner, in order to protect their education, care, and overall stability and assuring they're continuing thriving to success with the help of God blessed be he!

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: August 1, 2025
New York

_____
Yakov Felberbaum