**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In the Matter of B.F. and M.F.,    )
    )
P.F.    )
    )    No. 7:24-cv-2333 (PMH) (VR)
    Petitioner,    )
    )
vs.    )    **JOINT PRETRIAL ORDER**
    )
Y.F.    )
    )
    Respondent.    )
_____)

        The parties having conferred among themselves and with the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule"), the following statements, directions, and agreements are adopted as the Pretrial Order herein.

**<u>Parties and Counsel</u>**

_Parties:_

1. P.F., Petitioner
2. Y.F., Respondent

_Counsel:_

1. Menachem Mendel White, Esq.
   White Law Group

   4 Brower Avenue, Suite 3
   Woodmere, NY 11598
   347-628-5440
   mwhite@wwlgny.com
   _Attorneys for Plaintiff_

2. Richard Min, Esq.
   Michael Banuchis, Esq.
   Green Kaminer Min & Rockmore LLP
   420 Lexington Avenue, Suite 2821
   New York, New York 10170
   (212) 681-6400

rmin@gkmrlaw.com
mbanuchis@gkmrlaw.com
*Attorneys for Respondent*

**Statement of Jurisdiction**

**Petitioner's Claims**

Israel is the home state of the children.

The children were born in the United States. However, the parties agreed to move to Israel and were there for approximately four (4) years with the children living in Israel, attending school there, having doctors there, using Israeli health insurance and so on.

The father also applied to become an Israeli citizen but did not finish the process. The mother and children are all Israeli citizens.

When the father took the children to the US, the father bought round trip tickets, showing his intent to return.

The father unilaterally stayed in the United States, kidnapping the children from the Petitioner's custody.

The father was arrested for domestic violence in Israel for assaulting the mother.

No orders of protection were ever sought by the father against the mother and it is believed this the father is attempting to use mental health allegations as a weapon and not a shield.

The Hague Convention provides the following relief for the Plaintiff:

1. The immediate return of the children to Israel
2. Ordering the father to pay for all court costs regarding the case, including but not limited to attorneys fees, courts costs, transcripts et al.
3.

**Statement of Relief Sought**

Petitioner is respectfully seeking an Order following the evidentiary hearing directing that the subject Children be returned to Israel and allow the Israeli courts to decide this case.

Respondent is respectfully seeking for the Petition to be denied, enabling the Children to remain in New York and to have the New York Family Court determine any issues related to custody.

1)  Petitioner's Requests, Caselaw and Responses to Respondent's Affirmative Defenses:

2)  The United States and Israel have been treaty partners under the Hague Convention since December 1, 1990.  U.S. Dept. of State[1].

3)  The parties are divorced, upon information and belief and have 2 children of the marriage, B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015.

4)  Petitioner was exercising valid rights of custody over B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015 in Bnei Brak, Israel, within the meaning of Articles Three and Five of the Hague Convention, prior to the wrongful retention of B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015 by Respondent in New York commencing in April. 2022.

5)  Pursuant to Article 12 of the Convention, [w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

6)  Less than one year elapsed from the date of the Respondent's wrongful retention of B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015, beginning on or about April 7, 2023 to the filing of this case.

7)  It is agreed that the children were born in New York. However, the parties moved to Israel (made aliya) in 2019 and lived there for 3 years while the children attended school in Israel, saw doctors there and made friends.

---

[1] http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html

8)  Furthermore, the children had Israel medical insurance and received aid from the government financially as citizens with the petitioner.

9)  The children are citizens of Israel and the United States. However, Israel seems to be in support of the children being returned.

10) Furthermore, the children were in school in Israel for over 3 years.

11) The Respondent has kept the children's school, address and all personal information from the Petitioner mother and the mother hasn't spoken to the children in over a year. The Respondent has done everything in his power to alienate the children from the mother.

12) The father kidnapped the children in April, 2023 when the father stated he was taking the children to New York for Passover and never came back.

13) Tickets were bought for round trip but the return trip has never occurred.

14) The central remedy under the Hague Convention is the return of the child to his or her **habitual residence**. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).

15) The Supreme Court ruled in *Abbott* that

> The Hague Convention provides that [t]he removal or the retention of the child is to be considered wrongful where (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Abbott*, 560 U.S. at 8 quoting Hague Convention, Art. 3.

16) Therefore, to establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must demonstrate by a preponderance of the evidence that

(1) the child was habitually resident in one State and has been removed to or retained in a different State;

(2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and

(3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005).

17) Once a petitioner establishes a *prima facie* case, the child must be returned to the place of habitual residence unless "one of the affirmative defenses set forth in Articles 12, 13, and 20 applies." *Cruvinel v. Cruvinel*, No. 19-CV-4237 (LDH) (SIL), 2022 WL 757955, at 5 (E.D.N.Y. Jan. 10, 2022).

18) In determining a child's habitual residence, the "court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In re the Application of: Idalia Dominguez Ochoa**, 2025 WL 2172646 (S.D.N.Y., 2025).**

19) In making this determination, the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child." *Gitter*, 396 F.3d at 134. Importantly, Courts have rejected finding that a new country is a child's habitual residence where the move of children was "of a 'trial nature' and 'conditional.' " *Ermini v. Vittori*, 758 F.3d 153, 162 (2d Cir. 2014).

20) When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Id*. quoting Hague Convention, Arts. 4, 12.

21) The father has been arrested in Israel for domestic violence against the Petitioner and an order of protection was granted in Petitioner's name.

22) The parties reconciled and they got back together and lived together until April, 2023.

23) A child's habitual residence may turn on a variety of facts, none of which will be dispositive in every case. *Monasky*, 589 U.S. at 78. These include "where a child has lived, the length of time there, acclimatization, and the purposes and intentions of the parents." *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020).

24) By approaching the habitual residence determination with "maximum flexibility," courts can stay faithful to the "core premise" of the Convention to ensure that custody determinations are made in the child's home country. *Monasky*, 589 U.S. at 72, 79.

25) When considering habitual residence, especially for younger children, "the intentions and circumstances of caregiving parents are relevant." *Monasky*, 589 U.S. at 78; *see also Gitter*, 396 F.3d at 135 (the parties' "shared intent" is relevant but not dispositive). The parents' intent can be determined through "actions as well as declarations." *Gitter*, 396 F.3d at 134.

26) Although an "actual agreement" is not required to establish habitual residence, *Monasky*, 589 U.S. at 76, where a petition alleges that a child's habitual residence has changed from one country to another, the parties' "latest shared intent" is instructive, *Gitter*, 396 F.3d at 134.

6

27) To assess whether the parties intended to change a child's habitual residence, courts consider "whether the parents formed a shared, settled intention to abandon the child's previous habitual residence" and "whether the parents have mutually intended that the child acquire a new habitual residence in a new location." *Matter of E.Z.*, No. 1:21-cv-06524, 2021 WL 5106637, at *19 (S.D.N.Y. Nov. 2, 2021); *see also Ermini v. Vittori, 758 F. 3d 153, 159 (2d Cir. 2014)* (assessing parents' "settled intent").

28) Conditional intent dependent on future circumstances is insufficient to change a child's habitual residence. *See Gitter, 396 F.3d at 135*.

29) In this case, the parties never agreed to relocation and the only reason the father went to New York was through deceit and trickery.

30) The habitual residence is therefore Israel for the children.

31) It is shocking that a party can say a 4 year move, with the father applying for Israeli citizenship, was temporary. (See Answer of father).

1. Affirmative Defenses should be denied

1) If the petitioner meets the *prima facie* burden to establish wrongful retention or removal, the respondent may raise one or more of several defenses established by the Convention and outlined by ICARA. *See Golan, 596 U.S. at 670–71, 671 n.2*; 22 U.S.C. § 9003(e)(2).

2) Furthermore, even if a defense is sufficiently established, the Court maintains equitable discretion to nonetheless order return of the child in "exceptional cases." *Swett, 733 F. Supp. 3d at 293*.

3) That is because "[e]stablishing a defense merely lifts the Convention's return requirement" but "does not *forbid* return." *Id.* (emphasis in original).

4)  As relevant to this action, a respondent may raise the affirmative defense of consent pursuant to Article 13 of the Convention. *Morales v. Restrepo,* 2025 WL 939294 (EDNY, 2025) citing 22 U.S.C. § 9003(e)(2).

a.  Argument against affirmative defenses

Grave risk of harm to the children doesn't exist.

1)  As stated above, the Respondent was the person arrested for domestic violence and no evidence has been shown the mother was arrested or that any orders of protection were ever brought against the mother in Israel prior to the wrongful removal of the children from Israel to New York.

2)  A respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by 'clear and convincing evidence.' Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the country of habitual residence." *Id*. at 672. (what is this citing to?)

3)  "The level of risk and danger required to trigger this exception has consistently been held to be very high." *Norden–Powers v. Beveridge,* 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000).

4)  The Second Circuit has stressed that a "grave risk" of harm "does not exist when repatriation 'might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences. *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014).

5)  A grave risk of harm "exists when repatriation would make the child 'face a real rick of being hurt, physically or psychologically.' *Id.*

6)    The potential harm 'must be severe,' and there must be a probability that the harm will materialize. *Id*.

7)    No proof of abuse by the mother to the children has been espoused or proven.

8)    At the same time, *Souratgar* did hold that "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id*. at 104.

9)    The Respondent will not be able to prove grave risk of harm to the children if they were to be returned to Israel.


### Mature child and child's position affirmative defenses should be denied


1)    The burden is on the Respondent by a Preponderance of the evidence. 22 U.S.C. 9003 (e)(2)(B).

2)    The children are now 11 and 9 years old. However, they were 9 and 7 when they were kidnapped from Israel and the mother's custody by the father with limited, if any contact with the Petitioner mother since the kidnapping.

3)    A court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Velozny on behalf of R.V. v. Velozny*, 550 F. Supp. 3d 4 (S.D.N.Y. 2021), *aff'd*, No. 21-1993-CV, 2021 WL 5567265, at *22 (2d Cir. Nov. 29, 2021).

4)    A relevant question for the court is whether the children are "of sufficient age ... [and] of sufficient maturity for [their] views about return to be given weight." *Swett v. Bowe*, 733 F. Supp. 3d 225, 271 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024).

5)     Indeed, "there is no precise age at which a child will be deemed sufficiently mature under the Convention." *Id*. The child's maturity is "a question for the district court, to be determined upon the specific facts of each case." *Id*.

6)     There is undue influence as the father has cut the children from their mother, has hidden his address, the schools of the children and almost all of the information about the children's lives for over 2 years.

7)     Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." *Swett v. Bowe,*

8)     Under Article 13, a "child's views concerning the essential question of [his or her] return or retention may be conclusive" provided the child has "attained an age and degree of maturity sufficient for its views to be taken into account. Elisa Pérez-Vera, Hague Convention *on the Civil Aspects of International Child Abduction: Explanatory Report* ¶ 30 ("Pérez-Vera Report"); *see Gitter, 396 F.3d at 129 n.4* (recognizing Pérez-Vera Report as "an authoritative source for interpreting the Convention's provisions").

9)     However, it bears emphasis that the Convention merely calls for a court to "take account of" a mature child's objection to return, not to accede to it automatically. *Haimdas v. Haimdas, 720 F.Supp.2d 183* (EDNY, 2010).

10)    Further, a court always retains discretion to order repatriation notwithstanding the applicability of any Hague Convention exception if that would best fulfill the purposes of the Convention; the discretionary aspect is particularly important with respect to the mature child exception "because of the potential for undue influence by the person who allegedly wrongfully retained the child." Hazbun Escaf, 200 F.Supp.2d at 615.

11)    "[I]t would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against [his or her] will." Pérez-Vera Report ¶ 30. However, "the exception must be construed narrowly so its application does not undermine the express purposes of the Convention." *Velozny*, 550 F. Supp. 3d at 22 (cleaned up) (citing *Yang v. Tsui*, 499 F.3d 259, 278 (3d Cir. 2007)).

12)    And "proving that the defense applies is not dispositive; courts ultimately retain discretion to order repatriation despite that showing." *Id.*; *see* *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) ("[A] district court can decline to order return of a wrongfully retained or removed child on [this] ground alone.").

13)    In *Tsai–Yi Yang v. Fu–Chiang Tsui*, the 3rd Circuit Court ruled that [e]ven if the record supported a finding that [respondent] met his burden of proving the applicability of the exception to this case, it cannot be said that the District Court abused its discretion by refusing to apply the exception," because that "would reward [respondent] for violating [petitioner's] custody rights, and defeat the purposes of the Convention. *Tsai–Yi Yang v. Fu–Chiang Tsui,* 499 F.3d 259, 280 (3rd Cir.2007).

14)    In *Giampaolo v. Erneta*, the District Court ruled that:

the Child has been in the United States with Respondent exclusively for over two (2) years. The Child only recently saw Petitioner on August 11, 2004, when Petitioner came to the United States for this evidentiary hearing. Naturally, the Child is now accustomed to the United States and has been influenced by Respondent's preference for her to remain here. The Child appears to have internalized Respondent's views about the possibility of being returned to Argentina and being around Petitioner.

> The Court does not wish to imply that the Child expressed no independent thoughts, but the testimony of the Child must be weighed and considered in its entirety.

*Giampaolo v. Erneta*,  390 F.Supp.2d 1269 (NDGA, 2004).

15)    Jeremy Morley has stated that the result may seem harsh because the objecting child was both old enough and mature enough. However, the passage of time and amount spent after the abduction occurred had presumably influenced the child[2].

16)    Expression of a *preference* to remain in the respondent's country is not enough ... to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return." (internal quotation marks omitted)); *Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004).

17)    Additionally, the courts have ruled that the fact that the [13-year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sport activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."). In addition, "[t]he exception must not be applied where the opinion of the child is the product of undue influence by either parent." *Matovski v. Matovski*, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007).

2.    The expert should not be allowed to testify as it is unethical and illegal under New York penal law.

---

[2] The Hague Abduction Convention: Practical Issues and Procedures for Family Lawyers, By Jeremy D Morley Fourth Edition, Page 232.

3.      Then children's psychologist should not be allowed to testify because no proof of this therapist being an expert has been produced nor has a cv or report been provided to Petitioner.

      1)   Under New York penal law [i]t is a misdemeanor for an unlicensed person to "use the title '**psychologist**' or to describe his services by the use of the words '**psychologist**', 'psychology' or 'psychological' in connection with his practice" (Education Law §§ 7601, 6513[1]). *People v. Abrams*, 177 A.D.2d 633 (2d Dept, 1991).

      2)   In this case, the expert of the Respondent is only admitted as a psychologist in Oregon and is not admitted as a psychologist in New York and forensics includes the practice of psychology. Respondent refused to hire a New York admitted Psychologist in this case and therefore, should not allow a crime to occur by using said therapist, especially as it is against the rules of ethics of psychology.

## Respondent's Responses to Petitioner's Claims and Affirmative Defenses

Respondent answers Petitioner's claims and asserts affirmative defenses as follows:

Respondent denies that Israel was ever the Children's habitual residence, as their habitual residence never shifted from the United States. Petitioner may not invoke the protections of the Hague Convention if the Children's habitual residence was the United States. *See Heydt-Benjamin v. Heydt-Benjamin,* 404 F. App'x 527 (2d Cir. 2010) (affirming dismissal of petition where children's habitual residence was the United States); *Mota v. Castillo*, 692 F.3d 108, 113 (2d Cir. 2012) (stating that "the Child must have been removed to or retained in a Contracting State other than her State of habitual residence for the Convention to apply").

1.      The parties' stay in Israel was for a "trial period" which failed. Where a family agrees to take up residence in a new country on a trial or conditional basis, however, courts have declined to find a change in habitual residence despite the potentially indefinite duration of the

move. *See Papakosmas v. Papakosmas*, 483 F.3d 617, 625-26 (9th Cir. 2007) (conditional intent based on parents' employment and housing arrangements); *Gitter,* 396 F.3d at 135 (affirming the district court's finding of no shared intent because "Mr. and Mrs. Gitter 'only mutually agreed to move to Israel on a conditional basis-namely, that Mrs. Gitter would be satisfied with the new arrangements'") (*citing Gitter v. Gitter*, 03–CV–3374, 2003 WL 22775375, at *4 (E.D.N.Y. Nov. 20, 2003)); *Prinz v. Faso*, 03–CV–6653, 2004 WL 1071761, at *5 (W.D.N.Y. May 12, 2004) (finding that one of the reasons the parties did not have shared intent regarding their child's habitual residence is that they arrived into the foreign country with "very different intentions and expectations": "while [petitioner] may have understood the relocation to Germany to be permanent, or at least indefinite, [respondent] believed that the parties had agreed that if either family member was unhappy in Germany, the family could and would return to the United States").

Even if this Court finds that Israel was the Children's habitual residence, the Convention provides that return is not required if "[t]here is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b). "[A] grave risk of harm" from repatriating the child to the country of habitual residence arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (internal quotations omitted).

The Convention "is designed to protect the interests of children and their parents," *Lozano v. Montoya Alvarez*, 572 U.S. 1, 19 (2014) (Alito, J., concurring), and children's interests may point against return in some circumstances. The Convention explicitly recognizes that the child's interest

in avoiding physical or psychological harm, in addition to other interests, "may overcome the return remedy." *Id*. at 16 (majority opinion) (cataloging interests). Courts must remain conscious of this purpose, "bearing in mind that the Convention sets as a primary goal the safety of the child." *Golan v. Saada*, 596 U.S. 666, 668 (2022).

In the instant case, the Children have PTSD due to Petitioner's abusive treatment of them in Israel. PTSD has been cited as a grave risk barring return. *See, e.g. Saada v. Golan,* 712 F. Supp. 3d 361, 376 (E.D.N.Y. 2024) (PTSD diagnosis satisfies standard of proof sufficient to defeat petition). To that point, the Court's task in determining "grave risk" is not to determine whether psychological harm is a certainty but whether there is a risk of harm. *See Souratgar*, 720 F.3d at 103 (grave risk determination includes both "the magnitude of the potential harm" and "the probability that the harm will materialize"); *Blondin v. Dubois*, 238 F.3d 153, 160 (2d Cir. 2001) (accepting "uncontroverted" report from psychiatrist recommending that "if the children were returned to France with or without their mother and even if they could avoid being in the same domicile as their father [ ] they would almost certainly suffer a recurrence of their traumatic stress disorder (i.e. post-traumatic stress disorder) that would impair their physical, emotional, intellectual and social development"), abrogated on other grounds by *Golan v. Saada,* 596 U.S. 666 (2022); *Reyes Olguin v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094, at *7 (E.D.N.Y. Jan. 13, 2005) ("Here, there is uncontroverted expert testimony that the children are at great risk of severe psychological damage if they are returned to Mexico.").

The Petition should also be denied due to a provision of Article 13 which allows a court to refuse repatriation of a child based solely upon a child's wishes. Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take

account of [his or her] views." *Swett v. Bowe*, 733 F. Supp. 3d 225 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024). Under Article 13, a "child's views concerning the essential question of [his or her] return or retention may be conclusive" provided the child has "attained an age and degree of maturity sufficient for its views to be taken into account." Elisa Pérez-Vera, *Hague Convention on the Civil Aspects of International Child Abduction: Explanatory Report* ¶ 30 ("Pérez-Vera Report"); *see Gitter*, 396 F.3d at 129 n.4 (recognizing Pérez-Vera Report as "an authoritative source for interpreting the Convention's provisions"). Here, the Children wish to remain in the United States due to the abuse they suffered in Israel, and they have attained an age and degree of maturity at which it is appropriate to take their views into account.

## Jury or Bench Trial

The above-referenced case is to be tried without a jury and is scheduled for two (2) trial days, October 27 and 28, 2025. At this time, the parties do not believe that more than two (2) days will be required for trial in this matter.

## Consent to Trial by a Magistrate Judge

Both parties have not consented to trial of the case by a Magistrate Judge.

## Deposition Testimony

The parties have not conducted depositions in this matter as of this submission.

## Stipulations

The parties agree to the following statements of fact:

(1)     The Respondent Y.F. (the "Respondent" or "Y.F.") is the subject Children's father.

(2)     The Respondent is a United States citizen.

(3)     The Petitioner, P.F. (the "Petitioner" or "P.F.") is the subject children's mother, who is an Israeli and American citizen.

(4)    The parties are the parents of the two (2) children, M.F and B.F (the "Children").

(5)    The Children are dual citizens of the United States and Israel.

(6)    The parties were married on November 2, 2011, in Bnei Brak, Israel.

(7)    In October 2012, the couple moved to the United States, establishing their home and starting a family in New York.

(8)    The parties' first child, B.F. was born on May 1, 2014, followed by the birth of M.F. on November 9, 2015.

(9)    Both Children were born in New York.

(10)    From 2012 through 2019, the family exclusively lived in New York.

(11)    On April 4, 2023, Respondent brought the Children to New York for the Passover holiday.

(12)    The Children have remained in New York since April 4, 2023

(13)    On March 27, 2024, Petitioner filed her Verified Petition pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act ("ICARA") seeking the return of the Children to Israel and alleging that the Children were wrongfully retained from Israel in the Southern District of New York.

(14)    On April 18, 2025, Respondent filed his Answer, asserting several defenses, including, *inter alia*, the Article 13(b) Grave Risk of Harm defense and the Mature-Age objection.

        The parties agree to the following statements of law:

(1)    United States District Court, Southern District of New York has jurisdiction pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

17

(2)    Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because the Children and Respondent are residing in the Southern District of New York; and because this matter involves a claim of retention of two (2) children under the age of 16 from Israel in the United States of America.

**Petitioner's Proposed Witnesses**

1. **Petitioner P.F.**
   a. P.F. can testify to the facts set forth in her Verified Petition for Return of the Children to Israel (ECF No. 10) and all facts and statements made in Respondent's Answer (ECF No. 57). Petitioner requests Petitioner be allowed to testify remotely. Petitioner's testimony is expected to last approximately two (2) hours.

2. Miriam Gross (longtime friend of the parties)
   a. She will testify about the abuse by the husband against the Petitioner and the close relationship between the mother and the children.
   b. She will also testify about the parties moving to Israel and the father's unilateral decision to move to United States.  Gross' testimony is expected to last approximately one (1) hours.

3. Doctor Yael Ratner
   a. Dr. Ratner will testify about the mother not being mentally ill, not being a danger to herself or others et al.
   b. Dr. Ratner will be testifying via video and the estimated length of testimony, including both direct and cross-examination is approximately three (3) hours.

**Respondent's Proposed Witnesses**

1. Petitioner, P.F.

P.F. can testify to the facts set forth in her Verified Petition for Return of the Children to Israel (ECF No. 10) and all facts and statements made in Respondent's Answer (ECF No. 57). We

understand that P.F. will be testifying remotely, and her cross-examination is expected to last approximately two (2) hours.

2. <u>Respondent, Y.F.</u>

Y.F. will testify with regard to all facts set forth in his Answer (ECF No. 57) to Petitioner's Verified Petition for Return of the Children to Israel (ECF No. 10). Y.F. will be testifying in-person and the estimated length of testimony, including both direct and cross-examination is approximately three (3) hours.

3. <u>Dr. Harry Szachtel</u>

Dr. Szachtel is designated as an expert witness for the Respondent. He is expected to testify with regard to all opinions set forth in his Expert Report, and concerning any testimony or opinions proffered by Petitioner's witnesses at the hearing concerning the Children's psychological risk. Dr. Szachtel will be testifying in-person and the estimated length of testimony, including both direct and cross-examination, is approximately two (2) hours.

4. <u>Dr. Paul Stoltzfus</u>

Dr. Stoltzfus is designated as an expert witness for the Respondent. He is expected to offer testimony regarding the existence of a grave risk of harm to the Children should they be returned to Israel. He will also provide his expert opinion concerning the Children's level of maturity and whether their expressed objections to return should be taken into account by the trier of fact. Dr. Stoltzfus will be testifying in-person and the estimated length of testimony, including both direct and cross-examination is approximately three (3) hours.

**<u>Proposed Joint Witness List</u>**

| Witness | Objection | Basis for Objection |
|---------|-----------|---------------------|
| **Petitioner's Witnesses** | | |

| | | |
|---|---|---|
| Perl Felberbaum | | |
| Miriam Gross | | |
| Doctor Yael Ratner | | |
| Petitioner reserves the right to call any individual identified by Respondent and not objected to by Petitioner. | | |
| Petitioner reserves the right to call any individual necessary for rebuttal. | | |
| Petitioner reserves the right to call any witnesses necessary to authenticate, or lay the foundation for, any document Petitioner might rely upon at trial. | | |
| **Respondent's Witnesses** | | |
| Perl Felberbaum | | |
| Yakov Felberbaum | | |
| Dr. Harry Szachtel | **X** | **No CV or other proof showing he is an expert has been provided in this case.** **Also not relevant or reliable.** |
| Dr. Paul Stoltzfus | **X** | **Not admitted to practice in the State of New York.** **Would allow a crime to be committed by allowing a non admitted psychologist to work in New York State** |
| Respondent reserves the right to call any individual identified by Petitioner and not objected to by Respondent. | | |
| Respondent reserves the right to call any individual necessary for rebuttal. | | |
| Respondent reserves the right to call any witnesses | | |

| | | |
|---|---|---|
| necessary to authenticate, or lay the foundation for, any document Respondent might rely upon at trial. | | |

**Proposed Joint Exhibit List**

| Exhibit # | Description | Objection | Admitted Date |
|---|---|---|---|
| **Petitioner's Exhibits** | | | |
| **1** | **Amended Petition of Petitioner** | **FRE 802** | |
| **2** | **Marriage Certificate of parties** | | |
| **3** | **Hague Convention Application** | **FRE 802** | |
| **4** | **Cover Letter from State of Israel** | **FRE 802** | |
| **5** | **CV of Expert** | Subject to the Expert Testimony Rules in FRE 702, 703 and 705. | |
| **6** | **Expert report of psychiatrist** | **FRE 802** | |
| **Respondent's Exhibits** | | | |
| 1. | Respondent U.S. Passport | **None** | |
| 2. | Confirmation of Respondent's Non-Acquisition of Israeli Citizenship | **FRE 802** | |
| 3. | Petitioner U.S. Certification of Naturalization, dated December 7, 2018 | | |
| 4. | B.F. U.S. Passport | **None** | |
| 5. | M.F. U.S. Passport | **None** | |
| 6. | Children's U.S. Birth Certificates | **None** | |
| 7. | Children's New York State ID Cards | **None** | |
| 8. | Parties' New York State Drivers License | **None** | |
| 9. | Screenshot of Respondent's Travel Restriction to Israel, dated April 29, 2024 | **None** | |
| 10. | Email between Respondent and Harry Szachtel, dated October 19, 2023 | **FRE 802** | |
| 11. | PTSD Diagnosis of Children, dated November 16, 2023 | **FRE 402, 702, 703, 802, 901** | |

| | | | |
|---|---|---|---|
| 12. | Email from Alley Valley, dated January 27, 2025 | **FRE 402, 702, 703, 802, 901** | |
| 13. | M.F. Alley Valley Crisis Plan, dated October 10, 2024 | **FRE 402, 702, 703, 802, 901** | |
| 14. | B.F. Alley Valley Crisis Plan, dated October 10, 2024 | **FRE 402, 702, 703, 802, 901** | |
| 15. | B.F. Alley Valley Crisis Plan, dated April 10, 2025 | **FRE 402, 702, 703, 802, 901** | |
| 16. | B.F. Dentist Referral for Therapy, dated June 7, 2024 | **FRE 402, 702, 703, 802, 901** | |
| 17. | M.F. Dentist Referral for Therapy, dated June 7, 2024 | **FRE 402, 702, 703, 802, 901** | |
| 18. | Letter from Rehab Clinic re Petitioner's Difficulties with Children, dated March 16, 2022 | **FRE 402, 702, 703, 802, 901** | |
| 19. | Letter from Petitioner's Psychiatric Doctor, dated May 25, 2022 | **FRE 402, 702, 703, 802, 901** | |
| 20. | Letter from Treatment and Rehab Clinic re Petitioner's Admission, dated January 25, 2023 | **FRE 402, 702, 703, 802, 901** | |
| 21. | Emails from Respondent to Israeli CPS Requesting Meeting, dated February 20, 2023 | **FRE 802** | |
| 22. | Respondent's Email to Petitioner's Therapist, dated April 25, 2023 | **FRE 802** | |
| 23. | Letter from National Insurance re Petitioner's Medical Diagnosis, dated June 12, 2023 | **FRE 402, 702, 703, 802, 901** | |
| 24. | Letter from Petitioner re Seeking Psychological Help, dated October 12, 2023 | **FRE 402, 702, 703, 802, 901** | |
| 25. | Rockland County Executed Order to Show Cause, dated November 21, 2023 | **FRE 802** | |
| 26. | Police Report in Spring Valley, dated December 15, 2024 | **FRE 401, 402, 403, 404, 405, 602, 802** | |
| 27. | Letter re Petitioner's First Son, dated July 5, 2022 | **FRE 802** | |

| | | | |
|---|---|---|---|
| 28. | Mental Evaluation for Petitioner's First Son, dated July 7, 2022 | **FRE 402, 702, 703, 802, 901** | |
| 29. | Letter re Petitioner's First Son, dated September 20, 2022 | **FRE 802** | |
| 30. | Mechon L'Hoyroa Arbitration Agreement, dated May 24, 2020 | **FRE 802** | |
| 31. | Invoice from Mechon L'Hoyroa, dated May 24, 2020 | **FRE 402, 702, 703, 802, 901** | |
| 32. | Letter from Rabbinical Court | **FRE 802** | |
| 33. | Pre Divorce Summons | **FRE 401** | |
| 34. | Decision in Israeli Divorce Proceedings, dated December 29, 2024 | **FRE 802** | |
| 35. | Letter from B.F's Teacher to B.F. | **FRE 802** | |
| 36. | Letters to B.F. from Classmates in US | **FRE 802** | |
| 37. | Collage of Photos of Children's Life in Israel | **FRE 402, 702, 703, 802, 901** | |
| 38. | Collage of Photos of Children's Life in United States | **Need these provided first to make decision** | |
| 39. | Lease Agreement in Monsey, dated July 1, 2018 to June 30, 2020 | **FRE 402, 702, 703, 802, 901** | |
| 40. | Lease Agreement in Monsey, dated August 1, 2020 to July 31, 2022 | **FRE 802** | |
| 41. | Petitioner's Debtors' Statement, dated January 2023 | **FRE 802** | |
| 42. | Discharge of Debtor and Order of Final Decree, dated February 17, 2023 | **FRE 802** | |
| 43. | Petitioner's Response to Respondent's RFA, dated June 4, 2025 | **None** | |
| 44. | Petitioner's Response to Respondent's RFP, dated June 11, 2025 | **None** | |
| 45. | Petitioner's Response to Respondent's Interrogatory Demands, dated June 11, 2025 | **None** | |
| 46. | Dr. Stoltzfus Expert Report & other materials | **FRE 802** | |
| 47. | Video Recording 5 | **FRE 901** | |
| 48. | Video Recording 2* | **FRE 901** | |

| | | | |
|---|---|---|---|
| | *Issue with translation, exhibit will be produced at a later date* | | |
| 49. | Video Recording 3*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 901** | |
| 50. | Video Recording 6*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 901** | |
| 51. | Hebrew Agreement*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 901** | |
| 52. | Notarized Document for Hebrew Agreement, dated May 26, 2020*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 901** | |
| 53. | Email from Kaput Hashchina*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 402, 702, 703, 802, 901** | |
| 54. | Emails from Respondent to Israeli CPS, dated March 3 and 15, 2023*<br>*Issue with translation, exhibit will be produced at a later date* | **FRE 802** | |

Dated: August 15, 2025
      New York, New York


By: /s/ Richard Min                              By: /s/Menachem White
Richard Min                                      Menachem White
Michael Banuchis                           Law office of Menachem White,
Green Kaminer Min & Rockmore LLP           4 Brower Avenue, Suite 3
420 Lexington Avenue, Suite 2821            Woodmere, New York 11598
New York, New York 10170                    516-504-4101
Telephone: 212-681-6400                     Mwhite@wwlgny.com
Facsimile: 212-681-6999
Email: rmin@gkmrlaw.com

*Attorneys for Respondent*                         *Attorneys for Petitioner*
Y.F.                                            P.F.