**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In the Matter of B.F. and M.F.,                )
                                               )
P.F.                                           )
                                               )
                        Petitioner,            )
                                               )
vs.                                            )              No. 7:24-cv-02333-PMH
                                               )
Y.F.                                           )
                                               )
                        Respondent.            )
_____)


## RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Richard Min
Michael Banuchis
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: 212-681-6400
Facsimile: 212-681-6999
Email: rmin@gkmrlaw.com
Email: mbanuchis@gkmrlaw.com

_ATTORNEYS FOR RESPONDENT_
_YAAKOV FELBERBAUM_

1

## TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………...…4

II.    PROPOSED FINDINGS OF FACT……………………………………5

    a.  Early Relationship and Birth of Children……………………...…………....5

    b.  Temporary Move to Israel…………………………………………………6

    c.  The Relocation of Children to New York………………………...…….....9

    d.  Petitioner's Interference in the Children's Lives…………………………...…10

    e.  Establishing the Children's Habitual Residence in New York……………..…….11

    f.  The Children's Habitual Residence Never Shifted from New York to Israel……..12

    g.  Respondent's Temporary Immigration Status in Israel………………………13

    h.  Procedural History……………………………………….…………………14

III.    CONCLUSIONS OF LAW………………………………………….15

    a.  The United States is the Children's Habitual Residence………………………16

    b.  The Children are at Grave Risk of Retuning to Intolerable Situation if Forced to Relocate to Israel……………………………………………………19

        i.  The Children Would be at a Grave Risk of Harm if Returned to Petitioner……………………………………………………....19

        ii.  The Children's Interview with Dr. Stoltzfus……………………………21

            ➢  B.F.'s Interview…………………………………………………21

            ➢  M.F.'s Interview…………………………………………………...23

            ➢  Dr. Stoltzfus Findings of Grave Risk………………………………23

        iii.  Israel is in a State of War ………………………………………………24

    c.  The Children Have Reached a Sufficient Age and Degree of Maturity for their Views to be Considered………………………………………...…………25

IV.    CONCLUSION……………………………………………………..27

## <u>TABLE OF AUTHORITIES</u>

*Anderson v. Acree,* 250 F.Supp.2d 876, 883 (S.D. Ohio 2002)………………………………..26

*Blondin v. Dubois,* 238 F.3d 153, 158 (2d Cir. 2001)…………………………………………20

*Bonilla-Ruiz v. Bonilla,* 2004 WL 2883247 (Mich. 2004)……………………………………27

*Custodio v. Samillan,* 842 F.3d 1084, 1091 (8th Cir. 2016)…………………………………...26

*Danaipour v. McLarey,* 286 F.3d 1, 17 (1st Cir. 2002)………………………………………20

*Elyashiv v. Elyashiv,* 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005)………………………………..20

*Ermini v. Vittori,* 758 F.3d 153, 164–65 (2d Cir. 2014)………………………………………19

*Gitter v. Gitter,* 396 F.3d 124, 130–31 (2d Cir. 2005)………………………………………...17

*Grano v. Martin,* 821 F. App'x 26, 27 (2d Cir. 2020)…………………………………………17

*Hofmann v. Sender,* 716, F. 3d 282 (2d. Cir. 2013)……………………………………………18

*Lozano v. Montoya Alvarez,* 572 U.S. 1, 19 (2014)…………………………………………...16

*Matovski v. Matovski,* No. 06 CIV. 4259 (PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007*)*......26

*McKenzie v. McKenzie,* 168 F.Supp.2d 47(E.D.N.Y. 2001)…………………………………...19

*Monasky v. Taglieri,* 589 U.S. 68, 76–77 (2020)…………………………………………...17, 27, 28

*Papakosmas v. Papakosmas,* 483 F.3d 617, 625-26 (9th Cir. 2007)…………………………...17

*Prinz v. Faso,* 03–CV–6653, 2004 WL 1071761, at *5 (W.D.N.Y. May 12, 2004)…………..17

*Reyes Olguin v. Cruz Santana,* No. 03 CV 6299 JG, 2005 WL 67094, at *6-8 (E.D.N.Y. Jan. 13, 2005)……………………………………………………………………………………..20

*Rodriguez v. Yanez,* 817 F.3d 466, 475 (5th Cir. 2016)………………………………………26

*Royal Borough of Kensington & Chelsea v. Bafna-Louis,* No. 23-cv-00470, 2023 WL 6867135, at *1 (2d Cir. Oct. 18, 2023)………………………………………………………………..16

*Ruiz v. Tenorio,* 392 F.3d 1247, 1254 (11th Cir. 2004)…………………………………17, 18

*Saada v. Golan,* 712 F. Supp. 3d 361, 375 (E.D.N.Y. 2024)…………………………...15, 16

*Souratgar v. Lee,* 720 F.3d 96, 103 (2d Cir. 2013)……………………………………………15

*Simcox v. Simcox,* 511 F.3d 594, 608 (6th Cir. 2007)…………………………………………20

*Tereshchenko v. Karimi,* 102 F.4th 111, 129 (2d Cir. 2024)…………………………………..24

*Walsh v. Walsh,* 221 F.3d 204, 221 (1st Cir. 2000)……………………………………………20

## I.    **INTRODUCTION**

1.    This case is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention"), and its implementing legislation in the United States, the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. ("ICARA"). Respondent, Y.F. ("Respondent" or "Y.F.") is a United States citizen and the father of the minor Children. Petitioner, P.F. ("Petitioner" or "P.F.") seeks the return of the subject Children to Israel, alleging that Respondent unlawfully retained the Children on or about April 18, 2023 in the United States.

2.    While the Parties' marriage began in Israel in 2011, they soon relocated to New York, where the Children were born and raised and where the family maintained its primary residence until a trial move to Israel in July 2019 due to relationship difficulties. That relocation was expressly intended on a temporary basis, dependent on the Petitioner's progress in mental health treatment and improvement. However, those conditions were never met. Instead, during the family's time in Israel, the Children were exposed to instability, neglect, and abuse by the hands of Petitioner which caused both of the Children to suffer from Post-Traumatic Stress Disorder (PTSD) as diagnosed by their therapist and confirmed by Respondent's expert in this case, Dr. Stoltzfus.

3.    In April 2023, with Petitioner's consent, Respondent brought the Children to New York for the Passover holiday. During this trip, Respondent was hospitalized due to a flare-up of his Crohn's disease. Circumstances in Israel, including Petitioner's unilateral abandonment of the family home, her continued harassment, and the absence of a safe, stable environment for the Children to return to, made it clear to Respondent that returning to Israel would place the Children at serious risk of harm. Since that time, the Children have resided exclusively in New York, where they have

developed meaningful social connections, engaged in therapy, and thrived academically and emotionally in a safe and stable environment under Respondent's sole care.

4.      The Children do not want to return to Israel in fear of their mother. The interests of the Children are best served by denying the Petition.

## II.    PROPOSED FINDINGS OF FACT[1]

### a.    Early Relationship and Birth of Children

5.      Respondent Y.F. (the "Respondent" or "Y.F.") is the subject Children's father. Respondent is a United States citizen. Petitioner, P.F. (the "Petitioner" or "P.F.") is the subject children's mother, who is an Israeli citizen and in December of 2018, she underwent the naturalization process to become an American citizen. The parties are the parents of the two (2) subject children, M.F (age 9) and B.F (age 11) (the "Children"). The Children are dual citizens of the United States and Israel.

6.      The parties were married on November 2, 2011, in Bnei Brak, Israel. In October 2012, the Parties relocated to the United States, establishing their home and starting a family in New York. This relocation was due to the Petitioner's ongoing and intense conflicts with her family, which had become intolerable, and by recommendation of their marriage counselor at the time and by the Grand Rabbi of Skulen[2] at the time.

---

[1]      This Factual Summary is intended to provide context for the legal analysis contained in this Proposed Findings of Fact and Conclusions of Law. It is an overview of the evidence Respondent submits will be adduced at trial. This contextual summary is not intended to be all-inclusive, nor to limit or preclude probative evidence from being adduced at trial.

[2]      The parties in this action are members of the Hasidic Jewish community. They greater community is composed of groups called Dynasties. Skulen is one of the Dynasties.

7.      From 2012 through 2019, the family resided in New York. The parties' first child, B.F. was born on May 1, 2014, followed by the birth of M.F. on November 9, 2015. Both Children were born in New York.

a.   Temporary Move to Israel

8.      In July 2019, the family temporarily relocated to Israel. The parties had agreed that their stay in Israel was for a trial period and on a conditional basis. Moreover, Respondent was never interested in returning to live in Israel; however, he wanted to make his marriage work with Petitioner and to stay together as a family. During their temporary residence in Israel, the Parties continued to maintain strong ties to New York, including holding an active lease for a family apartment, participating in legal proceedings within the state, maintaining New York State drivers' licenses, maintaining valid New York State identification cards for the Children, and preserving valid U.S. passports for them.

9.      When the COVID-19 pandemic began, the family returned to New York for several months. Prior to traveling back to Israel, the Parties executed an arbitration agreement on May 24, 2020 in New York. *See* **Exhibit 30.** Under the terms of the agreement, Respondent consented to return to Israel with the Children solely on a trial basis. This arrangement was expressly contingent upon Petitioner's mental health showing improvement and her consistent adherence to prescribed medication. Respondent later came to realize that, unfortunately, that did not occur. To the contrary, Petitioner's behavior became increasingly erratic and dangerous.

10.     In Israel, Petitioner was diagnosed with several psychiatric disorders, including depression, anxiety, and attention deficit hyperactivity disorder ("ADHD"). *See* **Exhibit 20.** Throughout the course of the relationship, Petitioner engaged in various abusive behaviors toward the minor Children, such as physical abuse and withholding food as a form of punishment. On

multiple occasions, neighbors found the Children wandering the streets searching for food. When confronted, Petitioner instructed the neighbors not to provide food, stating that the children were being disciplined.

11.     Furthermore, Petitioner often isolated Respondent by locking him in a room while she mistreated the children. During these episodes, Respondent was unable to intervene and could hear the children crying out for help. On one particularly traumatic occasion, Respondent found Petitioner choking their minor son, M.F. Respondent immediately intervened to stop the assault and protect the child. This horrifying incident led to a family friend reporting to the Israeli Child Protective Services that the Children were in danger.

12.     This choking incident specifically proved beyond all doubt that Petitioner's mental state was not improving during their trial residency in Israel and that she was a danger to the Children. It was a tipping point in the Parties relationship. The trial run in Israel failed in its entirety, however, the circumstances did not allow for Respondent and the Children to leave. Respondent remained in Israel at that time because he did not want to leave the Children behind with Petitioner due to fear for their safety. Petitioner also denied Respondent access to his passport.

13.     On August 3, 2020, Petitioner served Respondent with a pre-divorce summons in Jerusalem Rabbinical Court. Along with the pre-divorce summons was a travel restriction imposed on Respondent by Petitioner, preventing him from traveling outside of Israel without Petitioner's consent. Given that the Parties had previously entered into the arbitration agreement in New York approximately three (3) months prior, Petitioner violated their arbitration agreement by taking legal action against Respondent in Israel. In September of 2020, the parties agreed to put their divorce on hold and work on their marriage in counseling. They attended marriage counseling

together until approximately the end of 2021. Over the course of their marriage, they ultimately attended over a dozen marriage counselors, both in the United States and Israel.

14.    The parties continued working on their marriage for the sake of the Children until approximately September 2022 when they ultimately decided to separate. While separated, the Parties continued to reside in the same residence. However, Petitioner would stay at her parents' home frequently, leaving Respondent as the sole caretaker for the Children.

15.    During their time in Israel, the parties maintained their ties to New York as it was always the intention of the Respondent to return. In 2020, Respondent and the Children traveled to New York for several months. Respondent maintained a lease for an apartment in New York from July 1, 2018 to June 30, 2020, and subsequently entered into another lease for an apartment in New York from August 1, 2020 to July 31, 2022 for the family, knowing they would always return to New York.

16.    In November 2022, the parties came into financial difficulty and made the choice to file for joint bankruptcy in New York, not Israel. The parties were granted relief on their bankruptcy filing based on the fact that they had never gave up residency in New York. In the discharge of debtor and order for final decree filed by the Southern District of New York Bankruptcy Court on February 17, 2023, both parties' address was listed as 185 Park Lane, Monsey, NY 10952-0551. *See* **Exhibit 42.**

17.    During the family's time in Israel, the Petitioner's son from her first marriage, now 18 years old (DOB: 06/10/2007), resided in the household. His behavior toward the Children has been consistently aggressive and concerning. A letter from the counseling center where he receives treatment states that "his behavior at home has, over time taken on a violent character, primarily verbal, particularly toward his brother and sister from the second marriage." *See* **Exhibit 29**.

Additionally, a letter from the administration of the school he attended describes his emotional instability and recommends intensive emotional support, noting that "his emotional state is unstable; he erupts and becomes upset over the smallest things." *See* **Exhibit 27.** A psychiatric evaluation further highlights the severity of the situation, stating that "he exhibits a low frustration threshold and may threaten his siblings. He may even threaten his parents." *See* **Exhibit 28**. Given the documented instability, aggression, and violent tendencies of the Petitioner's son, it is unsafe for the subject Children to reside in the same household with him.

    b.  <u>The Relocation of Children to New York</u>

18.    On April 4, 2023, with Petitioner's consent, Respondent brought the Children to New York for the Passover holiday. During this trip, Respondent was hospitalized due to a flare up of his Crohn's disease, resulting in an extension of the trip. However, throughout this period, Petitioner disposed of all of Respondent's belongings, moved out of the family home and moved to a different district in Israel. Due to her unilateral relocation, the Children no longer had a residential address for school enrollment purposes and thus would have nowhere to live or attend school upon their hypothetical return to Israel. Upon information and belief, the residence was occupied by a different family by September of 2023.

19.    While Respondent had return flights booked for April 25, 2023, during this trip, it became apparent to Respondent that it was in the best interests of the Children to remain in New York due to the Children's prior experiences of chaos, emotional distress, and abuse at the hands of their mother, which persisted until Respondent returned to the United States with the Children. He remained conflicted throughout the summer but ultimately concluded that, in the best interests of the children, it would not be appropriate to return to Israel or to be in the presence of the Petitioner.

20.    While Respondent was still hospitalized, Petitioner's verbal, emotional, and psychological harassment intensified considerably. Instead of showing concern for his well-being, she fixated on pressuring others to send the Children to her care in Israel, despite having repeatedly stated over the years that she was incapable of managing them alone. Respondent found this particularly distressing given her prior conduct, including a deeply traumatic incident in which she attempted to choke M.F. Respondent was only able to intervene and prevent serious harm after B.F. screamed for help.

21.    Throughout the Children's childhood, Respondent had been the sole caregiver, and it was clear that placing the Children with Petitioner would be unsafe. After the choking incident, Israeli Child Protective Services had explicitly warned Respondent that if the Children were found alone with Petitioner without his supervision, they could permanently lose custody.

22.    In May 2023, Respondent enrolled M.F. in the Vishnitz[3] School in Monsey and B.F. in Bais Trany's summer camp. Respondent intended for the Children to remain enrolled in these schools for the 2023-2024 academic year. Both Children were very happy in their respective schools and began developing meaningful friendships, which they had been denied of for so long. These institutions for the Children were inundated with phone calls, messages and emails from Petitioner, alleging that these educational institutions had no authority to enroll the Children.

c.    <u>Petitioner's Interference in the Children's Lives</u>

23.    While the Children were attending school and camp, Petitioner obtained contact information of the school administration and camp counselors and began threatening them with lawsuits for allowing the Children to be enrolled without her consent. Later attempts to enroll the Children for the 2023–2024 academic year were denied due to Petitioner's behavior. Further, both

---

[3]    Vizhnitz is a Hasidic Dynasty.

Children had to begin therapy due to their mother's actions, with their first session on June 7, 2023. They remain in therapy to this day.

24.     Respondent later began homeschooling the Children while seeking alternative modes of education for the Children.

25.     By September 2023, it became abundantly clear to Respondent that there was no compelling reason to ever return to live in Israel. Any purported stable life that Respondent and the Children once had in Israel had been destroyed at the hands of Petitioner. There was no home or school to return to. What remains there is a pattern of instability and trauma that poses a serious risk to the Children's well-being. Respondent decided to invest all of his energy into building a stable, happy and normal life for the Children in New York.

26.     On November 16, 2023, as he was running out of options of where the Children could attend school, Respondent felt compelled to file an Emergency Order to Show Cause in the Rockland Family Court, seeking an order to enroll his Children in school without Petitioner's consent.

27.     On November 21, 2023, Honorable Rachel E. Tanguay granted Respondent temporary legal custody of the Children for the limited purpose of enrolling them in school in New York. Furthermore, Judge Tanguay directed Petitioner to refrain from contacting the Children's school, staff or any personnel directly or indirectly through a third party. A copy of the order is attached hereto as **Exhibit 25.**

   d.   The Children's Life in New York

28.     The Children have been residing in New York since April 2023. The Children are enrolled in school and participate in extra-curricular activities. They attend weekly therapy sessions due to the trauma caused by Petitioner. They have friends and family in New York. The

Children have, therefore, become well-settled in their new environment, including their home, schools, community, and social relationships.

29.    They are now thriving emotionally, socially, and academically in New York. Given their current stability and well-being, any disruption or removal from this environment would be detrimental to their well-being and would risk causing them emotional and psychological harm. Since their return to life in New York, the Children have experienced significant improvement and now live in a stable environment to which they have become deeply attached.

30.    In their interviews with Dr. Stoltzfus, B.F. and M.F. explained that they enjoy trips and activities such as amusement parks, waterslides, coloring, biking and playing in New York. They reported that they enjoy playing with other Children in their area. *See* **Exhibit 46** at 15:23-26.

31.    Established in New York, the Children are visibly happier as they are no longer exposed to the unpredictable and volatile environment created by Petitioner. Their basic sense of safety is restored, and that alone has a profound impact on their emotional state. Respondent and the Children now reside in a safe and stable apartment in New York.

e.    The Children's Habitual Residence Never Shifted from New York to Israel

32.    Respondent never severed his ties with New York and always intended on returning. He maintained apartments in New York for the family from July 2018 through July 2022. The Children both have U.S. passports that were issued during the time they were temporarily residing in Israel in addition to their New York State identification cards. When faced with financial difficulties, the parties filed bankruptcy in New York and listed their address in Monsey, New York. In April 2023, when Respondent and the Children returned to New York, they

returned to Monsey – the same area that they previously lived in prior to July 2019. No ties were ever severed with New York, as it was always the Children's habitual residence.

33.     However, Petitioner restricted Respondent from leaving Israel and returning to New York. Prior to April 2023, Respondent attempted to return to New York, however Petitioner presented numerous obstacles to prevent Respondent from returning to New York for an extended time. Along with the pre-divorce summons that Petitioner served Respondent was a travel restriction that he could not travel out of Israel without her permission. Further, she would take Respondent's passport and give it to a family friend to keep it away from his possession so he could not travel. As Respondent told Dr. Stoltzfus, "[Petitioner] has blocked [Respondent] from leaving Israel[,] besides for long periods of time that [Petitioner] had [Respondent's] passport held by someone else understandably against [Respondent's] will". *See* **Exhibit 46** at 13:43-45. Respondent never abandoned New York as the habitual residence, Petitioner simply prevented him from returning.

f.    Respondent's Temporary Immigration Status in Israel

34.     Respondent is a United States Citizen and does not hold citizenship in Israel. Upon the Parties relocation to Israel in July of 2019, Respondent was granted Israeli citizenship upon arrival as an oleh (a Jewish immigrant to Israel) due to the Law of Return. Receiving an Israeli passport upon arrival in Israel is not optional, it is part of the procedure of making Aliyah (a Jewish immigrant returning to Israel).

35.     However, Respondent submitted a letter revoking his Israeli citizenship in October 2019 because he did not intend to live in Israel permanently and did not want Israeli citizenship. *See* **Exhibit 2.** Respondent's revocation of his Israeli citizenship clearly shows it was never his intention to live in Israel permanently and that their residence in Israel was temporary.

36.     Furthermore, Respondent is unable to return to Israel due to a travel ban that the Rabanut entered against him based on the request of Petitioner. Additionally, Petitioner has filed a legal proceeding against Respondent in Israeli Courts regarding the Children relocating to New York with Respondent. The Respondent cannot afford legal representation to facilitate the discovery of what was filed against him but has received a travel restriction from the Israeli Government. *See* **Exhibit 9**.

37.     Moreover, Respondent still maintained his and the Children's United States citizenship by ensuring they all possess valid United States passports and New York State ID's, allowing them to travel freely to the U.S. while living in Israel, as permitted by Petitioner, and ultimately return home to New York. In addition to Israel not being the habitual residence of the Children, it is also not the habitual residence of their father.

g.  Procedural History

38.     On March 27, 2024, Petitioner filed a Verified Petition under the Hague Convention, which was almost an entire year after the date of retention. Throughout 2024, Petitioner made multiple attempts to amend filings and effectuate service on the Respondent. Three amended petitions followed in early July, each found deficient. On July 12, 2024, the Court granted a 60-day extension to serve the Respondent.

39.     Numerous affidavits of service were filed claiming the Respondent was served via overnight mail and personal delivery at his Monsey residence. However, the Respondent contested these claims in a September 26, 2024 letter, stating he had vacated the property on August 6, 2024, and no longer lived here. Thus, Respondent had not been served.

40.     Petitioner subsequently filed for a Clerk's Certificate of Default on October 9, 2024, which was entered the next day. The Respondent again disputed service in a letter to the Court. A

motion for default judgment followed on November 19, 2024, requesting return of the Children to Israel. The Court issued an Order to Show Cause on November 20, 2024, with service requirements by December 4, 2024 and proof of service due by December 9, 2024.

41.    On March 11, 2025, documents were improperly served to M.F. outside of his therapy session, who handed them to his therapist. Nonetheless, Petitioner filed an affidavit of service on March 13, 2025. Respondent opposed the motion for default judgment on April 11, 2025. On April 15, 2025, the Court denied default judgment and vacated the entry of default. The documents were never personally served upon Respondent. At the time of the apparent service, Respondent was in a supermarket, from which he has a receipt with the date and time confirming such.

### III.    CONCLUSIONS OF LAW

42.    The Convention generally requires the "prompt return" of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country. Art. 1(a). There are exceptions to return, however. As relevant here, the Convention provides that return is not required if "[t]here is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b). "[A] grave risk of harm" from repatriating the child to the country of habitual residence arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (internal quotations omitted).

43.    A child having PTSD which would cause harm if returned has been found to be a basis for grave risk sufficient to defeat a Hague petition. *See Saada v. Golan*, 712 F. Supp. 3d 361,

375 (E.D.N.Y. 2024). In the instant case, the Children both have been diagnosed with PTSD due to their experiences with Petitioner in Israel. Returning them to Israel would therefore pose a grave risk of harm.

44.    Return is also not required if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views [,]" Art. 13. Here, both Children object to returning to Israel and are sufficiently mature that the Court should consider and credit their objections.

45.    The Convention "is designed to protect the interests of children and their parents," *Lozano v. Montoya Alvarez*, 572 U.S. 1, 19 (2014) (Alito, J., concurring), and children's interests may point against return in some circumstances. The Convention explicitly recognizes that the child's interest in avoiding physical or psychological harm, in addition to other interests, "may overcome the return remedy." *Id*. at 16 (majority opinion) (cataloging interests). Courts should be conscious of this purpose, "bearing in mind that the Convention sets as a primary goal the safety of the child." *Golan v. Saada*, 596 U.S. 666, 668 (2022).

**a. The United States is the Children's Habitual Residence**

46.    The party petitioning for relief pursuant to the Convention has the initial burden to show by a preponderance of the evidence that the child was wrongfully removed or retained. *Golan*, 596 U.S. at 671. This requires three elements: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Royal Borough of Kensington & Chelsea v. Bafna-Louis*, No. 23-cv-00470, 2023 WL 6867135, at *1 (2d Cir. Oct.

18, 2023) (citing *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005)). The petitioner must establish each element by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

47.    Respondent challenges all three elements of Petitioner's prima facie case.

48.    The first element, habitual residence, is not defined in the Convention. *Monasky v. Taglieri*, 589 U.S. 68, 76–77 (2020). This depends on the totality of the circumstances and requires courts to remain "sensitive to the unique circumstances of the case and informed by common sense." *Id*. at 77–78, 84. A child's habitual residence may turn on a variety of facts, none of which will be dispositive in every case. *Monasky*, 589 U.S. at 78. These include "where a child has lived, the length of time there, acclimatization, and the purposes and intentions of the parents." *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020). The Supreme Court has given trial courts "maximum flexibility" in their habitual residence analysis. *See Monasky*, 589 U.S. at 72, 79.

49.    Critical to the analysis here, whether one parent conditionally agreed to abandon a prior habitual residence or only agreed to move to another country for a "trial period" is also relevant to settled intention inquiry. *Ruiz v. Tenorio*, 392 F.3d 1247, 1254 (11th Cir. 2004).

50.    Where a family agrees to take up residence in a new country on a trial or conditional basis, however, courts have declined to find a change in habitual residence despite the potentially indefinite duration of the move. *See Papakosmas v. Papakosmas*, 483 F.3d 617, 625-26 (9th Cir. 2007) (conditional intent based on parents' employment and housing arrangements); *Gitter,* 396 F.3d at 135 (affirming the district court's finding of no shared intent because "Mr. and Mrs. Gitter 'only mutually agreed to move to Israel on a conditional basis-namely, that Mrs. Gitter would be satisfied with the new arrangements'") (*citing Gitter v. Gitter*, 03–CV–3374, 2003 WL 22775375, at *4 (E.D.N.Y. Nov. 20, 2003)); *Prinz v. Faso*, 03–CV–6653, 2004 WL 1071761, at *5 (W.D.N.Y. May 12, 2004) (finding that one of the reasons the parties did not have shared intent regarding

their child's habitual residence is that they arrived into the foreign country with "very different intentions and expectations": "while [petitioner] may have understood the relocation to Germany to be permanent, or at least indefinite, [respondent] believed that the parties had agreed that if either family member was unhappy in Germany, the family could and would return to the United States").

51.     *Hofmann v. Sender,* 716, F. 3d 282 (2d. Cir. 2013) is instructive. In *Hofmann*, the mother and father lived in Canada with their two sons. *Id.* at 286. Relationship problems led the couple to explore relocation opportunities to New York. *Id*. Shortly thereafter, the mother took the two sons to New York as the first step in their "permanent relocation." *Id*. Although the family remained in New York for one and a half years, the district court found that any consent to the children's stay to New York, on the part of the father, was conditioned on the family living together in New York. *Id*. at 287.

52.     In *Hofmann*, the mother decided that she was unhappy with the marriage and sought a divorce. *Id*. On appeal, the Second Circuit agreed with the district court in finding that the mother and father "had a shared intent to relocate to New York, but the extent to which that intent was shared was limited by [the father's] conditional agreement that the relocation was to be accomplished as a family." *Id*. at 293.

53.     In *Ruiz*, 392 F.3d 1247, the parties met in Mexico, married in the U.S., and settled in Minnesota. After seven years in the United States, the couple moved to Mexico "[i]n an attempt to save the marriage." *Id*. at 1249. The couple spent two years and ten months in Mexico, during which time they both retained ties to the U.S. The district court determined that there was no shared intention to make Mexico their permanent residence, and that the mother had agreed to the move on a conditional basis. Although the parties had spent a significant time in Mexico, during

which the children went to a local school and had social engagements, the court found that there was no settled intent to abandon the U.S.

54.     In *McKenzie v. McKenzie*, 168 F.Supp.2d 47(E.D.N.Y. 2001), the court found that the Child's habitual residence never shifted from Germany to the Unites States when the mother believed that she would be able to return to Germany with the child if she was unhappy in the U.S. The Court ultimately found that the child's habitual residence is Germany because the parties came to New York "on a trial basis" and that the mother, who was a German citizen, maintained a residence in Germany, as well as occupational and familial ties with that country.

55.     In the instant case, the parties' experienced significant relationship turmoil in large part due to Petitioner's mental health issues and they moved to Israel on a trial basis. When Petitioner's mental condition continued to deteriorate and she abused the Children, the trial period failed. The Children's habitual residence should not shift under these circumstances.

**b.  The Children are at Grave Risk of Retuning to an Intolerable Situation if Forced to Relocate to Israel.**

   h.      <u>The Children Would be at a Grave Risk of Harm if Returned to Petitioner</u>

56.     Even where a petitioner has established a prima facie case for the repatriation of an abducted child, Article 13(b) of the Convention relieves a court from the obligation to order repatriation where "there is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

57.     Pursuant to ICARA, to invoke the grave risk defense, a responding parent must establish by "clear and convincing evidence" that such a risk exists. 22 U.S.C. § 9003(e)(2)(A).

58.     Courts have routinely found that circumstances involving domestic violence and abuse present a grave risk of harm to an abducted child. *See, e.g., Ermini v. Vittori*, 758 F.3d 153,

164–65 (2d Cir. 2014) ("A 'grave risk' of harm from abuse [may be] established where the 'petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question'" (citation omitted)); *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) (finding grave risk of harm where the petitioner subjected children to "repeated beatings, hair pulling, ear pulling, and belt-whipping," as well as psychological abuse); *Walsh v. Walsh*, 221 F.3d 204, 221 (1st Cir. 2000) (finding grave risk of harm where petitioner had abused respondent and "was harsh with the[ir] son, including pinching his legs so hard as to leave bruises and other forms of abuse").

59.    Several courts have also found that a risk of PTSD constitutes grave risk under Article 13(b). *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (holding that evidence regarding PTSD can have "a direct bearing on grave risk determinations"); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (affirming district court's grave risk determination based on a finding the children would suffer from a recurrence of PTSD); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (grave risk of harm where children had experienced physical abuse from father, had witnessed his abuse of their mother, and expert testified that their return to Israel would trigger post-traumatic stress disorders, as well as 14-year-old's suicidal ideations); *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 JG, 2005 WL 67094, at \*6-8 (E.D.N.Y. Jan. 13, 2005) (denying petition on record of frequent violence in front of the children and expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child). *See also, Simcox*, 511 F.3d 594, 608–09 (grave risk of harm where children suffered from post-traumatic stress disorder due to father's "serious" physical and psychological abuse); *Walsh*, 221 F.3d at 221–22 (grave risk of harm where child diagnosed with post-traumatic stress disorder due to father's conduct).

60.     In the instant case, the Children were subject to both physical and psychological abuse from Petitioner to the extent that they suffer PTSD. Their PTSD diagnosis from their therapist was corroborated in their expert interview with Dr. Stoltzfus. The past physical and psychological abuse, the professional diagnoses of PTSD, and the expert opinion that repatriation would trigger a recurrence of trauma together establish that return would place the Children in an intolerable situation. The Convention does not require courts to deliver children into the hands of their abuser, and under these facts, it compels this Court to deny repatriation.

ii.     The Children's Interview with Dr. Stoltzfus

➤  B.F.'s Interview

61.     In her interview with Dr. Stoltzfus, B.F. informed him that while in Israel; "[Petitioner withheld food to punish me, [Respondent] had food and would give me food. [Petitioner] would scream at [Respondent] not to give [B.F.] food". (**Exhibit 46** at 15:45-46). She further reported that she would go outside, and the neighbors would give her food. When Petitioner found out, she would scream at the neighbors, "don't give [B.F.] food, I told you not to". **Exhibit 46** at 15:46; **Exhibit 46** at 16:1-2. B.F. expressed that her mother did not want to feed her and she did not know why. **Exhibit 46** at 16:2.

62.     B.F. continued to explain how she would go to bed hungry. In the mornings, she would have a little snack. Sometimes Petitioner would give the Children lunch, but sometimes she would not. *See* **Exhibit 46** at 16:3-5. Sometimes Petitioner would make a cake but if B.F. touched it, Petitioner would scream at her and would not let her have it. **Exhibit 46** at 16:15-17.

63.     B.F. told Dr. Stoltzfus, "I don't know why [Petitioner] don't like me". **Exhibit 46** at 16:7. She told Dr. Stoltzfus that she never knew whether her mother would be mean or nice and added that Petitioner "wasn't much nice" and that "[Petitioner] would give [B.F.] a smack for no reason, upset, mad, give smack for no reason". **Exhibit 46** at 16:17. She further explained that every day she

came home "[…] there was a smack or a kick or a pinch and she didn't want to give [B.F.] food. She did this [B.F.'s] whole life." **Exhibit 46** at 16:19-21.

64.    Petitioner would also lock B.F. in a room when she did not want to see her. Respondent would return home to hear B.F. crying in a locked room. **Exhibit 46** at 16:23-30. When Respondent told Petitioner to let B.F. out, she would then lock Respondent in a room so he could not interfere. B.F. would attempt to run away, but Petitioner would smack her and threaten to call the police. Petitioner made numerous threats of calling the police on the Children if they attempted to leave the house. **Exhibit 46** at 16:26-30.

65.    B.F. told Dr. Stoltzfus that when Petitioner would hit her, Respondent would try to protect her. He would take her away to a different room until Petitioner would stop hurting her. **Exhibit 46** at 16:18-19. In Israel, after school, B.F. would go to the park and not return until she  Respondent's car and knew he had returned home. As a result, Petitioner would punish B.F. **Exhibit 46** at 16:10-12. Notably, B.F. stated that Respondent does not disparage or talk negatively about Petitioner. **Exhibit 46** at 17:17.

66.    B.F. then described the incident to Dr. Stoltzfus where Petitioner choked her younger brother, M.F. She ran to her father, stating that Petitioner was choking M.F. and holding him really tight. Respondent told her to let M.F. out three times before pushing Petitioner's hand out of the way to save M.F. B.F. reported that she was afraid that her mother was going to hurt her too. **Exhibit 46** at 16:32-35.

67.    When Dr. Stoltzfus asked B.F. what she thought about Petitioner, she explicitly stated that she does not want to see her mother. She has nightmares about Petitioner and wakes up in the middle of the night crying. **Exhibit 46** at 17:2-4. She further states that "if [Petitioner] isn't normal, [B.F.] don't want to see [Petitioner] with [B.F.] own eyes, [Petitioner] is not normal". B.F. specifically

stated that she wanted to stay in New York and did not want to see Petitioner again. **Exhibit 46** at 17:8-10.

> ➢ M.F.'s Interview

68.     M.F. told Dr. Stoltzfus he only wants to live with Respondent, not Petitioner. When asked to clarify why he does not want to live with Petitioner, he stated that "[Petitioner] slaps [B.F. and M.F.] and when [they] are playing[,] [Petitioner] stops our play". **Exhibit 46** at 17:24-27. He further stated that Petitioner would hit him and his sister on their backs, feet and face. **Exhibit 46** at 17:30.

69.     When asked about the choking incident, M.F. explained that he was jumping on the couch and did not stop when Petitioner asked him to. As a result, Petitioner began choking M.F. and he "[…] could breathe only weakly, [Petitioner] tried to choke [M.F.]". He described that Respondent attempted to help him, but Petitioner refused to stop. Petitioner then called the police on Respondent. **Exhibit 46** at 17:33-28.

70.     M.F. told Dr. Stoltzfus that, if Respondent ever decided that they would live with Petitioner again, "[M.F.] would rather walk into a bus. [M.F.] would not actually do it because [he] want[s] to be with [Respondent]". **Exhibit 46** at 17:41.

71.     M.F. told Dr. Stoltzfus that he did not have food many times. He said, "[Petitioner] didn't feed [M.F.] and [B.F.], [they] would go to sleep hungry". **Exhibit 46** at 18:1-2. He reported that Respondent would shout at Petitioner for not feeding the Children, and Respondent would prepare food for them instead. **Exhibit 46** at 18:3-4.

> ➢ Dr. Stoltzfus Findings of Grave Risk

72.     Dr. Stoltzfus stated that based on medical documents provided to him and his interviews with the Children, significant psychological harm would occur if the Children were returned

to Petitioner's care. **Exhibit 46** at 18:15-18. Furthermore, he evaluated that both Children suffer from PTSD, which is consistent with their therapist's mental health diagnosis. **Exhibit 46** at 18:28-33. *See also* **Exhibit 11.**

        iii.      <u>Israel is in a State of War</u>

73.      Returning children to a zone of war constitutes grave risk. *Tereshchenko v. Karimi*, 102 F.4th 111, 129 (2d Cir. 2024). The Court should not return the Children to Israel on the independent basis that Israeli is inherently dangerous due to the ongoing war.

74.      Currently, there is a travel advisory in place from the United States Government for all travel to Israel, the West Bank and Gaza due to terrorism, armed conflict and civil unrest. In the case at bar, the family previously resided in Bet Shemesh, Israel, which is located approximately one hour from the West Bank in Israel. On June 16, 2025, Bnei Brak was struck by a series of missile attacks, resulting in numerous casualties.[4] Given the severity of the situation, this environment poses a significant risk and is not suitable for any child, particularly when a safe and stable home is available elsewhere.

75.      Furthermore, Petitioner has acknowledged the danger currently posed in Israel throughout this litigation. In a letter to the Court seeking an extension of discovery deadlines, Petitioner stated that "[…] residing in a country that is subject to attack by missiles, there exists both good cause and excusable neglect sufficient for this Court to exercise its discretion in favor of granting the requested extension". [ECF No. 76.]

76.      The ongoing armed conflict, active missile strikes in proximity to the Children's former residence, and the United States Government's highest-level travel warnings confirm that repatriation

---

[4]      https://www.timesofisrael.com/from-shelters-to-shattered-streets-the-night-war-came-to-petah-tikva-and-bnei-brak/ (last accessed 8/15/25)

would expose the Children to unacceptable physical danger wholly apart from the abuse-related grave risk Respondent can establish. Petitioner's own admissions acknowledge the present threat. The Convention does not compel a court to disregard such hazards or to send children into an active conflict zone when a safe, stable alternative exists. On this independent basis, the petition must be denied.

### c.    The Children Have Reached a Sufficient Age and Degree of Maturity for their Views to be Considered

77.    Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." Under Article 13, a "child's views concerning the essential question of [his or her] return or retention may be conclusive" provided the child has "attained an age and degree of maturity sufficient for its views to be taken into account." Elisa Pérez-Vera, Hague Convention on the Civil Aspects of International Child Abduction: Explanatory Report ¶ 30 ("Pérez-Vera Report"). [5] "[I]t would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against [his or her] will." Pérez-Vera Report ¶ 30.

78.    As seen above from their interviews with Dr. Stoltzfus, both M.F. and B.F. strongly object to being returned to the care of Petitioner. <u>Nine-year-old M.F. stated that he would walk in front of a bus if he had to return to live with Petitioner</u>. *See* **Exhibit 46** at 17:41. (emphasis added). Article 13 of the Hague Convention specifically provides that the court may refuse "to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."   The child objection defense must be proven only by a preponderance of the evidence, and not by clear and convincing evidence. 22 U.S.C. §9003(e)(2).

---

[5]    The Perez-Vera Report "is an authoritative source for interpreting the Convention's provisions." *Lozano*, 697 F.3d at 52.

79.     The Fifth Circuit explained in *Rodriguez v. Yanez*, 817 F.3d 466, 475 (5th Cir. 2016) that the Perez-Vera Report "does not suggest the child's interpretation of [his] 'own interests' is invalid if it is based" on custody considerations. *Id*. at 475. Rather, "the drafters of the Convention simply deemed it inappropriate to return a mature child 'against its will'— whatever the reason for the child's objection." *Id*. at 475–76. In following that reasoning, the Eighth Circuit in *Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016) affirmed the district court's decision to deny a petition based on a 15-year old's desire to remain in the U.S. rather than return to Peru.

80.     In *Matovski v. Matovski,* No. 06 CIV. 4259 (PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007*)*, the Court denied the request to return the children, in large part due to the wishes of the children, two of whom, aged eleven and twelve, had reached the requisite maturity level. The Court found that the children understood the difference between telling the truth and a lie and honestly preferred to stay in the United States. The psychologist in that case, similarly to the case at bar, concluded that the return of the child would present a grave risk of psychological harm because "although they love [the father], they do not feel safe with him." The doctor also testified that he believed the children were well-settled in their new environment because they "feel that they are in a safe and stable environment, and their beliefs in this regard reflect the objective reality of their circumstances." *Id.* at 6.

81.     Nine-year-old children (and in some instance those even younger) have also been found sufficiently mature to have their objections considered by the court.  In *Anderson v. Acree,* 250 F.Supp.2d 876, 883 (S.D. Ohio 2002), the court held that an eight-year-old child who was composed, calmly and readily answered questions, pointed to New Zealand on a globe, and indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth. *See*

*also Bonilla-Ruiz v. Bonilla*, 2004 WL 2883247 (Mich. 2004) (an 8-year old's objections were enough to require dismissal of Hague abduction case.)

82.    In the instant case, Dr. Stoltzfus concluded that M.F. and B.F. demonstrated a high level of emotional insight and verbal articulation regarding the abusive dynamics in their home. He cited the Children's clear and consistent refusal to return to an environment marked by Petitioner's frequent abuse. Notably, both Children described activities they enjoyed in New York, their social engagements, discussed their strong preference to live with their father and very firmly construed that they do not want to return to living with Petitioner.

83.    M.F, in particular, used strong and graphic language to convey the emotional toll of the situation, while B.F. was equally firm and articulate in her stance to not return. Given their consistency and emotional intelligence, Dr. Stoltzfus affirmed that both Children possess the necessary age and developmental capacity for their views to be taken seriously in decisions regarding repatriation.

## IV.    CONCLUSION

84.    The Supreme Court advised trial courts to be informed by common sense when analyzing habitual residence. *Monasky*, 589 U.S. at 78. Common sense suggests that M.F. and B.F. are American children who were merely temporarily away from their home country before their return in April 2023. B.F. has spent 7 years and 6 months of her 11 years and 3 months of life in New York, and she expressly wishes that she wants to remain in New York. M.F. has spent 6 years of his 9 years and 9 months of life in New York, and he expressly wishes to remain in New York. It would be nothing short of distressing and detrimental to the Children if they are forced to return to Israel. Under these circumstances the Petition should be dismissed, and M.F. and B.F. should be permitted to remain in the United States.

85.    In sum, this case presents multiple, independently sufficient grounds to deny repatriation. Clear and convincing evidence establishes that return would expose the Children to severe physical and psychological harm, including a recurrence of diagnosed PTSD stemming from years of abuse. The ongoing armed conflict in Israel, marked by active missile strikes near their former residence and acknowledged by Petitioner as a present danger, creates an additional independent grave risk. Even apart from these dangers, common sense, as endorsed by the Supreme Court in *Monasky*, confirms that M.F. and B.F. are American children whose ties, upbringing, and express wishes are rooted in New York and not Israel. Forcing them to return under these circumstances would be both legally unwarranted and profoundly detrimental. The petition should be dismissed, and the Children permitted to remain safely in the United States.

Dated:  August 15, 2025
        New York, New York

Respectfully submitted,

/s/ Richard Min
Richard Min
Michael Banuchis
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com
mbanuchis@gkmrlaw.com
*Attorneys for Respondent*