**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| In the Matter of B.F. and M.F. ) | |
| P.F.                            ) | |
|                                 ) | |
|         Petitioner,             ) | |
|                                 ) | |
| vs.                             ) | No. 7:24-cv-02333-PMH |
|                                 ) | |
| Y.F.                            ) | |
|                                 ) | |
|         Respondent.             ) | |

_____

/s/ Menachem White
White Law Group, PLLC
4 Brower Avenue, Suite 3
Woodmere, New York 11598
Telephone: 516-504-4101
Email:Mwhite@wwlgny.com

ATTORNEYS FOR
PETITIONER P.F.

1

**PETITIONER'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Petitioner Perl Felberbaum (the "Petitioner" or "Mother"), by and through undersigned counsel, respectfully submits these Proposed Findings of Fact and Conclusions of Law pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Hague Convention" or "Convention"), and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. To the extent that any proposed findings of fact are deemed conclusions of law, or that any proposed conclusions of law are deemed findings of fact, they should be so construed.

INTRODUCTION

1. This case arises under the Hague Convention and ICARA. The Convention is not a custody statute and does not authorize courts to decide the best interests of the child. Its narrow purpose is to determine whether a child has been wrongfully removed from, or retained outside of, their country of habitual residence, and if so, to order their prompt return so that custody determinations may be adjudicated by the courts of the habitual residence. The central remedy under the Hague Convention is the return of the child to their habitual residence. The Convention's purpose is to restore the status quo and deter international child abduction.

2. Here, the Petitioner seeks the return of her two minor children—her daughter, age 11, and her son, age 9½—wrongfully retained by Respondent, their father, in the United States.

3. The record establishes that:

    a. The children were habitually resident in Israel immediately prior to their retention in the United States.

    b. Petitioner possessed and actively exercised custody rights under Israeli law.

    c. Respondent wrongfully retained the children in the United States without Petitioner's knowledge or consent.

4. Respondent asserts affirmative defenses under Articles 12 and 13 of the Convention, including allegations of grave risk and arguments that the children are "settled" in their new environment. None withstand scrutiny under the applicable law and evidence. The Court should therefore order the children's prompt return to Israel.

## PROCEDURAL BACKGROUND

5. On March 24, 2024, Petitioner filed a timely Verified Petition under ICARA seeking the return of her two minor children to Israel.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331, as this action arises under a treaty of the United States. Venue lies in this District because Respondent resides in the Southern District of New York and is currently retaining the children within this jurisdiction.

## PROCEEDINGS

7. The Respondent was duly served with process. The Court conducted an initial status conference, entered an expedited briefing schedule consistent with the summary nature of proceedings under the Hague Convention.

### Burden of Proof

8. Under ICARA, the Petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful. The Respondent bears the burden of proving any asserted defenses, with grave risk requiring clear and convincing evidence.

**FINDINGS OF FACT**

9. Petitioner's Background: Petitioner was born and raised in Bnei Brak, Israel, in a large religious family. She is one of 11 siblings, all of whom continue to reside in Israel, and she maintains strong family and community ties. She was educated in religious schools, has worked as a bookkeeper, preschool substitute teacher, and in preparation for religious burial services. She is deeply rooted in Israel and maintains close contact with her extended family, including her elderly parents, who provide support and stability.

10. Children and Family History: At age 23, Petitioner married and had Petitioner's first son, Avraham, now 18, who is thriving in yeshiva. Petitioner raised Avraham with dedication and consistency, maintaining a strong bond with him after divorcing Petitioner's first husband.

11. At age 28, Petitioner married Respondent Y.F. The parties were married for 11½ years and have two children together: a daughter (now 11) and a son (now 9½).

12. Respondent's Background: Respondent did not pursue higher education and worked only intermittently. Respondent has a son from a prior marriage, now age 21, residing in London, with whom he has remained largely estranged. Respondent suffers from Crohn's disease and is prescribed psychotropic medications, which he has a history of misusing.

13. Respondent's abuse of these medications has left him frequently drowsy, unstable, and volatile. Respondent's moods were unpredictable; Respondent was often harsh, controlling, and manipulative toward both Petitioner and the children. The father was also arrested in Israel for domestic violence against the Petitioner, and an order of protection was granted in Petitioner's name. The parties later reconciled and lived together until April 2023.

**Life in Israel**

14.     The family returned to Israel in 2018, where they reestablished their residence. The parties lived in Israel for three years while the children attended school, saw doctors, and made friends there.

15.     The children were habitual resident in Israel until the Respondent's wrongful retention. They attended school daily, became fully immersed in Hebrew, maintained friendships, and were integrated into the community.

16.     Both children received consistent medical care, including dental and therapeutic services. Petitioner and Respondent both participated in these appointments, though Respondent's involvement was erratic due to his health and temperament.

17.     The children had Israeli medical insurance and received financial aid from the government as citizens. The children are citizens of Israel and the United States. By all objective measures, Israel was the children's home.

**Abuse and Manipulation**

18.     Throughout the marriage, Respondent engaged in emotional and verbal abuse of Petitioner, often in the presence of the children. He sought to undermine Petitioner's authority, deliberately contradicting her parenting decisions and destabilizing the household.

19.     In one incident on Shabbat, their then-seven-year-old son grabbed a knife in a distressed state. Following therapeutic instruction, Petitioner restrained him to prevent self-harm.

20.     Respondent, heavily sedated at the time, twisted the event to portray Petitioner as abusive, instilling in the children a false narrative that he had "saved" them from Petitioner.

21.     This manipulation exemplifies a pattern by which Respondent sought to alienate the children from their mother.

**The Trip to the United States**

22.     In 2020, Respondent sought and obtained Petitioner's consent for a short-term trip to the United States so that the children could visit his extended family.

23.     Petitioner agreed only on the condition that the trip was temporary, and Respondent purchased round-trip tickets. The father kidnapped the children in April 2023 when he stated he was taking them to New York for Passover and never returned. Respondent also left his personal belongings in Israel, further demonstrating the trip's temporary nature.

**Wrongful Retention**

24.     Upon arrival in the United States, Respondent refused to return the children. Initially, the Respondent falsely cited COVID-19 restrictions, then quarantine requirements, and later illness, all to feign the trip being temporary and not the kidnapping the Respondent intended.

25.     When international flights resumed, Respondent continued to fabricate new excuses why the Respondent and/or the children couldn't return to Israel.

26.     Respondent eventually ceased responding to Petitioner's communications altogether. Respondent pressured Petitioner to relocate to the United States despite Petitioner's lack of language skills, family support, and the abusive history Petitioner endured in the United States.

27.     This is in addition to the fact that the Petitioner's family is in Israel and only the Respondent has family here.

28.     Respondent cut off the children from their Israeli schools, friends, and community ties. Respondent has kept the children's school, address, and all personal information from the Petitioner, and the mother has not spoken to the children in over a year.

**Petitioner's Efforts to Secure Return**

29. Petitioner persistently sought to arrange for the children's return, including proposing that they be escorted by relatives or third parties.

30. It was the Respondent who rejected all such proposals of the children returning.

31. Petitioner contacted Israeli authorities, attempted mediation, and ultimately retained counsel to bring this Petition under the Hague Convention. The Petitioner's affiant has requested that the children be returned to Israel and offered that the mother would stay away from the children pursuant to any order the father would submit, and that any issues of custody could be dealt with in Israel.

32. This offer was rebuffed again by the Respondent.

33. The Respondent's counsel instead offered that the children stay in New York and the mother get visitation from family court. The Petitioner also requested contact with the children, which was also rebuffed.

**CREDIBILITY FINDINGS**

34. Respondent's testimony was inconsistent and contradictory. He initially represented the trip as temporary, only later shifting to claim it was intended to be permanent. The round-trip tickets and belongings left in Israel contradict his later assertions.

35. Respondent's justifications: COVID restrictions, illness, and shifting excuses, further undermine Respondent's credibility.

36. Respondent most likely has manipulated the children by instilling false memories and narratives about Petitioner during the time the children have been solely with the Respondent.

37. Respondent's estrangement from Respondent's older son, coupled with Respondent's history of unstable behavior and manipulative conduct, further diminishes Respondent's credibility as a custodial parent.

38. By contrast, Petitioner's testimony remained consistent across proceedings. Her account will be corroborated by documentary evidence, communications, and testimony from those familiar with Petitioner's parenting.

39. The Court therefore should accord substantial weight to Petitioner's testimony and find Respondent's testimony unreliable and self-serving.

## **CONCLUSIONS OF LAW**

I. Jurisdiction and Governing Law

40. This Court has jurisdiction pursuant to ICARA and 28 U.S.C. § 1331.

41. The Hague Convention applies to children under sixteen at the time of removal or retention.

42. The role of this Court is not to determine custody but to ensure the return of children wrongfully removed or retained. The Supreme Court ruled in *Abbott v. Abbott*, 560 U.S. 1 (2010), that the Convention's purpose is to restore the status quo and deter international child abduction.

II. Wrongful Retentio

43. To establish a prima facie case of wrongful retention under the Hague Convention, a petitioner must demonstrate by a preponderance of the evidence that: (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

## A. Habitual Residence

44.     The United States and Israel have been treaty partners under the Hague Convention since December 1, 1990.

45.     In *Monasky v. Taglieri*, 589 U.S. ___, 140 S. Ct. 719 (2020), the Supreme Court confirmed that habitual residence is a fact-driven inquiry, requiring courts to consider the totality of circumstances.

46.     The evidence here is overwhelming: the children resided in Israel for years, were enrolled in school, spoke Hebrew, maintained friendships, and were deeply integrated in their community, saw medical doctors and all things children do when living in a country for a long period of time.

47.     The parties moved to Israel in 2019 and lived there for three years.

48.     The court should inquire into the shared intent of the parents at the latest time that their intent was shared. When a petition alleges that a child's habitual residence has changed, the parties' "latest shared intent" is instructive.

49.     To assess whether the parties intended to change a child's habitual residence, courts consider "whether the parents formed a shared, settled intention to abandon the child's previous habitual residence" and "whether the parents have mutually intended that the child acquire a new habitual residence in a new location".

50.     Conditional intent dependent on future circumstances is insufficient to change a child's habitual residence.

51.     In this case, the parties never agreed to relocation and the only reason the father went to New York was through deceit and trickery. The move of the children was of a "trial nature" and "conditional," which courts have rejected as a basis for a new habitual residence.

52. The Court should therefore conclude that Israel was their habitual residence immediately before the wrongful retention.

### B. Custody Rights

53. Under Israeli law, both parents share custody rights absent a judicial order to the contrary. The *Legal Capacity and Guardianship Law 5728-1962* of Israel provides that both parents are equal guardians of their children with joint custody rights. This includes a *ne exeat* right, which is the right to prohibit a child from being removed from a country without consent.

54. Petitioner retained custody rights at the time of retention.

55. The Hague Convention defines wrongful retention as occurring where it is in breach of such rights under the law of the State of habitual residence. The Supreme Court ruled in *Abbott v. Abbott*, 560 U.S. 1 (2010), that the removal or retention is considered wrongful if it is in breach of custody rights attributed to a person under the law of the State where the child was habitually resident.

### C. Exercise of Rights

56. The evidence will demonstrate that Petitioner was exercising her custody rights at the time of the retention.

57. She raised the children, ensured they attended school, and made health and educational decisions for them. *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993), states that a parent is "exercising" custody rights even if they are not with the child at the time of retention, as long as they are fulfilling parental responsibilities.

58. The Hague Convention also requires that at the time of removal or retention, those rights were actually exercised. A parent fails to exercise their custody rights only if they act in a manner that constitutes "a clear and unequivocal abandonment of the child".

59. Accordingly, Respondent's refusal to return the children constitutes wrongful retention under Article 3 of the Convention.

### III. Respondent's Affirmative Defenses

60. Once a petitioner establishes a prima facie case, the child must be returned to the place of habitual residence unless "one of the affirmative defenses set forth in Articles 12, 13, and 20 applies". Even if a defense is established, the Court maintains equitable discretion to nonetheless order the child's return in "exceptional cases".

### A. Article 12 - "Now Settled"

61. Article 12 provides that if a petition is filed more than one year after wrongful retention and the child is "now settled" in the new environment, a court may decline return.

62. Here, Petitioner acted promptly, filing the case less than one year from the date of wrongful retention. Any perceived delay resulted from Respondent's concealment and obstruction.

63. The children are not meaningfully "settled"; they remain cut off from their extended family, their schools, their language, and their community. Courts require more than simple adaptation. The Ninth Circuit's analysis in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), found that a "very full year" of school, friends, and activities was not sufficient to find that the child's habitual residence had shifted.

64. The Second Circuit has likewise held that even two years is not enough to find a child acclimated. The defense therefore fails.

### B. Article 13(b) - Grave Risk of Harm

65. Respondent asserts that return would expose the children to a grave risk of harm.

66. The grave risk defense must be proven by clear and convincing evidence. The level of risk and danger required to trigger this exception has consistently been held to be very high.

11

*Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014), states that a grave risk "does not exist when repatriation 'might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences'".

67. A grave risk of harm "exists when repatriation would make the child 'face a real risk of being hurt, physically or psychologically'". The potential harm "must be severe," and there must be a probability that the harm will materialize.

68. There is no credible evidence that Petitioner poses a grave risk of harm. No Israeli authority has ever found her abusive. The Respondent was the person arrested for domestic violence and had an order of protection against him when the parties lived together in Israel.

69. Instead, Respondent's history of instability, drug misuse, and manipulation presents the greater risk. Given Israel's robust legal system and protective services, any concerns can be addressed there. *Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013), found that potential harm can be addressed by a functioning judiciary in the country of habitual residence. The defense therefore fails.

### C. Article 13(a) - Non-Exercise of Rights

70. To establish non-exercise, Respondent must show unequivocal abandonment of parental responsibilities.

71. Petitioner's consistent parenting and her immediate pursuit of remedies under the Convention prove the opposite. This defense fails.

### D. Mature Child Objection

72. Article 13 permits courts to consider a child's objection to return if the child has attained sufficient age and maturity. The burden is on the Respondent by a preponderance of the evidence.

73. Such objections must reflect independent judgment, not the product of undue influence. Here, the children's statements will most likely bear the hallmarks of manipulation by Respondent.

74. The father has cut the children off from their mother, has hidden his and the children's addresses, and almost all information about the children's lives for over two years, which should constitutes undue influence.

75. Their preferences cannot be considered independent, and this defense fails. A court always retains discretion to order repatriation notwithstanding the applicability of any Hague Convention exception if that would best fulfill the purposes of the Convention.

76. This discretionary aspect is particularly important with respect to the mature child exception "because of the potential for undue influence by the person who allegedly wrongfully retained the child".

77. The fact that a child prefers to remain in a new country because of friends, school, or sports is not enough to disregard the narrowness of the exception. In *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269 (N.D. Ga. 2004), the court found that a child's preference was influenced by the respondent after a long period of separation from the petitioner.

78. To deny return here would reward Respondent for wrongful retention and encourage forum shopping.

### IV. Evidentiary Issues

79. Respondent has stated that Respondent seeks to introduce therapeutic communications. Such communications are privileged under *Jaffee v. Redmond*, 518 U.S. 1 (1996).

80. Courts in this Circuit routinely exclude such testimony absent a waiver.

81.     Under New York penal law, it is a misdemeanor for an unlicensed person to use the title "psychologist". The expert of the Respondent is only admitted as a psychologist in Oregon and is not admitted in New York.

## V. Policy Considerations

82.     The Hague Convention's purpose is to restore the status quo and deter international child abduction.

83.     To deny return here would reward Respondent for wrongful retention and encourage forum shopping.

84.     Israel provides a competent, functioning judiciary capable of addressing custody and protective concerns.

## VI. Protective Undertakings

85.     Petitioner affirms her willingness to comply with any protective measures deemed appropriate by Israeli courts, including supervised visitation or counseling.

86.     Petitioner is prepared to arrange immediate return travel, re-enrollment in school, and continuity of medical care.

87.     These undertakings further ensure that the children's welfare will be safeguarded.

## VII. Relief Requested

88. Petitioner respectfully requests that the Court:

    a. Order the immediate return of the children to Israel

    b. Direct that Respondent deliver the children's passports and travel documents to Petitioner or her counsel;

    c. Authorize Petitioner to obtain replacement travel documents if necessary;

    d. Award Petitioner her costs and attorney's fees pursuant to 22 U.S.C. §9007(b)(3) and 42 U.S.C. § 11607(b)(3);e.

    e. Order phone contact between the Mother and the children; and

    f. Order the Respondent to pay for all expenses associated with the trial, including the costs for transcripts and translators, as he has the funds to afford a large firm with three attorneys, while the Petitioner has no money for this case.

## CONCLUSION

89.     Petitioner has demonstrated wrongful retention under the Hague Convention and ICARA. Respondent has failed to establish any defense under Articles 12 or 13. Consistent with the treaty obligations of the United States, this Court should order the immediate return of the children to Israel, their habitual residence, so that custody determinations may be adjudicated there.

Dated: September 3, 2025

Respectfully submitted,

/s/ Menachem White
White Law Group, PLLC
4 Brower Avenue, Suite 3
Woodmere, New York 11598
Telephone: 516-504-4101
Email:Mwhite@wwlgny.com

ATTORNEYS FOR
PETITIONER P.F.