**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of B.F. and M.F., | ) |
| | ) |
| P.F. | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| Y.F. | ) |
| | ) |
| Respondent. | ) |
| | ) |

Case No. 7:24-cv-2333 (PMH) (VR)

**PETITIONER'S EXHIBITS**



**WHITE LAW GROUP, PLLC**
Menachem M. White, Esq.
4 Brower Avenue, Suite 3
Woodmere, New York 11598
(516) 504-4101 (office)
(347) 628-5440 (cellular)
mwhite@wwlgny.com

*Attorneys for Petitioner*

**SAGE LEGAL LLC**
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Additional Attorneys for Petitioner*

1

UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

PERL FELBERBAUM,                                                    24-CV-02333 (PMH)

                Plaintiff/Petitioner,                      Amended
                                                   COMPLAINT/PETITION

        -against-

YAAKOV FELBERBAUM,

                Defendant/Respondent,

----------------------------------------------------------------------X

Petitioner, Perl Felberbaum, by her undersigned attorneys, Law Office of Menachem White, PLLC by Asher White, Esq., hereby alleges and states as follows:

1.     This Petition is brought by the natural mother of the children, B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015 (hereinafter referred to as "Children"), to obtain relief pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention") and the implementing legislation within the United States, including the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C.A. §§ 9001 et seq., and New York's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), DRL §§ 75(d), 77 et seq.

2.     Prior to Respondent's wrongful retention of the children within the State of New York, the Children habitually resided with their mother, Petitioner Perl Felberbaum, in Bnei Brak, Israel.

3.     Prior to Respondent's wrongful retention of the Children within the State of New York, Petitioner possessed valid rights of custody and was exercising such rights of custody over the Children in Bnei Brak, Israel.

4.    Petitioner hereby seeks an Order pursuant to the Hague Convention, ICARA and UCCJEA directing the return of the Children to Petitioner, together with the provisional relief requested herein and such other and further relief as may be granted by the court.

## RELEVANT STATUTES

5.    The Hague Convention went into effect within the United States on July 1, 1988, and applies to disputes involving child abduction and the wrongful retention of children from inter alia Israel.

6.    The objects of the Hague Convention are:

   a.  To secure the prompt return of children wrongfully removed or retained in any Contracting State (Article 1(a)); and

   b.  To ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States (Article 1(b)).

7.    The United States implemented the Hague Convention by enacting ICARA, 22 U.S.C.A. §§ 9001 et seq. in 1988. Under § 11601(b)(4) of ICARA, federal district courts are authorized to determine the merits of wrongful abduction and retention claims arising under the Hague Convention, but are not authorized to consider the merits of the underlying custody dispute between the parties, if any.

8.    The UCCJEA was adopted by New York in 2002.

9.    The object of the UCCJEA is to "provide an effective mechanism to obtain and enforce orders of custody and visitation across state lines." DRL § 75(2).

## JURISDICTION

10.    This court has subject matter jurisdiction over Petitioner's claims pursuant to 42 U.S.C.A. § 11603(a) of ICARA, which provides that the courts of the States and the United States district courts shall have concurrent original jurisdiction over actions arising under the Convention.

11.    This court has supplemental subject matter jurisdiction over Petitioner's UCCJEA claim pursuant to 28 U.S.C.A. § 1367.

12.    This court has personal jurisdiction over the Respondent, as, upon information and belief, Respondent resides within this Court's jurisdiction and is currently present within the jurisdiction of this court.

## STATEMENT OF FACTS

A. The Parties

13.    The Petitioner, Perl Felberbaum, was born in Israel, and is a citizen of Israel.

14.    The Respondent, up and until April of 2023, Yaakov Felberbaum resided at 39 Ezrat Street, Bnei Brak, Israel.

15.    Upon information and belief, the Respondent was born in Brooklyn, New York, and is a citizen of the United States.

16.    Upon information and belief, the Respondent currently resides at 80 Meron Road, Monsey, New York 10952.

17.    The Petitioner and Respondent were married in the city of Bnei Brak, Israel on November 2, 2011. Annexed hereto as **Exhibit A** is the Marriage Certificate of the parties.

18.    Petitioner and Respondent are the natural parents of the children, namely: B.F., Date of Birth May 1, 2014 and M.F., Date of Birth September 11, 2015, who were both born in New York. Annexed hereto as **Exhibit B** are the Birth Certificates of the subject children.

19.     The Children's Habitual Residence was and continues to be in Bnei Brak, Israel despite Respondent's Wrongful Retention of the Children in New York.

20.     The Respondent took the Children to New York on or about April of 2023 for Passover holiday and has refused to return the children to Israel since then. The Respondent and the children were originally supposed to return back to Israel prior to April 18, 2023.

21.     From March, 2019 until the children went on their aforementioned Passover holiday, the children habitually resided with Petitioner in Bnei Brak, Israel.

22.     The Hague Convention applies where a child under the age of sixteen (16) years has been removed from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child. Convention, Article 4.

23.     B.F., Date of Birth May 1, 2014 is now nine (9) years old and M.F., Date of Birth September 11, 2015, is now eight (8) years old.

24.     Prior to the Respondent's wrongful retention of the Children within the State of New York commencing in April of 2023, they were habitual residents of Israel within the meaning of the Hague Convention, residing with their natural mother in Bnei Brak, Israel.

25.     Petitioner has valid rights and custody over the Children under Israel law.

26.     Petitioner was exercising valid rights of custody over the Children in Bnei Brak, Israel, within the meaning of Articles Three and Five of the Hague Convention, prior to Respondent's wrongful retention of them in New York commencing in April of 2023.

27.     On or about March, 2023, Petitioner agreed to allow the children to visit United States with the Respondent, with the agreement and/or understanding that the Children would be returned to Petitioner in Bnei Brak, Israel in late April of 2023.

28.    Respondent has wrongfully retained the Children in the United States in violation of the Hague Convention, and has failed to return the Children to Petitioner in Israel as previously agreed.

29.    Despite Petitioner's repeated requests to return the Children, Respondent has refused to do so.

30.    Respondent continues to wrongfully retain the Children in the United States, despite requests and efforts on Petitioner's part to have the Children returned to Israel.

31.    Respondent also continues to wrongfully obstruct Petitioner's access to the Children within the State of New York.

32.    Petitioner filed an Application with the Central Authority of the Official Solicitor's Office in Israel on November 15, 2023, requesting that the Central Authority act on Petitioner's behalf to secure the return of the Children back to Petitioner in Israel. Annexed hereto as **Exhibit C** is the application of the Petitioner.

33.    The International Child Abduction and Contact Unit of the Official Solicitor's Office in Bnei Brak, Israel issued a letter directed to the United States Department of State, Office of Children's Issues, on July 6, 2022, transmitting Petitioner's Application. Annexed hereto as **Exhibit D** is the letter sent to the United States Department of State.

34.    Respondent has frustrated Petitioner's efforts to secure the return of her Children back to Israel, by relocating to New York State with the Children without providing notice to Petitioner of Respondent's intentions.

35.    Respondent has further acted to obstruct and continues to restrict Petitioner's telephone communications with the Children, including by recently disconnecting the telephone number Petitioner was using to communicate with the Children.

36.    Upon information and belief, Respondent and the Children are currently residing at 80 Meron Road, Monsey, New York 10952, in the State of New York, County of Rockland.

37.    Pursuant to Article 12 of the Convention, [w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

38.    Although more than a year has elapsed since Respondent and the Children entered the United States, Petitioner was unaware that this was a permanent relocation for the Respondent with the Children and as soon as Petitioner realized that fact, she immediately contacted officials as outlined above.

39.    Respondent has wrongfully retained the Children's habitual country of residence, without Petitioner's consent or permission, and in violation of the valid rights of residential custody of the Petitioner.

40.    Petitioner is also being denied access to her children in violation of the Hague Convention. In addition to Respondent's wrongful retention of the Children within the State of New York in violation of the Hague Convention.

## REQUEST FOR ENTRY OF AN ORDER DIRECTING THE RETURN OF THE
## CHIDLREN TO PETITIONER FORTHWITH

41.    Petitioner requests that the court enter an Order, pursuant to Article 12 of the Convention, directing that Respondent return the Children to Petitioner's care and custody in Bnei Brak, Israel forthwith.

### REQUEST FOR EXPEDITED HEARING

42.    Petitioner requests that an expedited hearing pursuant to Article 11 of the Convention and DRL § 77-g(3), take place concurrently in the interests of justice.

43.    44. Pursuant to 42 U.S.C.A. § 11603(c), Petitioner requests that Respondent shall be given notice of hearing pursuant to the Court Rules.

## PROVISIONAL RELIEF

44.    Pending further hearing in this court, it is requested that this court issue an immediate order prohibiting the removal of the Children from the jurisdiction of this court, taking into custody for safe-keeping by the court all of the Childrens' and Respondent's travel documents (including passports and visas), and setting an expedited hearing on the Petition for the Return of the Children to Petitioner pursuant to 42 U.S.C.A. § 11604.

45.    Pending further hearing in this court, it is requested that this court issue an immediate order directing that the name of the Children be entered into the national police computer database in the missing person's section.

46.    Petitioner requests, for the well-being of the Children, pending further hearing in this court that Petitioner be given immediate access/information including, but not limited to: (a) information regarding his whereabouts of the Children, (b) a telephone number at which the Children can be reached, and (c) regular access, via telephone, to the Children.

47.    Pursuant to Article 16 of the Hague Convention, Petitioner requests that this court stay any and all proceedings that Respondent may have commenced, or may commence in the future, before the courts of the State of New York or any other state or territory of the United States, concerning the custody of the Children, pending a determination under the Hague Convention of this Petition.

48.     Section 5(b) (Provisional Remedies) of ICARA provides, inter alia, that, in a proceeding under Section 4(b) for the return of a child, "No court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." 42 U.S.C.A. § 11604.

49.     In New York, the UCCJEA is the source for statutory law governing, inter alia, the resolution of both domestic and international child custody disputes. DRL § 76-i(1) authorizes this court to order the appearance of the child and custodian together. Therefore, this court has the authority to order the immediate appearance of Respondent and of the Children together.

50.     Furthermore, the Respondent has violated Israeli law by taking and keeping the Children in the United States without consent of the Petitioner.

51.     Furthermore, Petitioner requests that the court issue an Order to Show Cause, and direct that said Order be served immediately by United States Marshals Office on Respondent, directing that he appear before this court at the hearing along with the Children.

RELIEF REQUESTED

WHEREFORE, Petitioner respectfully requests that this court:

a.  grant Judgment in favor of Petitioner directing that the Children be returned forthwith to Petitioner's care and custody in Israel, pursuant to Article 12 of the Convention; and

b.  Issue an immediate Order prohibiting the Childrens' removal from the jurisdiction of this court, pending the court's hearing and determination on this Petition, which Order shall temporarily restrain Respondent, and any person acting in concert with or participating with Respondent, from taking any action to remove the Children from the jurisdiction of this court pending a hearing and determination on this Petition; and

c.  Issue an Order directing that Respondent surrender into the custody of this court Respondent's and the Childrens' travel documents (including passports and visas), pending a determination of this Petition pursuant to 42 U.S.C.A. § 11604; and

d.  Direct that the name of the Children shall be entered into the National Crime Information Center (NCIC) computer database in the missing persons section; and

e.  Issue an Order directing Respondent to advise Petitioner's counsel and this court in writing of Respondent's and the Childrens' current address, current telephone number and other contact information to facilitate Petitioner's access to the Children, and that pending a hearing and determination on the merits of the Petition, Respondent shall notify Petitioner's counsel and this court immediately of any change or contemplated change in such contact information; and

f.  Issue an Order directing Respondent shall allow Petitioner access to the Children for telephonic and personal visitation; and

g.  Direct respondent to appear at this court with the Children at an expedited hearing to show cause why the Children should not be returned to Petitioner's care and custody forthwith pursuant to the Hague Convention, ICARA and the New York's UCCJEA; and

h.  Issue an Order staying any proceedings in any Court in the State of New York or any other state or territory of the United States concerning the custody of the Children as required by Article 16 of the Convention; and

i.  Grant such other and further relief as this court may deem just and proper, including but not limited to reimbursement of Petitioner's costs in this action, as well as Petitioner's attorneys' fees, pursuant to 42 U.S.C.A. § 11607(b)(3).

Dated:    May 31, 2024

Woodmere, New York

*Menachem White*

Menachem White, Esq.
Attorney for Petitioner
Law Office of Menachem White
4 Brower Avenue, Suite 3
Woodmere, New York 11598
(516) 504-4101

I, P.F., declare verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. Further, I certify that I am qualified and authorized to file this Petition.

Executed on May 28, 2024.

PERL FELDBERBAUM

Signature

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

24-CV-02333 (PMH)

---

PERL FELBERBAUM,

Plaintiff/Petitioner,

– against –

YAAKOV FELBERBAUM,

Defendant/Respondent.

---

PETITIONER'S
MEMORANDUM OF LAW

---

Law Office of Menachem White, PLLC
*Attorneys for Petitioner*
4 Brower Avenue, Suite 3
Woodmere, New York 11598
(516) 504-4101

## TABLE OF CONTENTS

Table of Authorities … iii

Jurisdictional Statement … 1

Statement of Facts … 1

    I.  Introduction … 1

    II.  Background … 1

    III. Ms. P.F.'s Hague Convention Claim … 4

        A.        Grave Risk of Harm Defense … 5

        B.        Sufficient Age and Maturity Defense … 6

        C.        Consent and/or Acquiescence Defense … 6

Argument … 7

    I.  RESPONDENT'S RETENTION OF THE CHILDREN IN 2023, WAS WRONGFUL UNDER THE HAGUE CONVENTION AND ENTITLES THE PETITIONER TO JUDGMENT IMMEDIATELY REPATRIATING THE CHILD TO TO ISRAEL … 7

        A.  B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11, 2015 WAS A HABITUAL RESIDENT OF TO ISRAEL IMMEDIATELY PRIOR TO Y.F.'S WRONGFUL RETENTION OF THE CHILD IN THE UNITED STATES … 9

        B.  P.F. HAS RIGHTS OF CUSTODY WITH RESPECT TO B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11, 2015 UNDER ISRAELI LAW … 11

        C.  AT THE TIME OF MR LARSON'S WRONGFUL RETENTION OF B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11, 2015 IN THE UNITED STATES, P.F. WAS ACTUALLY EXERCISING RIGHTS OF CUSTODY AS TO THE CHILD OR WOULD HAVE BEEN EXERCISING SUCH RIGHTS BUT FOR THE WRONGFUL RETENTION … 12

        D.  Y.F. WRONGFULLY RETAINED B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11, 2015 IN THE UNITED STATES WHEN HE FAILED TO RETURN THE CHILD TO ISRAEL ON SEPTEMBER 10, 2014 … 14

II.  A HAGUE CONVENTION ART. 13(B) "GRAVE RISK OF HARM" OR
    "INTOLERABLE SITUATION" DEFENSE TO REPATRIATION DOES NOT EXIST
    AS A MATTER OF LAW ... 14

III. B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11,
    2015 HAS NOT ATTAINED AN AGE AND DEGREE OF MATURITY AT WHICH IT
    IS APPROPRIATE TO TAKE ACCOUNT OF HIS VIEWS ... 17

IV. P.F. DID NOT CONSENT TO B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE
    OF BIRTH SEPTEMBER 11, 2015'S WRONGFUL RETENTION IN THE UNITED
    STATES OR MANIFEST A SUBJECTIVE INTENT THAT HE REMAIN IN THE
    UNITED STATES THEREAFTER ... 18

Conclusion ... 19

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Abbott*, 568 U.S. 1 (2010) ... 11

*Asvesta v. Petroutsas*, 580 F.3d 1000 (9th Cir. 2009) ... 8

*Bader v. Kramer*, 484 F.3d 666 (4th Cir. 2007) ... 13

*Baxter v. Baxter*, 423 F.3d 363 (3d Cir. 2005) ... 12, 18

*Chafin v. Chafin*, 133 S.Ct. 1017 (2013) ... 8

*Charalambous v. Charalambous*, No. 2:10-CV-375, 2010 WL 4115495 (D. Me. Oct. 12, 2010) ... 16

*Chechel v. Brignol*, No. 5:10-CV-164-OC-10GRL, 2010 WL 2510391 (M.D. Fla. June 21, 2010) ... 14

*Croll v. Croll*, 66 F. Supp. 2d 554 (S.D.N.Y. 1999) ... 16

*Flynn v. Borders*, 472 F. Supp. 2d 906 (E.D. Ky. 2007) ... 16

*Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996) ... 12, 13

*Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005) ... 9, 10

*Hollis v. O'Driscoll*, 739 F.3d 113 (2d Cir. 2014) ... 19

*In re Kim*, 404 F. Supp. 2d 495 (S.D.N.Y. 2005) ... 20

*Lockhart v. Smith*, No. 06-CV-160-P-S, 2006 WL 3091295 (D. Me. Oct. 20, 2006) ... 16

*McManus v. McManus*, 354 F. Supp. 2d 62 (D. Mass. 2005) ...16

*Mitsuing v. Lowry*, No. 4:09-CV-02124ERW, 2010 WL 1610418 (E.D. Mo. April 21, 2012) ... 14

*Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) ... 18

*Nunez v. Ramirez*, No. CV07-01205-PHX-EHC, 2008 WL 898658 (D. Ariz. Mar. 28, 2008) ... 16

*Santowsky v. Kramer*, 455 U.S. 745 (1982) ... 16

*Sealed Appellant v. Sealed Appellee*, 394 F.3d 338 (5th Cir. 2004) ... 13

*Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007) … 17

*Souratgar v. Fair*, 720 F.3d 96 (2d Cir. 2013) … 15, 16, 17

*Tahan v. Duquette*, 259 N.J. Super. Ct. 328, 613 A.2d 486 (App. Div. 1992) … 17

*Tropea v. Tropea*, 87 N.Y.2d 727 (1996) … 9

*Walker v. Walker*, 701 F.3d 1110 (7th Cir. 2012) … 13

## Statutes & Treaties

Israeli Civil Code § 1662(1) … 11

Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, 1343 U.N.T.S. 98, T.I.A.S. No. 11,670 ("Hague Convention") … 1

Hague Convention art. 3 … 14

Hague Convention art. 3(a) … 11

Hague Convention art. 6 … 11

Hague Convention art. 7 … 11

Hague Convention art. 11 … 19

Hague Convention art. 13 … 17

Hague Convention art. 13(a) … 18

Hague Convention art. 13(b) … 14

22 U.S.C. § 9001 … 7

22 U.S.C. §§ 9001-9011 … 1

22 U.S.C. § 9001(b)(4) … 8, 12

22 U.S.C. § 9003(a) … 1

22 U.S.C. § 9003(b) … 1

22 U.S.C. § 9003(e)(2)(A) … 15

22 U.S.C. § 9003(e)(2)(B) … 18

22 U.S.C. § 9007(b)(3) … 19

28 U.S.C. § 1331 … 1

**Other Authorities**

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) … 3

Black's Law Dictionary (10th ed. 2014) … 15

N.Y. Pattern Jur. Instr. 1:64 (2014) … 16

U.S. Dept. of State, http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html … 7

## JURISDICTIONAL STATEMENT

The United States District Court has jurisdiction over this action pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9003(a), (b) and 28 U.S.C. § 1331.

## STATEMENT OF FACTS

### I.  Introduction

Plaintiff/Petitioner, Perl Felberbaum, commenced this action on March 27, 2024, pursuant to the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, 1343 U.N.T.S. 98, T.I.A.S. No. 11,670 ("Hague Convention"), as implemented by ICARA, 22 U.S.C. §§ 9001-9011, for judgment directing repatriation of her children, B.F., DATE OF BIRTH MAY 1, 2014 AND M.F., DATE OF BIRTH SEPTEMBER 11, 2015 (hereinafter referred to as "Children") to ISRAEL, where she and the Children had been permanently residing since 2019.

Plaintiff/Petitioner and the Children were residents of ISRAEL immediately prior to the unilateral retention of the Children within the State of New York by their father, Defendant/Respondent, at the conclusion of an agreed-upon visit between the parties herein which was supposed to be end of April, 2023.

### II. Background

A. The Parties

1.    The Petitioner, Perl Felberbaum, was born in Israel, and is a citizen of Israel.

2.    The Petitioner resides at 39 Ezrat Street, Bnei Brak, Israel.

3.    Upon information and belief, the Respondent, Yaakov Felberbaum, was born in Brooklyn, New York, and is a citizen of the United States.

4.      Upon information and belief, the Respondent currently resides at 80 Meron Road, Monsey, New York 10952.

5.      The Petitioner and Respondent were married in the city of Bnei Brak, Israel on November 2, 2011. Annexed hereto as **Exhibit A** is the Marriage Certificate of the parties.

6.      Petitioner and Respondent are the natural parents of the Children who were born in New York. Annexed hereto as **Exhibit B** are the Birth Certificates of the children.

7.      The Children's' Habitual Residence was in Israel prior to Respondent's Wrongful Retention of the Children in New York.

8.      The Respondent took the Children to New York in April, 2023 for Passover holiday and has refused to return the Children to Israel since then. The Respondent and the Children were supposed to return before April 18, 2023.

9.      From 2019    until    the    wrongful    retention    of the    Children    by Respondent, they habitually resided with the Petitioner in Bnei Brak, Israel.

10.     The Hague Convention applies where a child under the age of sixteen (16) years has been removed from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child. Convention, Article 4.

11.     B.F., Date of Birth May 1, 2014 is now nine (9) years old and M.F., Date of Birth September 11, 2015, is now eight (8) years old.

12.     Prior to the wrongful retention of the Children by Respondent within the State of New York commencing in April, 2023, the Children were habitual residents of Israel within the meaning of the Hague Convention, residing with their natural mother in Bnei Brak, Israel.

13. Petitioner has valid rights and custody over the Children under Israel law.

14. Petitioner was exercising valid rights of custody over her Children in Bnei Brak, Israel, within the meaning of Articles Three and Five of the Hague Convention, prior to the wrongful retention of the Children by Respondent in New York commencing in April. 2023.

15. Petitioner agreed to allow the Children to visit New York with the Respondent in March, 2023, with the agreement that Respondent would return the Children back to Petitioner in Bnei Brak, Israel in April, 2023.

16. Respondent has wrongfully retained the Children in the United States in violation of the Hague Convention, and has failed to return the Children back to the Petitioner at the end of April, 2023 as agreed, notwithstanding Petitioner's requests.

17. Respondent continues to wrongfully retain the Children in the United States, more specifically within the State of New York, despite requests and efforts on Petitioner's part to have the Children returned to Israel.

18. Respondent also continues to wrongfully obstruct Petitioner's access to the Children in New York.

19. Petitioner filed an Application with the Central Authority of the Official Solicitor's Office in Israel on November 15, 2023, requesting that the Central Authority act on Petitioner's behalf to secure the return of the Children to Petitioner in Israel. Annexed hereto as **Exhibit C** is the application of the Petitioner.

20. The International Child Abduction and Contact Unit of the Official Solicitor's Office in Bnei Brak, Israel issued a letter directed to the United States Department of State, Office of Children's Issues, on November 15, 2023, transmitting Petitioner's Application. Annexed hereto as **Exhibit D** is the letter sent to the United States Department of State.

21.     Respondent has frustrated Petitioner's efforts to secure the return of the Children to Israel, by relocating without providing notice to Petitioner of Respondent's intentions to do so.

22.     Respondent has further acted to obstruct and restricted Petitioner's telephone communications with the Children including by recently disconnecting the telephone number Petitioner was using to communicate with the Children.

23.     Upon information and belief, Respondent and the Children are currently residing at 80 Meron Road, Monsey, New York 10952, within the State of New York, County of Rockland.

24.     Pursuant to Article 12 of the Convention, [w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

25.     Less than one year has elapsed from the date of the Respondent's wrongful retention of the Children which was beginning on or about April 7, 2023 and the initiation of this proceeding.

26.     Respondent has wrongfully retained the Children in the United States away from the Children's habitual country of residence, without Petitioner's consent or permission, and in violation of the valid rights of custody of Petitioner.

27.     Petitioner is also being denied access to her Children in violation of the Hague Convention in addition to Respondent's wrongful retention of the Children within the State of New York in violation of the Hague Convention.

### III. Perl Felberbaum's Hague Convention Claim

Perl Felberbaum bases her Hague Convention claim for the Children's repatriation to ISRAEL on the above. Specifically, she contends that, at the time Defendant/Respondent retained the Children in New York State (i) Perl Felberbaum had established ISRAEL as the Children 's permanent home, (ii) Perl Felberbaum had rights of custody to the Children under Israeli law, (iii) Perl Felberbaum was exercising her right to custody of the Children under Israeli law, and (iv) Yaakov Felberbaum breached Perl Felberbaum's rights of custody, when he wrongfully retained the Children in the United States on or about April, 2023, contrary to the parties' prior agreement.

### ARGUMENT

## I. DEFENDANT/RESPONDENT'S RETENTION OF THE CHILDREN IN THE UNITED STATES in April, 2023, WAS WRONGFUL UNDER THE HAGUE CONVENTION AND ENTITLES PLAINTIFF/PETITIONER TO JUDGMENT IMMEDIATELY REPATRIATING THE CHILDREN TO TO ISRAEL

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11. In 1988, the United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, [22] U.S.C. § [9001] *et seq.*

*Chafin v. Chafin*, 133 S.Ct. 1017, 1021 (2013). The United States and TO ISRAEL have been treaty partners under the Hague Convention since December 1, 1990. U.S. Dept. of State,

http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (last visited Mar. 7, 2015).

The goal of the Hague Convention is to regulate the transnational relocation of children without the consent of the other parent, "to secure the prompt return of children wrongfully removed to or retained in any Contracting State and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Chafin*, 133 S.Ct. at 1021 (citations omitted).

> Article 3 of the Convention provides that the removal or the retention of a child is to be considered wrongful when it is in breach of rights of custody attributed to a … [parent], either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention and at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.* (citations and quotation marks omitted).

To be sure, the Hague Convention is not a vehicle for determining relative parental fitness and custody rights or enforcing custody decrees rendered by a foreign country. ICARA, 22 U.S.C § 9001(b)(4) ("The [Hague] Convention … empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."); *e.g.*, *Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009) ("[I]t is the State of habitual residence to which the child should be returned and where the ultimate merits of the custody fight are to be decided.") (citation omitted).  Following repatriation, the abducting parent may commence custody litigation in the country to which repatriation is ordered; but the court

directing repatriation is entirely without subject matter jurisdiction to address issues of custody, the abducting parent's ultimate right to relocate the child's residence,[1] and the child's best interests.

Under the Hague Convention and ICARA, P.F.'s cause of action for repatriation of the Children to ISRAEL is warranted because her situation meets four specific foundational requirements for repatriation:

1. The Children were habitual residents of ISRAEL immediately prior to April 2023 when Defendant/Respondent failed to return the Children to ISRAEL as previously agreed;

2. Under Israeli law, Petitioner has rights of custody to the Children including rights relating to the care of the Children including the right to determine the Children's place of residence;

3. Defendant/Respondent wrongfully retained the Children in the United States when he failed to return the Children to ISRAEL in April of 2023; and

4. Perl Felberbaum was exercising rights of custody to the Children at the time of the Children's wrongful retention in the United States or would have exercised such rights but for the retention.

Each element of Perl Felberbaum s cause of action for repatriation and the expected evidence in support of the same is addressed *in seriatim* below.

## A. THE CHILDREN WERE HABITUAL RESIDENTS OF ISRAEL IMMEDIATELY PRIOR TO DEFENDANT/RESPONDENT'S WRONGFUL RETENTION OF THE CHILDREN IN THE UNITED STATES

---

[1] The right to relocate with a child is a component of state law custody jurisprudence. *See, e.g., Tropea v. Tropea*, 87 N.Y.2d 727 (1996).

Existing Second Circuit law defining the child's "state of habitual residence" was established in *Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005). *Gitter* creates a two-part analysis for determining habitual residence. First, the court must first determine – as a "primary consideration" – the "shared intent of those entitled to fix a child's residence (usually the parents) at the latest time that their intent was shared." *Id.* at 134. In this regard, the child's actual location is relevant, but the parents' actual intent controls. Thus, a child might be physically present in a particular location but the child's presence at a particular location is intended by the parents to be temporary. In determining the parents' shared intent, the court is required to consider evidence of their "actions and declarations", i.e., what they did and what they said. *Id.*

Second, notwithstanding the parents' intent, the court must consider "whether the evidence unequivocally points to the conclusion that the child [has become] acclimated to [another] location …." *Id.* In other words, the reality can *possibly* trump the parents' shared intent. By way of illustration, in *Gitter* the Second Circuit wrote:

> We would be hard pressed to conclude, for example, that a child who has spent fifteen years abroad in the same State is not habitually resident there, even if the parents intended some day to [have the child] return and did not intend that the child acquire a new habitual residence.

*Id.* at 133.

In the present case, there can be no dispute that the Children s state of habitual residence was, and continues to be, ISRAEL. The parties shared intent can be inferred by (i) the history of their relationship, i.e., that Perl Felberbaum had *de facto* decision-making authority concerning where she and the Children would live;

Thus, the parties' last shared intent and agreement was that Perl Felberbaum would have authority to determine all custodial matters, including where the Children would reside. On that basis Perl Felberbaum established ISRAEL as the Children's "state of habitual residence" in 2019.

Finally, no serious claim can be made that the Children hava somehow become "acclimated" to the United States within the short time they have been here

## B. PERL FELBERBAUM HAS RIGHTS OF CUSTODY WITH RESPECT TO THE CHILDREN UNDER ISRAELI LAW

As stated, a "removal or … retention of a child is … wrongful" if it is in "breach of rights of custody attributed to [a parent] …, either jointly or alone, under the law of the state … [of] the [child's habitual residence]." Hague Convention art. 3(a). "This uniform, text-based approach ensures international consistency in interpreting the [Hague] Convention, foreclosing courts from relying on local usage to undermine recognition of custodial arrangements in other countries and under other legal traditions." *Abbott v. Abbott*, 560 U.S. 1, 2-3 (2010).

Israeli Civil Code § 1662(1), gives Perl Felberbaum rights of custody as to the Children. Additionally, under Israeli law, Defendant's determination to change the Children's residence to the United States last April of 2023 could not have been legally effective unless both parties had previously agreed to the change.

## C. AT THE TIME OF DEFENDANT'S WRONGFUL RETENTION OF THE CHILDREN, PERL FELBERBAUM WAS ACTUALLY EXERCISING RIGHTS OF CUSTODY AS TO THE CHILDREN OR WOULD HAVE BEEN EXERCISING SUCH RIGHTS BUT FOR THE WRONGFUL RETENTION

Perl Felberbaum must establish that she actually was exercising his rights of custody at the time of the Children's retention in New York, or that she would have exercised those rights but for the Children's wrongful retention. The Hague Convention does not define the phrase "actual exercise."

The leading case defining the actual exercise of rights of custody is *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996). As explained in *Friedrich*:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop-completely[,] avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Id.* at 1066 (citing ICARA, re-codified at 22 U.S.C. § 9001(b)(4)).

The Second Circuit has not addressed the "exercise of custody rights" issue. However, other circuits have followed the analysis in *Friedrich*, holding that maintaining any sort of relationship with the child is sufficient. For example:

- *In Baxter v. Baxter*, 423 F.3d 363 (3d Cir. 2005), the Third Circuit emphasized that the test for finding the non-exercise of custody rights under the Hague Convention is stringent. The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child ...."

  *Id.* at 370 (quotation marks omitted) (citing *Friedrich*).

- The Fourth Circuit followed suit in *Bader v. Kramer*, 484 F.3d 666 (4th Cir. 2007), holding that

  we find persuasive the nearly-universal approach taken by courts faced with the question of the exercise of custody rights, and we adopt it here. Accordingly, we will liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.

  *Id.* at 671 (quotation marks omitted) (citing *Friedrich*).

- The Fifth Circuit held likewise in *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338 (5th Cir. 2004), stating that "the district court erred in its conclusion that ... [the] Father was *not* exercising his custody rights. At the district court hearing, Mother conceded Father

visited the children about five times a year and paid child support to her." *Id.* at 345 (citing *Friedrich*).

• To the same effect is *Walker v. Walker*, 701 F.3d 1110 (7th Cir. 2012), in which the Seventh Circuit held that

> courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. Indeed, a person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.
>
> As the Sixth Circuit has explained [in *Friedrich*], sound policy reasons support this liberal standard. U.S. courts are not well equipped to determine whether the courts of a child's habitual residence would conclude that a parent with *de jure* custody rights has nevertheless forfeited those rights because he or she was not acting sufficiently like a custodial parent. Moreover, any determination that a parent has failed to behave in a sufficiently parent-like fashion comes dangerously close to an adjudication on the merits of the parents' custody dispute, which (to repeat) is something the Convention expressly reserves for the courts of the child's habitual residence. Finally, the confusing dynamics of domestic strife make it difficult to assess adequately the acts and motivations of a parent.

*Id.* at 1121 (citations and quotation marks omitted) (citing *Friedrich*).

Perl Felberbaum was the Children's full-time caretaker. Under the *Friedrich* analysis, she was indisputably exercising rights to custody as to the Children at all relevant times as a matter of law. Any claim by Defendant/Respondent that Perl Felberbaum was not exercising rights of custody would be specious and without any basis whatsoever in fact or law.

## D. DEFENDANT/RESPONDENT WRONGFULLY RETAINED THE CHILDREN IN THE UNITED STATES WHEN HE FAILED TO RETURN THE CHILDREN TO ISRAEL IN APRIL 2023

The Hague Convention expressly proscribes a child's wrongful "removal" from his or her state of habitual residence or "retention" in a foreign country. Hague Convention art. 3. A wrongful retention in a foreign country takes place when the left-behind parent consents to an overseas visit or trip for a specific period but not to a permanent removal. "[T]he wrongful retention begins when the agreed date [of return] passes ...." *Chechel v. Brignol*, No. 5:10-CV-164-OC-10GRL, 2010 WL 2510391, at *7 (M.D. Fla. June 21, 2010) (citations omitted); *see also, e.g., Mitsuing v. Lowry*, No. 4:09-CV-02124ERW, 2010 WL 1610418, at *10 n.5 (E.D. Mo. April 21, 2012) ("The Court notes that Mother is asserting wrongful retention in violation of the Hague Convention, and not wrongful removal. This is presumably because when C.L. was removed from Canada to the United States by Grandfather and Grandmother, they had the express permission of both Mother and Father.").

Here, Perl Felberbaum consented to the Children visiting New York for Passover in 2023 to be returned end of April of 2023. When Respondent failed to return the Children's wrongful retention in the United States began.

## II.  A HAGUE CONVENTION ART. 13(B) "GRAVE RISK OF HARM" OR "INTOLERABLE SITUATION" DEFENSE TO REPATRIATION DOES NOT EXIST AS A MATTER OF LAW

The Hague Convention art. 13(b) sets forth a limited affirmative defense to repatriation, where "there is a grave risk that [the child's] return [to the state of habitual residence] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The affirmative defense must be established by clear and convincing evidence. ICARA, 22 U.S.C. § 9003(e)(2)(A).

As recently explained by the Second Circuit:

[A] grave risk of harm from repatriation arises in two situations: (1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason,* may be incapable or unwilling to give the child adequate protection. The potential harm to the child must be severe, and the the [sic] level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize.

This 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule. … [P]ermissive invocation of the affirmative defenses would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.

*Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013) (emphasis in original) (quotation marks, brackets and citations omitted).

Here, Defendant/Respondent will no doubt argue that Perl Felberbaum is an unfit parent. Perl Felberbaum inherently denies these allegations. Any negative stories by the Children about the care they received in ISRAEL, even if true, do not constitute clear and convincing evidence[2] of "potential harm to [the Children] [that is] … severe … [in terms of the] magnitude of the potential harm but also the probability that the harm will materialize." *Id.* at 103. "Sporadic or isolated incidents of physical discipline directed at the child … have not been found to constitute a grave risk." *Id.* at 104 (citations omitted).

District courts across the country have engaged in the same analysis, emphasizing the high level of proof required to establish an art. 13(b) "grave risk of harm" defense and rejecting the defense based on alleged child abuse or neglect that can be addressed in the child's state of habitual residence. *E.g., Charalambous v. Charalambous*, No. 2:10-CV-375, 2010 WL 4115495, at *10 (D. Me. Oct. 12, 2010), *aff'd*, 627 F.3d 462 (1st Cir. 2010) (holding that striking child on multiple occasions with a wooden spoon and imposing physical discipline by pulling child's ear, did not constitute a grave risk of harm); *Nunez v. Ramirez*, No. CV07-01205-PHX-EHC, 2008 WL 898658, at *5 (D. Ariz. Mar. 28, 2008) (same – striking children "on different occasions, including striking them with a belt"); *Flynn v. Borders*, 472 F. Supp. 2d 906, 912-14 (E.D. Ky. 2007) (same – abuse of alcohol, slapping child "from time to time" and speaking to

---

[2] "Clear and convincing evidence is defined as "[e]vidence indicating that the thing to be proved is highly probable …..," Black's Law Dictionary (10th ed. 2014), and "conveys to the fact-finder the [higher] level of subjective certainty about his factual conclusions necessary to satisfy due process," *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). *See also* N.Y. Pattern Jury Instr. Civil 1:64 (2014) ("The burden is on the plaintiff to prove [the facts at issue] … by clear and convincing evidence. This means evidence that satisfies you that there is a high degree of probability [as to the facts you determine].").

child in degrading tone); *Lockhart v. Smith*, No. 06-CV-160-P-S, 2006 WL 3091295, at *3-*4 (D. Me. Oct. 20, 2006) (same – spanking and forcing child to watch "scary movies"); *McManus v. McManus*, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (same – subjecting children to physical discipline and psychological distress); *Croll v. Croll*, 66 F. Supp. 2d 554, 562 (S.D.N.Y. 1999), *rev'd on other grounds*, 229 F.3d 133 (2d Cir. 2000) (same - red handprint mark on her daughter's thigh apparently caused by the other parent).

Finally and as emphasized in *Souratgar*, a grave risk of harm, if any, can only exist if the allegations made against Perl Felberbaum concerning impaired parenting abilities are both "true and incapable of redress by the Israeli courts and child welfare authorities." *See Souratgar*, 720 F.3d at 104. But, as noted, the Israeli courts are fully equipped to address any of these issues. To the extent Defendant/Respondent's allegations could be proved to have any merit and might support a request a transfer of the Children's custody to Defendant/Respondent in New York, he would have to present his evidence on this issue to a Israeli court with jurisdiction over issues involving child custody. *See supra* note 1 and accompanying text.

## III. THE CHILDREN HAVE NOT ATTAINED AN AGE AND DEGREE OF MATURITY AT WHICH IT IS APPROPRIATE TO TAKE ACCOUNT OF THEIR VIEWS

Hague Convention art. 13 allows a court to refuse repatriation if it finds as a factual matter that "the child objects to being returned and has obtained an age and degree of maturity at which it is appropriate to take account of its views." In that regard, art. 13 expressly requires the court to consider the child's "social background" – which would include evidence provided by the neutral forensic mental health professional, Richard G. Dudley, Jr., M.D.

The Hague Convention does not set forth a specific age at which a child's objection either should or should not be considered, although the New Jersey Appellate Division has held that the maturity exception "simply does not apply to a nine-year-old." *Tahan v. Duquette*, 259 N.J. Super. 328, 335, 613 A.2d 486, 490 (N. J. Super. Ct. App. Div. 1992); *but see, e.g., Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (holding otherwise with respect to an eight-year-old). The Sixth Circuit has noted that the inquiry is "fact-intensive[,] … idiosyncratic [and results in] decisions … [that] are understandably disparate." *Id.* at 604.

The "age and maturity" defense must be established by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

Here, the court should not conclude that the Children B attained an age and degree of maturity at which their views on staying in the United States (or their statements, if any, on any other issue) should be taken seriously.

## IV. PERL FELBERBAUM DID NOT CONSENT TO THE CHILDREN'S WRONGFUL RETENTION IN THE UNITED STATES OR MANIFEST A SUBJECTIVE INTENT THAT THEY REMAIN IN THE UNITED STATES THEREAFTER

"[A] district court is not bound to return a wrongfully removed or retained child if the respondent demonstrates by a preponderance of the evidence that the petitioner had consented to or subsequently acquiesced in the removal or retention." *Mota v. Castillo*, 692 F.3d 108, 117 (2d Cir. 2012) (citing Hague Convention, art. 13(a) and ICARA, re-codified at 22 U.S.C. § 9003(e)(2)(B)). The issue is "the subjective intent of the parent who is claimed to have

acquiesced." *Baxter*, 423 F.3d at 371; *accord In re Kim*, 404 F. Supp. 2d 495, 516-17 (S.D.N.Y. 2005).

Here Perl Felberbaum clearly stated that the Children were only to come to New York for Passover and thereafter returned home to Israel.

Regardless, the parties communicated and discussed about the return of the Children

Given all of the above and viewed in context, there is nothing to justify a conclusion that Perl Felberbaum ever intended to waive her rights under the Hague Convention.

## CONCLUSION

Perl Felberbaum's Petition for repatriation of the Children to ISRAEL, pursuant to the Hague Convention, should be granted "expeditiously." Hague Convention art. 11. This would simultaneously protect the Children's interest in having the courts in ISRAEL – their state of habitual residence – determine the parties' underlying custody dispute and vindicate important treaty obligations of the United States concerning children, such as the Children, who are wrongfully retained in the United States. As detailed above, Defendant/Respondent cannot establish a basis for proceeding otherwise.

In addition, Perl Felberbaum is presumptively entitled to an award for the reasonable "costs and fees" she incurred in prosecuting this action. ICARA, 22 U.S.C. § 9007(b)(3) ("Any court ordering the return of a child pursuant to … section 11603 of this title *shall order* the respondent to pay necessary expenses incurred by … the petitioner, including court costs, [and] legal fees[] … during the course of … the action, and transportation costs related to the return of the child, *unless the respondent establishes that such order would be clearly inappropriate*.") (emphasis added).

"The District Court, as the court ordering the return of the child, is responsible in the first instance for determining what costs, if any, should be assessed" at the end of the case and after any appellate remedies are exhausted. *Hollis v. O'Driscoll*, 739 F.3d 108, 113 (2d Cir. 2014). P.F. will seek such an award at the appropriate time.

Dated: Woodmere, New York

June 21, 2024

Law Office of Menachem White

*Asher White*

By _____

Asher White, Esq.

*Attorneys for Plaintiff/Petitioner*
4 Brower Avenue, Suite 3
Woodmere, New York 11598
(516) 504-4101
akhuto@gmail.com

EXHIBIT 2

# Ronit Notarized Translation Services

*Hebrew to English & English to Hebrew*

22 Aselin Drive
Spring Valley, NY 10977

CERTIFIED

STATE OF ISRAEL                     OFFICE OF RELIGIOUS SERVICES

## MARRIAGE CERTIFICATE  No. 2283317

| PERSONAL DETAILS | THE HUSBAND | THE WIFE |
|---|---|---|
| THE COUPLE - FAMILY NAME | ELTERBRAUM | ROZENTAL |
| LAST NAME FOLLOWING MARRIAGE | ELTERBRAUM | ELTERBRAUM |
| FIRST NAMES | JACOB | PERL |
| THE RELIGIOUS CONGREGATION | JEWISH, COHEN LEVI ISRAEL | ISRAEL |
| DATE OF BIRTH | JANUARY 18, 1983 | JANUARY 02, 1983 |
| RECENT PROFESSION | YESHIVA SCHOLAR | SECRETARY |
| PLACE OF RESIDENCE PRIOR TO MARRIAGE | UNITED STATES, MONSEY | 30 EZRA STREET, BNEI BRAK |
| I.D. NO. | AMERICAN PASSPORT 471199001 | 9-1311001 |
| THE PARENTS | | |
| LAST & FIRST NAMES OF THE FATHER | ELTERBRAUM YESHIYA TZVI | HOROWITZ ISRAEL |
| LAST & FIRST NAMES OF THE MOTHER | ELTERBRAUM CHANA ALTA | HOROWITZ ESTHER |
| | UNITED STATES | BNEI BRAK |
| FATHER'S RESIDENCY | UNITED STATES | BNEI BRAK |
| MOTHER'S RESIDENCY | | |
| FATHER'S PROFESSION | COMPUTERS | COLLECTOR |
| MOTHER'S PROFESSION | HOUSEWIFE | HOUSEWIFE |
| THE WITNESSES | ISRAEL ABRAM DAVIDOWITZ | YITZCHAK YOSEF WEISS |
| FAMILY NAME & FIRST NAMES | | |
| PROFESSION | | |

I hereby certify that the marriage ceremony of the above couple took place in BNEI BRAK on the 5th ... of ... CHESHVAN in the year of 5771 ... according to ... NOVEMBER 02, 2011 ... And ... of ... BNEI BRAK

Signature of Delegated Rabbi On file                     Stamp On file ... Office of Records ...

## CERTIFICATE OF TRANSLATION:

Upon penalty of perjury, I hereby certify that I have translated the Hebrew into English and that it is a true and correct translation from Hebrew into English.

Name and address of translator:
Tzvi Karni, 22 Aselin Drive
Spring Valley, NY 10977

TRANSLATOR SIGNATURE



NOTARY PUBLIC

2283317

תעודת זיהוי

07.01 1984

בני ברק שרות 89

039316001

בני ברק

20.11 2011

בני ברק



EXHIBIT 3



## STATE OF ISRAEL
## REQUEST FOR RETURN OF ABDUCTED CHILDREN
### HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE
### CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

FROM THE CENTRAL AUTHORITY FOR THE STATE OF ISRAEL
TO THE CENTRAL AUTHORITY OF THE UNITED STATES OF
AMERICA

1. **Details of the children:**

**First Child**

| | |
|---|---|
| First and last name(s) | B F |
| Date of birth | May 1, 2014 |
| Place of birth | United States |
| Habitual residence before removal | Miriam Hanveaa 23, Beit Shemesh, Israel |
| Nationality | American |
| Passport number | Unknown |
| Additional nationality | Israeli |
| Additional passport number | ████████ |
| Gender | Female |
| Physical description | Photo attached, see exhibit F |

**Second Child**

| | |
|---|---|
| First and last name(s) | M F |
| Date of birth | September 11, 2015 |
| Place of birth | United States |
| Habitual residence before removal | Miriam Hanveaa 23, Beit Shemesh, Israel |
| Nationality | American |
| Passport number | Unknown |
| Additional nationality | Israeli |
| Additional passport number | ████████ |
| Gender | Male |
| Physical description | Photo attached, see exhibit F |

1

## 2. Details of the Parents:

### Parent one

| | |
|---|---|
| First and last name(s) | P F |
| Date of birth | January 7, 1984 |
| Place of birth | Israel |
| Nationality | Israeli |
| Passport number | ▮▮▮▮▮▮ |
| Additional nationality | American |
| Additional passport number | ▮▮▮▮▮ |
| Relationship to the children | Mother |
| Occupation | Rhythmic dance instructor |
| Habitual residence | At the time of the wrongful retention the mother lived at Miriam Hanveaa 23, Beit Shemesh, Israel, but has since moved to Ezra 39, Bnei Brak, Israel. |
| Telephone number | +972-58-3279438 |
| Language(s) | Hebrew, minimum proficiency in English. Will require assistance with translation. |

### Parent two

| | |
|---|---|
| First and last name(s) | Y F          b |
| Date of birth | January 18, 1984 |
| Place of birth | United States |
| Nationality | American |
| Passport number | ▮▮▮▮▮▮ |
| Additional nationality | Israeli |
| Additional passport number | Unknown |
| Relationship to the children | Father |
| Occupation | Yeshiva student |
| Habitual residence | Miriam Hanveaa 23, Beit Shemesh, Israel |
| Telephone number | +1-8454500499 = appears to not be in use now |
| Language(s) | Hebrew and English |

| | |
|---|---|
| Date and Place of Marriage | November 2, 2011, Bnei Brak, Israel |
| Date and Place of Divorce | Still married |

3. **Detail of the individual requesting the return of the children:**

**Requesting individual**

| First and last name(s) | P F |
|---|---|
| Nationality | Israeli |
| Relationship to the child/ren | Mother |
| Habitual residence | Ezra 39, Bnei Brak, Israel |
| Telephone and mobile number | +972-58-3279438 |

4. **Details of legal advisor both in the requesting and requested country:**

| Name, address and telephone number of legal adviser in requesting country | |
|---|---|
| Name, address and telephone number of legal adviser in requested country | The mother wishes to have an attorney appointed through the Legal Aid Program in the United States |

5. **Details of the person alleged to have retained the children:**

| First and last name(s) | Y F |
|---|---|
| Relationship to the children | Father |
| Last known address after the retention of the children | ROTH 306-181 UINT 304 MONSEY U.S.A |
| Last known phone number | +184-54500499 |
| Names and contact details of persons in the requested country who might be able to supply additional information relating to the whereabouts of the children, and the relation of such persons to the children | Landline number of the house where the children are: +184-53560062 Shimon Weinberg - the children's uncle. phone number: +184-55385656 Mendel Weinberg - the children's aunt. phone number: +184-55385636 The phone number of the boy's educational institution: +184-57313725 The phone number of the girl's educational institution: +184-53716900 |

6. **Time, date, place and circumstances of the wrongful retention, based on the claims of the left-behind parent:**

According to the mother, the parents agreed orally that the father could take the children for a two-week visit, to his family in the United States, during the Passover holiday in April 2023, provided that the children return in time to start school after the break, that being by 18 April 2023.

3

The mother claims that the father was hospitalized in the United States from 14-21 April, 2023. The mother therefore asked that the children be returned without him, however the father refused. She again requested their return after he was discharged, however he continued to refuse. She states that on 9 May, 2023, she demanded the return of the children and stated that she would take legal action if he did not comply. The father then cut off all contact with her, and between her and the children.

7. **Factual and legal background justifying this request, based on the claims of the left-behind parent:**

   **7.1 Habitual Residence is Israel:**

   According to the mother, the children were born in the United States. The family immigrated to Israel in 2019, and since then have lived in Israel, where the children have been attending Israeli educational institutions and are registered in the Israeli health system.

   **7.2 The requesting party has Custodial Rights under Israeli Law:**

   Pursuant to Israel's Capacity and Guardianship Law 1962, parents are the joint guardians of their minor children, which includes the right to custody and the right to determine the children's place of residence. The mother, therefore, has custodial rights under Israeli law.

   **7.3 The Requesting Party exercised their Custodial Rights Prior to The Wrongful removal :**

   The mother states that she has been actively involved in the children's upbringing and their daily care since their birth. She has been involved in all aspects of their lives, including medical appointments, daycare, etc.

   The mother therefore claims that the retention of the children in the United States, without her consent, is in contravention of her custodial rights that she was exercising at the time, and therefore constitutes a wrongful retention within the meaning of Article 3 of the Convention.

8. **Civil proceedings in progress between the parties:**

   To the mother's knowledge there are no such proceedings.

9. **Voluntary Return or Mediation:**

The mother wishes to pursue voluntary return.

10. **The child/ren is to be returned to:**

| First and last name(s) | P F   b |
|---|---|

4

| Relationship to the child/ren | Mother |
|---|---|
| Address | Ezra 39, Bnei Brak, Israel |
| Telephone number | +972-58-3279438 |
| Proposed arrangements for the return of the child/ren | Should the court in the United States order the return of the children to Israel and should the father refuse to return with them, the mother states that she will make the necessary arraignments to have the children returned to Israel. |

11. **List of Documents Attached with translations:**

    a. Birth Certificates of the children.
    b. Parents' marriage certificate.
    c. Confirmation of the son's attendance in Israeli educational institutions. (The mother has not yet been able to obtain confirmation from the daughter's school).
    d. Confirmation of the children's membership with healthcare services in Israel
    e. Extracts from the Population Registry in Israel, confirming that the children have been living in Israel since 2019.
    f. Photographs of the children.
    g. Copy of sections 14 and 15 of Israel's Capacity and Guardianship Law 1962 with respect to custodial rights.
    h. Authorization pursuant to Article 28 of the Hague Convention signed by applicant.
    i. Voluntary return letter signed by the applicant.
    j. Authorization to release case information, signed by the applicant.


Signature:        *Efrat Greenboim*
_____

**Efrat Greenboim, Director**
**Department of International Affairs**
**Office of the State Attorney**
**On behalf of the**
**Central Authority for the**
**State of Israel**

Date: November 15, 2023

5

EXHIBIT 4

**State of Israel**
Ministry of Justice
Office of the State Attorney
Department of International Affairs



מדינת ישראל

משרד המשפטים
פרקליטות המדינה
המחלקה הבינלאומית

15 November, 2023

Office of Children's Issues (CA/OCS/CI)
U.S. Department of State
SA-17, 9th Floor
WASHINGTON, DC 20522 - 1709
United States of America
By E-mail: MiddleEastIPCA@state.gov

Dear Sirs,

### Re: <u>Application pursuant to the Hague Convention on the Civil Aspects of International Child Abduction – Ms. P F</u>

Attached please find an Application pursuant to the Hague Convention on the Civil Aspects of International Child Abduction on behalf of Ms. P F, who seeks the return to Israel of her two children, M F and B F.

Ms. F claims that in April, 2023 she and her husband, Y F, agreed that he could take the children to the United States for a two-week visit to his family for the Passover holiday, and that they would to return to Israel in time for the children to return to school after the Passover break, that being by 18 April, 2023. The children were not returned at that time and to this day they remain in the United States, despite the mother's objection. She further claims that he has cut off contact between her and the children.

The mother claims that she cannot afford to hire an attorney. We attach the form for pro bono assistance, signed by the mother. We would be very grateful if you could provide names of attorneys who may be prepared to consider representing her and commencing proceedings for the return of the children on her behalf. While Ms. F does speak some English, she will require assistance with translation.

Ms. F states that she is very concerned for the children's well-being. She states that the father does not allow contact with the children, and it is her understanding that they are not in any educational framework. She therefore wishes that the welfare authorities in the United States check the welfare of the children.

We would be grateful if you could confirm receipt of the application in this matter. Should you have any questions, please do not hesitate to contact us.

We thank you for your assistance and look forward to hearing from you.

Your truly,

*Leslie Kaufman*

**Leslie Kaufman**
Unit Chief – International Child Abduction
Department of International Affairs
Office of the State Attorney

7 Mahal St. Maralot Dafna P.O. Box 49123  Jerusalem 9776316  ירושלים  מעלות דפנה ת.ד 49123  רח' מח'ל 7

Fax: 02-6467044 :פקס   Tel: 073-3928261/2 :טלפון

Email: ICA@justice.gov.il :דוא'ל

EXHIBIT 5

1

**TECHNION UNIVERSITY - Ruth & BRUCE RAPPAPORT**

**FACULTY OF MEDICINE**

**RESUME**

**JULY 2025**

### 1. PERSONAL DETAILS

| | | |
|---|---|---|
| **Full name** | **Yael Ratner** | יעל רטנר |
| ID Number: | 307429233 | |
| Date of birth | 1967 | |
| Phone number | Mobile phone: +972-54-4667030, Fax +972-1533-6481978 | |
| E-mail | yaelratner@gmail.com | |
| LANGUAGES | Russian , Hebrew , English | |

### 2. ACADEMIC DEGREES

1990             M.D., First Moscow Medical Institute, Russia

*POSTGRADUATE TRAINING*

| | |
|---|---|
| 2016 - 2017 | Course on forensic psychiatry (Technion, Haifa) |
| 2016 -2017 | Course on teaching stuff development (Technion, Haifa) |
| 2016 - 2016 | Course on Good Clinical Practice |
| 2009 – 2010 | Course on expert medical opinion (Israel Medical Association) |
| 2003 - 2003 | Course on teaching medical students (Shaar Menashe MHC) |
| 2003 - 2003 | Course on group therapy, I.Triest (Shaar Menashe MHC) |
| 1999, ...2017 | Course on first aid and reanimation (Shaar Menashe MHC) |
| 1997 - 1998 | Course in hypnotherapy, Dr S. Livneh, Jerusalem |
| 1993 | Course on conversational Arabic ( Jerusalem) |
| 1991 – 1992 | Course on Israeli medicine, University Institute of Hadassah Ein Kerem Hospital, Jerusalem |

### 3. ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2013 - 2020 | Lecturer, Rappaport Faculty of Medicine, Technion, Israel Institute of Technology, Haifa |
| 1995 – 1999 | Tutor, Hebrew University, Jerusalem ("Resident instructor"  -  medical students) |

### 3.  PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2020 – present | Private psychiatric clinic owner, independent psychiatrist |
| 2017 – present | Head of Closed Department, Sha'ar Menashe MHC, Hadera |
| 2016 - present | Head Department Assistant, Sha'ar Menashe MHC, Hadera |
| 1999 - 2016 | Senior psychiatrist, Sha'ar Menashe Mental Health Center, Hadera |
| 1999 - 2004 | Senior psychiatrist on duty, Hillel Yaffe Hospital, Hadera |
| 1994 - 1999 | Residency in psychiatry, Talbieh Mental Health Center, Jerusalem |
| 1992 - 1993 | Internship, Hadassah Ein Kerem Hospital, Jerusalem |
| 1990 – 1990 | Residency in neurology, Neurologic clinic of the First Moscow Medical Institute, Russia |

### *LICENSING*

| | |
|---|---|
| 2017 | Certification in Forensic Psychiatry |
| 1999 | Licensed as Specialist in Psychiatry in Israel (License no: 17201) |
| 1993 | ECFMG English Test |
| 1992 | Licensed to practice medicine in Israel (License no: 27192) |

### 5. RESEARCH INTERESTS

- Medical students attitudes to a specialty choice
- Novel neuroprotective treatments for schizophrenia
- Quality of life impairment in mental disorders patients and their relatives

## 6. TEACHING EXPERIENCE

**Courses:**

| | |
|---|---|
| 2008 – 2025 | Anxiety as a norm, anxiety disorders, drug, cognitive and behavioral treatment, Technion, [undergraduate, American program] |
| - | Depression, antidepressants [undergraduate] |
| - | Mood stabilizers and ECT [undergraduate, American program, and graduate, level I] |
| - | From Freud to Sandler, elements of psychotherapy [graduate] |
| 2007 | Fundamentals of psychotherapy [graduate] |
| 2006 - 2007 | Mood Disorders: Epidemiology, genetics, clinical features, course, treatment and rehabilitation [undergraduate] |
| 2002 - 2006 | Anxiety disorders, behaviour and cognitive therapies [undergraduate] |
| 2000 - 2005 | Dissociative disorders [undergraduate, graduate] |
| 2000 - 2004 | Factitious disorders [undergraduate, graduate] |
| 2000 - 2002 | Somatoform disorders  [undergraduate, graduate] |
| 2001 | Dissociative disorders, Sexual dysfunctions, Eating disorders |
| 1999 - 2000 | Basic course in psychiatry for residents,Preparation of  psychiatry residents for Level I examinations, c [graduate]: |
| 2000 | Child development  theories,    Attachment, Behaviourism, Dementia, Organic brain disorders, Defense mechanisms, Schizophrenia, Personality disorders, Piaget |
| 1999 | General pathology, Receptors, Antidepressants,  Benzodiazepines |

**Programs:**

| | |
|---|---|
| 1999 – present | American medical students from Touro Programs of Technoin [undergraduate]. Individual and group supervision, patient interview, 3 lectures to all the group during clerkship, examination of students, in Hebrew and English, 3 rounds per year. |
| 1999 – present | Resident psychiatrists in Shaar Menashe MHC: individual supervision of psychiatry residents,  2-4 residents per year. |

Management, theoretical issues, patient interview.

Lecture series and seminars to all residents in the hospital, Levels, I and II, 3- 8 lectures per academic year.

Individual supervision of psychotherapy for Level II residents from choosing a case through writing the case report and successful completion of the Level II examination.

**Hospital staff meeting presentations and patient interviews.**

1999 -             Psychiatric presentation of glioblastoma

2000  -             Monitoring of psychological distress in mentally ill patients

2002  -             Antipsychotic agents and quality of life of schizophrenic patients

2003 -             Outpatient interview

2004 -             Inpatient interview

2004  -             A case of pathological liar (Factitious disorder)

2007  -             Treating acute mania  (Valporal IV)

2010 -             Choosing medical profession by students

2011 -             Dissociation, trauma and psychosis

2013 -              Pregnancy, depression and suicide

2014 -              Cardiac complications of ECT

**Clerkships:**

1999 – present             Israeli and American medical students from Technion
[undergraduate].

Lectures on Clinical psychiatry (Sha'ar Menashe MHC), Individual and group supervision, patient interview, examination of students

1994-1999             Medical students from Hebrew University, Jerusalem,. Clinical psychiatry ( Talbiah MHC). Clinical and academic supervision, patient interviews, participation in examination of students.

**7. TECHNION ACTIVITIES**

2016 - 2017             Annually Composing questions for a Technion exam in
psychiatry –

"matconet", leading the group of 6 doctors from Shaar Menashe MHC  composing the questions, participating in the meeting in Technion of adjusting the questions from  4 north psychiatric hospitals to one exam.

2009 - 2016             Initiation and completion of a study of the influence of psychiatric clerkship on the future choice of medical specialty of Israeli and American Technion medical students

2015                Participating in a meeting of women - professors and lecturers in Technion

## 9. PUBLIC PROFESSIONAL ACTIVITIES

*COMMITTEES*

| | |
|---|---|
| 2009 – present Helsinki commettee | Member of Quality Control Committee of the Sha'ar Menashe |
| 2007 – present | Member of Sha'ar Menashe MHC Rehabilitation Committee |
| 2005 | Member of Sha'ar Menashe MHC Ethics Committee |
| 2004 – 2007 | Member of District Psychiatric Committee |
| 2003 – present | Member of Quality Control Committee for  examination of unsuccessful clinical cases |

## 10. MEMBERSHIP IN PROFESSIONAL SOCIETIES

Israel Society for Forensic Psychiatry

| | |
|---|---|
| 1995 - present | Israel Psychiatric Association |
| | Israel Medical Association |

## 11. HONORS

| | |
|---|---|
| 2004 | Special Mention and Prize for the paper "Correlation of plasma neurosteroids levels and cognition in schizophrenia", 5th International Congress of Neuropsychiatry, held in conjunction with the 1st Mediterranean Regional Congress of the World Federation of Societies of Biological Psychiatry in Athens Greece, 14-18 of October 2004. |
| 2012 | תעודה על זכאות להערכה על התרומה יוצאת הדופן להוראה בחוג לפסיכיאטריה בפקולטה לרפואה, טכניון - מכון טכנולוגי לישראל |

## 12. Students and Instruction

**2017 - resident instructor**

**13. Research Grants**

**14. Participation in significant professional projects**

2016 - 2017          PI in a commercial international study of "TREVICTA - PALMITOAT PAIPERIDONE injection once in 3 months" with JANSSEN in Shaar Menashe MHC

   2014               PI a commercial study "Management of Bipolar disease in Intercontinental region" in Shaar Menashe MHC, involving Technion firm TRDF, and receiving money for Technion


2009 – 2017                    **Y. Ratner,** A. Grinshpoon. Medical students

      attitudes to a specialty choice: natural prospective longitudinal study of 7 years . Shaar Menashe MHC on the basis of Technion medical faculty. Data collection and statistical analysis will be completed in 2017.

2014-2015          A. Peled, **Y.Ratner**. Development of a new instrument to estimate clinical state in psychiatric patients on the basis of EEG parameters.

2014-2015          M. Ritsner, **Y.Ratner**, M. Arbitman, H.Kardashev. Risk factors for hospital readmission in schizophrenia patients with high-service utlizing state. Shaar Menashe MHC

2013-2014          M. Ritsner, **Y.Ratner**, M. Arbitman, H.Kardashev. Studying rehospitalization. Shaar Menashe MHC


 2013                 M. Ritsner, **Y.Ratner**, H.Kardashev. The effect of add-on oral L-Theamine and Pregnenolone to stable ongoing antipsychotic treatment in schizophrenia patients. Supported by a grant from the Stanley Foundation (USA).


1999- 2015      M. Ritsner , A. Gibel, **Y. Ratner**. Longitudinal study of Quality of Life of patients with severe mental disorders. Shaar Menashe MHC.

2002               M. Ritsner , **Y. Ratner**, R. Navon, R. Ebstein. DNA Markers and Polymorphism of Major Psychoses. Shaar Menashe MHC, Tel Aviv & Ben Gurion Universities. 2004

               M. Ritsner, R.Strous, **Y.Ratner**, A.Gibel, The effect of add-on oral dehydroepiandrosterone to stable ongoing antipsychotic treatment in schizophrenia patients. A randomized double-blind placebo-

controlled, crossover trial.
Supported by a grant from the Stanley  Foundation (USA).

**PUBLICATIONS**

<u>**Referred papers in professional journals**</u>

***Published papers***

1. <u>Ludovic Samalin,</u>[a,1,2] <u>Eduard Vieta,</u>[2] <u>Tarek Ahmed Okasha,</u>[3] <u>MM. Jalal Uddin,</u>[4] <u>Seyed Ali Ahmadi Abhari,</u>[5] <u>Fethi Nacef,</u>[6] <u>Vyacheslav Mishyiev,</u>[7] <u>Dovi Aizenberg,</u>[8] <u>Yaël Ratner,</u>[9] <u>Lydie Melas-Melt,</u>[10] <u>Idir Sedeki,</u>[11] and <u>Pierre Michel Llorca</u>[1.] Management of bipolar disorder in the intercontinental region: an international, multicenter, non-interventional, cross-sectional study in real-life conditions. <u>Sci Rep.</u> 2016; 6: 25920. Published online 2016 May 16. doi: <u>10.1038/srep25920</u>

2. Kardashev A, Ratner Y, Ritsner MS. Add-on Pregnenolone with L-Theanine toAntipsychotic Therapy Relieves Negative and Anxiety Symptoms of Schizophrenia: An 8-week, randomized, double-blind, placebo-controlled trial. Clin Schizophr Relat Psychoses. 2015 Jul 28. [Epub ahead of print]

3. Kardashev A, Ratner Y, Ritsner . Mental health care needs of involuntarily admitted inpatients. <u>Evidence-based mental health</u> 1:59-66 · January 2015

4. <u>Miodownik C, Maayan R, **Ratner Y,** Lerner V, Pintov L, Mar M, Weizman A, Ritsner MS. Serum levels of brain-derived neurotrophic factor and cortisol to sulfate of dehydroepiandrosterone molar ratio associated with clinical response to L-theanine as augmentation of antipsychotic therapy in schizophrenia and schizoaffective disorder patients.  Clin Neuropharmacol. 2011;34(4):155-60.</u>

5. Ritsner MS, Miodownik C, **Ratner Y**, Shleifer T, Mar M, Pintov L, Lerner V.  L-theanine relieves positive, activation, and anxiety symptoms in patients with schizophrenia and schizoaffective disorder: an 8-week, randomized, double-blind, placebo-controlled, 2-center study.  J Clin Psychiatry. 2011 Jan;72(1):34-42.

6. <u>Strous RD, Ritsner MS, Adler S, **Ratner Y,** Maayan R, Kotler M, Lachman H, Weizman A</u>. Improvement of aggressive behavior and quality of life impairment following S-Adenosyl-Methionine (SAM-e) augmentation in schizophrenia.
<u>Eur Neuropsychopharmacol.</u> 2009 Jan;19(1):14-22.

7. Ritsner MS, **Ratner Y,** Gibel A, Weizman R.  Positive family history is associated with persistent elevated emotional distress in schizophrenia: evidence from a 16-month follow-up study. Psychiatry Res. 2007; 153(3):217-23

8. **Ratner Y,** Gibel A, Yorkov V, Ritsner MS.Effectiveness, safety, and tolerability of ziprasidone for treating schizophrenia patients undergoing usual care: a 12-month, open-label, flexible-dose, naturalistic observational trial. Prog Neuropsychopharmacol Biol Psychiatry. 2007;31(7):1401-9.

9.    Ritsner MS, Yorkov V, **Ratner Y,** Soifer P, Gibel A. The effectiveness of ziprasidone in treating impaired quality of life in schizophrenia: a 12-month, open-label, flexible-dose, naturalistic observational study of patients undergoing usual care. Prog Neuropsychopharmacol Biol Psychiatry. 2007;31(7):1470-7.

10.    Ritsner M, Gibel A, Maayan R, **Ratner Y,** Ram E, Modai I, Weizman A.  State and trait related predictors of serum cortisol to DHEA(S) molar ratios and hormone concentrations in schizophrenia patients. Eur Neuropsychopharmacol. 2007;17(4):257-64.

11.    Ritsner MS, Gibel A, Ponizovsky AM, Shinkarenko E, **Ratner Y,** Kurs R. Coping patterns as a valid presentation of the diversity of coping responses in schizophrenia patients. Psychiatry Res. 2006;144(2-3):139-52.

12.    Ritsner MS, Gibel A, **Ratner Y,** Tsinovoy G, Strous RD. Improvement of sustained attention and visual and movement skills, but not clinical symptoms, after dehydroepiandrosterone augmentation in schizophrenia: a randomized, double-blind, placebo-controlled, crossover trial.J Clin Psychopharmacol. 2006;26(5):495-9.

13.    Ritsner MS, **Ratner Y.** The long-term changes in coping strategies in schizophrenia: temporal coping types. J Nerv Ment Dis. 2006;194(4):261-7.

14.    Ritsner M, Gibel A, **Ratner Y.** Determinants of changes in perceived quality of life in the course of schizophrenia. Qual Life Res. 2006;15(3):515-26.

15.    Ritsner M, Kurs R, Gibel A, **Ratner Y,** Endicott J. Validity of an abbreviated quality of life enjoyment and satisfaction questionnaire (Q-LES-Q-18) for schizophrenia, schizoaffective, and mood disorder patients. Qual Life Res. 2005;14(7):1693-703.

16.    Ritsner M, **Ratner Y,** Gibel A, Weizman R. Familiality in a five-factor model of schizophrenia psychopathology: findings from a 16-month follow-up study. Psychiatry Res. 2005;136(2-3):173-9.

17.    Strous RD, **Ratner Y,** Gibel A, Ponizovsky A, Ritsner M. Longitudinal assessment of coping abilities at exacerbation and stabilization in schizophrenia. Compr Psychiatry. 2005;46(3):167-75.

18.    Ritsner M, Kurs R, **Ratner Y,** Gibel A. Condensed version of the Quality of Life Scale for schizophrenia for use in outcome studies. Psychiatry Res. 2005;135(1):65-75.

19.    Ritsner M, Gibel A, Maayan R, **Ratner Y,** Ram E, Biadsy H, Modai I, Weizman A. Cortisol/dehydroepiandrosterone ratio and responses to antipsychotic treatment in schizophrenia. Neuropsychopharmacology. 2005;30(10):1913-22.

20.    Ritsner M, Gibel A, Perelroyzen G, Kurs R, Jabarin M, **Ratner Y.** Quality of life outcomes of risperidone, olanzapine, and typical antipsychotics among schizophrenia patients treated in routine clinical practice: a naturalistic comparative study. J Clin Psychopharmacol. 2004;24(6):582-91.

21.  Korostishevsky M, Kaganovich M, Cholostoy A, Ashkenazi M, **Ratner Y**, Dahary D, Bernstein J, Bening-Abu-Shach U, Ben-Asher E, Lancet D, Ritsner M, Navon R.  Is the G72/G30 locus associated with schizophrenia? single nucleotide polymorphisms, haplotypes, and gene expression analysis. Biol Psychiatry. 2004;56(3):169-76.

22.  Ritsner M, Kurs R, Gibel A, Hirschmann S, Shinkarenko E, **Ratner Y.** Predictors of quality of life in major psychoses: a naturalistic follow-up study. J Clin Psychiatry. 2003;64(3):308-15.

23.  Modai I, Hirschmann S, Hadjez J, Bernat C, Gelber D, **Ratner Y,** Rivkin O, Kurs R, Ponizovsky A, Ritsner M.  Clinical evaluation of prior suicide attempts and suicide risk in psychiatric inpatients. Crisis. 2002;23(2):47-54.

**Books and book chapters**
1. Ritsner MS, Gibel A, **Ratner Y**, Weizman A. Dehydroepiandrosterone and Pregnenolone Alterations in Schizophrenia. In: Neuroactive Steroids in Brain Function, Behavior and Neuropsychiatric Disorders. Novel Strategies for Research and Treatment. Michael S. Ritsner, and Abraham Weizman, Editors. Springer, pp.251-298. 2008.

### 1.        CONFERENCES

**Contributed Talks and Abstracts**
1. Modai, I., Ritsner, M., Rivkin, O., Bernat, C., Gelber, D., **Ratner, Y**., Ponizovsky, A. Evaluation of Suicide Risk in Individual Psychiatric Patients. *American Psychiatric Association 2001 Annual Meeting*, May 5-10, 2001, New Orleans, LA, USA.

2. Hadjez J, Speaker, Modai I, Ponizovsky A, **Ratner Y**, Ritsner M.  Quality of sleep among new immigrants in Israel. 3rd International Congress of the World Federation of Sleep Research Societies.  World Conference Sleep Oddyssey 2001.  Punta del Este, Uruguay, October 21-October 26, 2001.

3. Ritsner M**.,** Speaker, **Ratner Y**, Gibel A. Is distress a more severe problem among familial than among sporadic schizophrenia patients; a follow-up study. . The *Seventh Annual Meeting of the Israeli Society for Biological Psychiatry*, Kefar Giladi, March 19-21, 2002. Isr J Psychiatry Relat Sci  2002, 39:41 (Supplement).

4. **Ratner Y.,** Ritsner M. Lack of differences in perceived quality of life between schizophrenia patients receiving conventional and atypical antipsychotics: follow-up study. The *Seventh Annual Meeting of the Israeli Society for Biological Psychiatry*, Kefar Giladi, March 19-21, 2002. Isr J Psychiatry Relat Sci  2002, 39:40 (Supplement).

5. **Ratner Y**., Ritsner M. Prediction of Quality of Life Change in Schizophrenia Patients: A 16 month's follow-up study. 11th National Conference of Israel Psychiatric Association (IPA), S.144, Haifa, Israel, 2003.

6. Ritsner M**.,** Gibel, A., **Ratner Y.** Domain-specific Quality of Life of Schizophrenia Patients: a follow up study. 11th National Conference of Israel Psychiatric Association (IPA), S.146, Haifa, Israel, 2003.

7. Gibel A, Kurs R, **Ratner Y**, Bistrov E, Ilan H, and Ritsner, M**.** Are there differences in the course of subjective quality of life between discharged and nondischarged psychiatric patients? 11th National Conference of Israel Psychiatric Association (IPA), S.1267, Haifa, Israel, 2003.

8. **Ratner, Y**., Kurs, R., Gibel, A., Ritsner, M. Condensed version of Heinrichs's Quality of Life Scale for clinical trials in schizophrenia. The Eight Annual Meeting of the Israel Society for Biological Psychiatry. Kfar Giladi, March 16-18, 2004.

9. **Ratner, Y**., Gibel, A., Weizman, R., Ritsner, M**.** Familial schizophrenia is associated with persistent elevated self-reported emotional distress. The Eight Annual Meeting of the Israel Society for Biological Psychiatry. Kfar Giladi, March 16-18, 2004.

10. Ritsner, M**.**, **Ratner, Y.,** Gibel, A., Weizman, R. Familiality in a five-factor PANSS model of schizophrenia psychopathology. The Eight Annual Meeting of the Israel Society for Biological Psychiatry. Kfar Giladi, March 16-18, 2004.

11. Ritsner, M**.**, **Ratner, Y**. Measures of coping abilities of schizophrenia patients. XII[th] Biennial Winter Workshop on Schizophrenia. Davos, Switzerland, February 7-13, 2004. Schizophrenia Research 67/1S: 224-225.

12. **Ratner, Y.,** Ritsner, M., Prediction of quality of life change in schizophrenia patients: A 16 month follow up study. XII[th] Biennial Winter Workshop on Schizophrenia. Davos, Switzerland, February 7-13, 2004. Schizophrenia Research 67/1S: 230.

13. Ponizovsky, A., Gibel, A., **Ratner, Y.,** Kurs, R., Bistrov, E., Ilan, H., Ritsner, M**.** Are there differences in the course of subjective quality of life between discharged and nondischarged psychiatric patients? XII[th] Biennial Winter Workshop on Schizophrenia. Davos, Switzerland, February 7-13, 2004. Schizophrenia Research 67/1S: 229.

14. **Ratner, Y**., Weizman, A., Maayan, R., Ram, E., Biadsy, H., Gibel, A., Ritsner, M. Correlation of plasma neurosteroids levels and cognition in schizophrenia. Presented during the 5th International Congress of Neuropsychiatry, held in conjunction with the 1st Mediterranean Regional Congress of the World Federation of Societies of Biological Psychiatry in Athens Greece, 14-18 of October 2004.

15. Ritsner, M., Gibel, A., Maayan, R., Ram, E., Biadsy, H., **Ratner, Y**., Weizman, A.  Can cortisol/DHEA(S) ratios serve as a peripheral biological marker for schizophrenia?  Presented during the 5th International Congress of Neuropsychiatry, held in conjunction with the 1st Mediterranean Regional Congress of the World Federation of Societies of Biological Psychiatry in Athens Greece, 14-18 of October 2004.

16. Lerner V., Miodownik C., Gibel A., Kovalenok E., **Ratner Y**., Ritsner MS. Augmentation with bexarotene in the management of schizophrenia: a pilot open-label trial. The 11th Annual Meeting of the Israel Society for Biological Psychiatry. Kfar Giladi, March 27-29, 2007. p. 26.

17. **Ratner Y.** Estimation of a psychiatric patient by PANSS scale. R092670SCH3015 (REMISSIO) Investigator Meeting. Athens, Greece. 22-23 September, 2016.

EXHIBIT 6

DR. YAEL RATNER, M.D.  
psychiatrist & psychotherapist  
20/63 BEIT EL STR.  
TEL-AVIV 6908716

ד"ר יעל רטנר  
פסיכיאטרית ופסיכותרפיסטית  
רח' בית אל 20 דירה 63  
ת"א 6908716

Telephone 0544 66 70 30  
מס' רישיון מומחה 17201

Date    JUNE 27th, 2025

### Psychiatric Opinion certificate

I, the undersigned, Dr. Yael Ratner, a certified specialist in psychiatry, hereby confirm that I examined Mrs FELBERBAUM PEARL , ID N 039318001, who was identified by her identity card, and below is my professional opinion.

My CV is attached to this document and is a part of it.

Sources for this opinion:

1.Two clinical evaluations of the examinee over the past three years

2. Medical document: a letter by Dr Tali Vishne – treating psychiatrist (one page)

This opinion was written at the request of FELBERBAUM PEARL.

Demographic details: FELBERBAUM PEARL      ID N 039318001     p0583279438@gmail.com

On the 1-st of August, 2022 I saw a 38 y.o. woman, married and a mother of 3 children, aged then 14, 8 and 6.5 years. The eldest child is from her first husband, and 2 children are from her current husband, the family lives in Beit Shemesh, Israel. She did not work nor had a profession, functioned at home with difficulties then. She denied being hospitalized ever in psychiatric hospital. She claimed being under the ambulatory treatment by Dr Tali Vishna for a depression, anxiety and attention disorder since 3 months ago with PAXXET that was stopped, CONCERTA and  VIEPAXX which dose was heightened up to 150 mg a day. CONCERTA was changed to VIVANCE 50 mg a day 2 weeks ago.

Until age 28 yrs she was healthy and functioned well. For the first time she was married from the age 24 till 25. She supposed because of relations with recurrent humiliations her body collapsed. She left her husband after a year. After 7 years she remarried. She said that had experienced physical assault from her second husband. He worked with obligations and lost money. They moved to the USA for several years and returned to Israel. She goes to an art treatment for half a year. Her elder children go to the psychological treatment to Mahon Weizman. They witnessed aggression from Father to Mom.

She complained that her body felt over 50 y.o., like after the climax. She got it difficult to divorce the first husband, feeling tired for years. At the visit she felt "now the situation starts to get better". She was not menstruating for several years, taking pills to substitute the hormones, ZOELY. The younger son was 6.5 yrs. She reported no strength to do things at home, she asked for help functioning as a Mom with her children. With the treatment, she feels better, she can cook and bake for her children. She suffers headaches for years, several years ago was diagnosed having migraine attacks. She doesn't receive the specific medication, cause it does not work with ZOELY. She takes EXCEDRIN and NAPROXIN that help.

Two days now with headaches and dizziness. Feels better with VIVANCE. Was able to function throughout the day during a 3-day vacation they recently went on. Has not attempted to harm herself or others. Her appetite is poor. Height: 169 cm. Weight: 70 kg. Sleeps reasonably well at night with the medication, sweating.

DR. YAEL RATNER, M.D.
psychiatrist & psychotherapist
20/63 BEIT EL STR.
TEL-AVIV 6908716

ד"ר יעל רטנר
פסיכיאטרית ופסיכותרפיסטית
רח' בית אל 20 דירה 63
ת"א 6908716

Telephone 0544 66 70 30
מס' רישיון מומחה 17201

Describes side effects from medications – bad taste in mouth from Paxil, which she discontinued; elevated prolactin from Concerta, so it was replaced with Vyvance. Currently experiencing severe excessive sweating, unsure of the cause. Gynecologist said Zoely is not the reason.

Mental status: Calm, cooperative. Neatly dressed in religious attire. Mood: 3 out of 10, where 10 is the highest mood she has felt in her life, and 1 is the worst. Affect is blunted, dysphoric. Speaks with a hightened fluency. Says she always talks a lot, unrelated to Vyvance or Effexor. Thought process is organized. No delusional thoughts noted. Denies any type of hallucinations. Denies suicidal or aggressive intentions. Abstract thinking is preserved.

Her diagnoses then were:

DS: F 32.11 MODERATE DEPRESSIVE DISORDER, WITH SOMATIC SYNDROME

R 52.82 CHRONIC FATIGUE SYNDROME

E28.310 SYMPTOMATIC PREMATURE MENOPAUSE

She was recommended to see a psychiatrist in a month,

To have a follow-up by her family doctor

To go on with the art therapy,

To continue TAB VIEPAX  150 mg a day in the morning,

To take TAB VIVANCE 50 mg a day,

In any case of deterioration in her state to apply to a medical help or to emergency room.

On July 10 th, 2025 on a follow-up of

FELBERBAUM PEARL      ID N 039318001:

She is 41 years old, lives with her parents, mother of three children.

The oldest, 18 years old, lives with them; the two younger children — a daughter, 11, and a son, 9.5 — live with her husband in America.

She and her husband were separated for a year and a half, and in the past month he gave her a get (Jewish divorce).

She told she lived in an abusive relationship for 11 years. He "kidnapped" the children, and she requested a divorce.

He used to throw and hurl things at her. The older son especially suffered.

He called her a "crazy mother, sick," and told the children to shout at their mother.

The children were constantly exposed to incitement against her.

2

DR. YAEL RATNER, M.D.
psychiatrist & psychotherapist
20/63 BEIT EL STR.
TEL-AVIV 6908716

ד"ר יעל רטנר
פסיכיאטרית ופסיכותרפיסטית
רח' בית אל 20 דירה 63
ת"א 6908716

Telephone 0544 66 70 30
מס' רישיון מומחה 17201

She dared to go to court to demand he return the children to Israel.

He claimed that she was unwell. Her husband stated that if the children returned to Israel, they would be at risk.

According to her, the periods when she was unable to function stemmed from being unable to live with him.

Her husband tried to claim that Perel was seeing a doctor due to mental health issues.


She hasn't taken medication for two years. She hasn't seen a doctor.

She wanted to receive a disability allowance, but the National Insurance didn't approve it.

Her husband did not provide financial support.


She was never hospitalized in a psychiatric hospital.

In 2022, she saw a psychiatrist, Tali Vishne, through her HMO.

According to her, she suffered from physical, emotional, and financial abuse.


She has lived with her parents for two years.

She and her mother cook, she does the laundry.

They are 5 sisters and 6 brothers. She and another sister, and sometimes a niece, wash the floors.


She previously suffered from side effects of excessive sweating from the medication Effexor.

She works with children as an activity leader in preschools.

She works five days a week, 3–4 hours a day.


She considers she is not dangerous to children.

She sleeps well at night. It takes her 10 minutes to fall asleep.

Her appetite is normal — previously it wasn't.

She weighs 65 kg, height 166 cm.

DR. YAEL RATNER, M.D.
psychiatrist & psychotherapist
20/63 BEIT EL STR.
TEL-AVIV 6908716

ד"ר יעל רטנר
פסיכיאטרית ופסיכותרפיסטית
רח' בית אל 20 דירה 63
ת"א 6908716

Telephone 0544 66 70 30
מס' רישיון מומחה 17201

She has not tried to harm herself or others.

Once, her husband pushed her. In response, she shouted at him and called the police.

On a Saturday night during dinner, her husband didn't want to say the blessing —

she extinguished the candle, and the wax sprayed onto him.

Her husband took the children during Passover two years ago.

He does not let her talk to the children on the phone.

He turns them against her. They currently don't want to contact with her.

Her husband gave her eldest son from a previous relationship a severe beating and kicked him out of the house.

He was less physically aggressive toward the daughter,

but if he got angry, he could hit very hard — he hit the younger son once or twice.

The police issued a 5-day restraining order against him.

<u>Mental status:</u> Calm, cooperative. Mood is good — rated 8 out of 10. Sais that her only difficulty is that her children are not with her. Euthymic affect. The process of thinking is intact. Speaks in a normal rhythm, normal voice. She does not display delusional thoughts.

In the content of thinking she explains that she has began the process of retrieving her children two years ago. Her husband causes her distress by not bringing the children,but he does not intend to harm her.

She reports that her husband travelled abroad legally. He was hospitalized there in a hospital and was unable to return the children. Even afterwards, he didn't bring them back. She describes her husband as extremely sensitive and fearful.

She denies any hallucinations. She is fully oriented in all aspects. Her concentration is somewhat poor. She sais that she has always had difficulty with math. She can read. Abstract thinking is intact. She denies any suicidal or aggressive intentions. Memory is intact across all ranges. Insight and judgment are intact.

She is familiar with the roles of key individuals involved in the legal process.

<u>My opinion</u> is that Pearl suffered from mild depression 2 years ago, and was treated successfully, but now she is in a good mental state, not revealing any affective or psychotic signs, probably she is functioning not superiorly, but her insight and judgement are intact and she is not any danger for her children. She can be with them, noting she will be on the regular check ups of a psychiatrist and her family doctor.

Sincerely,

Dr Yael Ratner

4

ד"א יעל רטנר
פסיכיא... ית מומחית
[ מנהל... מחלקה
מ.ר. 27192 מ.ר.מ. 17201