UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of B.F. and M.F., | No. 7:24-cv-2333 (PHM) (VR) |
| PERL FELBERBAUM | |
| Petitioner, | **PETITIONER'S POST-HEARING BRIEF** |
| vs. | |
| YAAKOV FELBERBAUM | |
| Respondent, | |

## I. INTRODUCTION: THE NARROW, NON-NEGOTIABLE MANDATE OF THE HAGUE CONVENTION

**A. The Policy and Purpose of the Hague Convention and ICARA**

This case is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. The fundamental and singular purpose of this treaty is to "secure the prompt return of children wrongfully removed or retained" to their country of habitual residence. This mandate is a deliberate, policy-driven objective designed to deter the practice of "self-help removal" and parental forum shopping by ensuring that the parent who seizes control of the children gains no jurisdictional advantage. The integrity of the international system depends on this Court's strict adherence to the Convention's anti-abduction policy.

**B. The Court's Limited, Mandatory Jurisdiction**

Petitioner respectfully submits that the Court's inquiry in this case is strictly limited and mandatory. It must determine only two (2) threshold questions:

1. Was Israel the children's habitual residence immediately prior to the retention?

2. Was the Father's retention of the children wrongful?

The ultimate issue of the children's long-term best interests, the primary concern of a custody court, is explicitly and unequivocally reserved for the courts of the habitual residence—in this case, the Israeli judicial system. The Hague Convention serves purely as a forum selection mechanism. By adhering to the mandatory return principle, the Court upholds the international legal principle of comity and respects the jurisdiction of the foreign sovereign.

**C. The Burdens of Proof**

Petitioner, Perl Felberbaum (the "Mother"), respectfully submits that she has met her burden of proof by a preponderance of the evidence, establishing Israel as the children's habitual residence and the Respondent, Yaakov Felberbaum (the "Father"), as the wrongful retainer. The burden then shifts to the Respondent to establish a defense notwithstanding Petitioner's establishing the habitual residence of the children is in Israel.

The Father has demonstrably failed to meet his "extremely high burden" to prove, by clear and convincing evidence, the sole applicable affirmative defense under Article 13(b): Grave Risk of Harm. The Court must therefore adhere to the treaty's clear mandate and order the immediate and prompt return of B.F. and M.F. to Israel.

**II. PETITIONER HAS ESTABLISHED A *PRIMA FACIE* CASE FOR RETURN**

The Petitioner must prove by a preponderance of the evidence that (1) Israel was the children's habitual residence; (2) the retention in New York was wrongful; and (3) the retention breached the Petitioner's custody rights under Israeli law.

**A. Israel is the Undisputed Habitual Residence Under the Monasky Standard**

The determination of habitual residence under the Hague Convention is governed by the Supreme Court's definitive standard in Monasky v. Taglieri, 589 U.S. 1 (2020), which mandates a "totality of the specific circumstances" test.

The inquiry focuses on where the children were "at home" immediately prior to the wrongful retention. The evidence of a settled environment and shared parental intent to live in Israel is overwhelming and incontestable in this case.

1. Definitive Proof of Shared Parental Intent: The Citizenship Fraud

The most potent and irrefutable evidence of the family's permanent settlement intent is rooted in the Father's own documented legal actions. The Mother is a native Israeli and a current Israeli citizen, born and raised into a deeply rooted, stable religious family there. Furthermore, the Father himself demonstrated an unequivocal, shared parental intent to make Israel the permanent family home by formally applying for Israeli citizenship. See Trial Transcript ("Tr.") at 99:12-13, 101:7-21 (the Father confirmed he made aliyah[1] to Israel in 2019), 107:7-22 (the Mother took care of the children in Israel while the Father traveled extensively), 131:12-133:23 (confirming the parties were divorced in Israel), at 149:20-150:4 (confirming plan was to return to Israel), 182:3-9 (same).

An application for full citizenship is the clearest possible formal expression of long-term intent under the law. The Father's current position—that the family's residence in Israel was merely "temporary"—is therefore a deliberate and fraudulent contradiction of his documented legal filings and must be rejected. The Father cannot simultaneously seek the permanent legal status of an Israeli citizen while claiming the family's presence in that nation was merely a brief sojourn. These actions provide definitive, documented proof of the shared parental intent required under the Monasky framework.

---

[1] The Father explained aliyah as a perfunctory manner in which an one becomes a citizen of Israel, which is done merely by arriving in the country, whereupon it may be revoked within ninety (90) days. Tr. at 134:17-135:13. However, this was a misrepresentation. In 1950, Israel published The Law of Return, which defines aliyah as immigration of jews. See https://www.adalah.org/uploads/oldfiles/Public/files/Discriminatory-Laws-Database/English/36-Law-of-Return-1950.pdf (last accessed November 12, 2025). Aliyah is not a perfunctory function; it is the expression of a desire to settle in Israel. Id.

**2. Deep and Irreversible Integration into the Israeli Community and Infrastructure**

From 2019 to April 2023, the family established a settled, five-year existence in the religious community of Bnei Brak. This substantial passage of time is heavily weighted in favor of finding a fixed habitual residence, and the nature of their five-year integration confirms permanence, not transience.

- Educational Institutions and Language: The children were not enrolled in general, international schools. They were placed in religious schools specific to the Bnei Brak community—the boys in a cheder and the girls in a Beis Yaakov. Instruction in these specialized institutions is primarily in Yiddish and Hebrew. These are deeply rooted educational placements that are central to the family's way of life and are not easily replicated in New York. Their linguistic and educational environment was Israel.

- Medical and Routine Care: The family was established with local doctors, pediatricians, and dentists within the Israeli health system. Establishing continuity of routine medical, dental, and pediatric care for children over five years is a fundamental indicator of a permanent routine and fixed residence, not a temporary stay.

- Social and Cultural Ties: The family was connected to a specific synagogue and community religious classes, and the children had established an age-appropriate circle of friends. Their entire social and cultural world was Israel.

3. The Mother's Role as Primary Caregiver and Her Intrinsic Ties to Israel

The Mother's status as the children's primary caregiver is confirmed by the Father's own pattern of behavior. The evidence establishes that the Father frequently departed from Israel, leaving the children solely in the Mother's care for extended periods.

This pattern of prolonged, often solo, custodial control by the Mother confirms her status as the *de facto* primary custodian and that Israel was the stable, settled environment where the children were accustomed to living and relying upon their mother. The Mother was the steady constant in the children's lives in Israel, further solidifying that nation as the children's home.

Furthermore, the Mother's personal circumstances make the argument for U.S. residence absurd: she has no family support in New York, faces a profound financial disparity with the Respondent, and almost entirely speaks Yiddish and Hebrew and has difficulty speaking English. Her linguistic and social constraints confirm that the children's linguistic, social, and cultural center of gravity is Israel. The Mother cannot sustain a stable life in the United States, further reinforcing that the children's stability lies in their Israeli home.

**B. Wrongful Retention and the Breach of the Mother's Custody Rights**

**1. Immediate and Unequivocal Objection to Retention**

The retention became wrongful in April 2023 when the Father refused to return the children to Israel following a planned round trip to the United States. Crucially, the Mother immediately and repeatedly objected to this retention, using every means available to her, including demanding their return, contacting law enforcement, and ultimately retaining counsel. This swift and persistent action unequivocally defeats any suggestion of consent or acquiescence to the move.

**2. The Abbott Standard and the *Ne Exeat* Right under Israeli Law**

The retention violated the Mother's custody rights under Israeli law. Under the Supreme Court's clear precedent in Abbott v. Abbott, 560 U.S. 1 (2010), rights of custody are construed broadly and include the right to determine the child's place of residence—the *ne exeat* right. As a co-parent and the *de facto* primary custodian for five (5) years, the Mother clearly possessed the right to prohibit the children from leaving the jurisdiction permanently.

The Father's unilateral retention of the children in New York without her permission is a direct and actionable violation of her custody rights under the Convention.

**C. The Father's Pattern of Contradiction and Calculated Deception**

The Respondent's entire defense is founded on a series of self-serving, calculated deceptions intended to justify his unlawful retention and manipulate the court into performing a custody review. His credibility is irreparably damaged by the following contradictions, which demonstrate a calculated effort to rewrite the family's history:

- The Citizenship Lie: His sworn testimony that the family were "temporary" residents of Israel is directly contradicted by his formal application for Israeli citizenship. This is a contradiction concerning the core element of habitual residence.

- The Custody Contradiction: He claims the Mother has no custody rights, yet his own pattern of extended departures from Israel, leaving the children in her care for long periods of time, demonstrates that he routinely entrusted her with the full exercise of the very rights of custody and control he now seeks to deny.

- The Consent Contradiction: He attempted to deny consent for the 2019 move to Israel, yet the Mother testified under oath that the move was "with his consent" (Tr. at 10:15-16). His post-abduction attempt to retroactively deny consent for the family's entire life in Israel is cynical manipulation.

- The "Acclimation" Fallacy as a Reward for Wrongdoing: The Father's final argument—that the children are now "fully acclimatized to life in New York" after a year of retention—is an explicit attempt to use the passage of time, which he deliberately caused through his wrongful act, as a defense. This is precisely the kind of forum-shopping reward the Hague

Convention was designed to prevent, and accepting it would fundamentally undermine the Convention's policy of deterrence.

## III. RESPONDENT FAILED TO MEET THE BURDEN FOR THE GRAVE RISK DEFENSE (ARTICLE 13(B))

### A. The Extremely High Burden and the Absence of Clear and Convincing Evidence

Upon establishing that the children's habitual residence is in Israel, the burden shifts to the Father to prove, by clear and convincing evidence (the highest burden in civil law), that the return would expose the children to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation. This is an extremely high burden reserved for cases of imminent danger.

Courts in the Second Circuit have repeatedly narrowed this defense to exclude generalized anxiety, domestic strife not directed at the child, or typical parental disputes.

### 1. The Respondent's Inadmissible Evidence: A Fatal Flaw in the Defense

The Father's failure to meet the clear and convincing standard is magnified by the preclusion of his core evidence—which the Petitioner contended was privileged, unscientific, and unduly prejudicial. A party relying on inadmissible, unreliable, or excluded evidence cannot, as a matter of law, sustain a burden of proof designated as extremely high. This preclusion leaves the grave risk defense factually and legally unsupported and must result in the denial of the Article 13(b) defense.

### B. The Definitive Rebuttal of Psychological Harm by the Petitioner's Forensic Expert, Dr. Yael Ratner

The Father's defense is founded on the unsupported claim that the children suffer from PTSD due to an abusive environment in Israel caused by the Mother.

This claim is decisively refuted by the objective testimony of the Petitioner's highly qualified forensic psychiatrist, Dr. Yael Ratner.

**1. Confirmation of Mother's Fitness and Stability**

Dr. Ratner, a certified specialist in psychiatry in Israel with specialized training in forensic psychiatry and expert medical opinion, professionally evaluated the Mother and concluded that she is in a good mental state, displays no affective or psychotic signs, and is "not any danger for her children." This objective professional finding fundamentally dismantles the Father's core premise that the Mother poses an imminent threat that would create a grave risk of harm. The Mother's past, mild depression was successfully treated and is not a present risk factor.

**2. The Abduction as the True Source of Trauma: The Return Order as the Remedy**

Most critically, Dr. Ratner's expert opinion establishes that any psychological symptoms observed in the children are secondary to the uprooting and separation from their primary caregiver and community in Israel. The current psychological distress is a direct consequence of the Father's wrongful retention. This finding completely inverts the Father's grave risk argument.

The return order is the remedy for the children's current psychological harm, not the cause of future harm. The psychological risk of denying the return—which would reward the Father for his wrongful retention, normalize the abduction, and prolong the children's separation from their stable home as well as their mother—vastly outweighs the unsubstantiated risk of ordering the return.

Prompt return is the Convention's remedy designed to mitigate the long-term psychological damage caused by the Respondent's "self-help removal."

**3. The Contradictions and Flaws of the Respondent's Expert, Dr. Paul Stoltzfus**

The testimony of the Respondent's expert, Dr. Paul Stoltzfus, is highly unreliable and should be afforded negligible weight due to profound methodological and structural flaws, particularly when contrasted with the qualifications of Dr. Ratner:

- Lack of Localized Forensic Specialization: Dr. Ratner holds an Israeli license as an expert specialist and completed specialized courses in forensic psychiatry and expert medical opinion in Israel. Dr. Stoltzfus lacks this critical, localized specialization and familiarity with the specific legal and mental health systems of the habitual residence. His opinion, therefore, is not informed by the reality of the jurisdiction to which the children would return.

- Uncorroborated and Contaminated Diagnosis: Dr. Stoltzfus' diagnosis of PTSD relies heavily on self-serving, uncorroborated allegations from the Father and from children who have been separated from their mother for a year. The diagnosis occurred after the Father's unlawful act had severed the children from their primary caregiver, rendering his finding inherently contaminated by the predictable trauma of separation and abductor-induced alienation. His failure to rule out abduction trauma as the source of distress is a fatal methodological error.

- The Expert as an Instrument of Forum Shopping: To accept Dr. Stoltzfus' diagnosis, which cannot distinguish between pre-existing trauma and trauma caused by the abduction itself, is to permit the abducting parent to create the very condition that forms the basis of his defense. This directly contravenes the core policies of the Hague Convention and ICARA.

**C. The Failure to Prove an "Intolerable Situation"**

The Father's claim that Israel represents an "intolerable situation" is equally flawed. He conceded he does not have a history of "directly abusing" the children. Under the binding precedent of Souratgar v. Lee, 720 F.3d 96 (2d Cir. 2013), generalized domestic conflict or violence not directed toward the child is insufficient to meet the grave risk threshold. Furthermore, the Mother's friend, Miriam Gross, observed that the children do not act appropriately and do not act their age with their father around in New York, demonstrating that the current retention environment is itself unstable and potentially detrimental. The Father has failed to demonstrate that the Israeli judicial system is incapable of protecting the children, which is the implicit requirement of the "intolerable situation" clause.

**D. The Children's Alleged Objection to Return (Article 13)**

The Father claims the children "fundamentally object" to returning to Israel. This Article 13 exception is discretionary and contingent upon the child possessing a sufficient age and degree of maturity.

- Skepticism Required: A child's stated objection after a period of wrongful retention must be viewed with the highest degree of skepticism, as it is a well-established phenomenon that children in this situation are highly susceptible to the influence and manipulation of the abducting parent.

- Lack of Independence: The testimony of Dr. Ratner, showing the children's trauma stems from the separation from their Mother, proves their stated objections are not the mature, independent will required by the Convention but rather the result of duress and possible manipulation. To allow a child's post-abduction, likely-coerced objection to defeat the

Convention's mandate would provide a simple, repeatable roadmap for every abducting parent to circumvent international law.

Based on the foregoing, Respondent failed to establish a grave risk.

## IV. THE DOCTRINE OF AMELIORATION AND THE <u>GOLAN V. SAADA</u> FRAMEWORK

The Supreme Court's definitive guidance in <u>Golan v. Saada</u>, 142 S. Ct. 1880 (2022), mandates that courts "ordinarily should" address concrete ameliorative measures raised by the parties before denying a petition based on a grave risk defense. Even if a grave risk were found—which it should not be—the Mother has presented feasible undertakings that satisfy the <u>Golan</u> framework and neutralize any residual risk.

A. Ameliorative Measures Proposed by Petitioner

The Mother has proactively presented specific, feasible undertakings that confirm the safety and stability of the return:

1. Guaranteed Care and Monitoring: The Mother is willing to continue regular check-ups with a psychiatrist and family doctor upon return to Israel, ensuring seamless continuity of any necessary mental health monitoring.

2. Capability of the Israeli Forum: Dr. Ratner explicitly confirmed that any necessary court-ordered psychological intervention can be "fully implemented in Israel," a nation with a modern, sophisticated judicial and mental health system. The Israeli judiciary is fully equipped and willing to impose protective measures far more effective than any this Court could order remotely.

3. Built-in Support: The Mother's large, stable family and extensive support system in Israel, confirmed by Miriam Gross, provides a robust, immediate support network, guaranteeing the efficacy of any protective measures ordered by the Israeli court upon arrival.

The Father has failed to meet his burden to prove, by clear and convincing evidence, that these concrete measures would be insufficient to protect the children. Under Golan, this failure is an independent basis to reject the grave risk defense and order the return.

## V. JUDICIAL INTEGRITY, COMITY, AND THE NECESSITY OF DETERRENCE

The integrity of the international legal process and the principle of international comity demand that the Father's wrongful retention not be sanctioned by this Court. The Father is attempting to weaponize allegations of psychological harm and domestic discord to achieve a prohibited goal: forum shopping and trapping the court in a "best interests" analysis.

This tactic is specifically forbidden by the Hague Convention. It is respectfully submitted that, to deny the petition based on his unproven and contradictory claims, it would be an act of judicial overreach and a profound violation of the Convention's anti-abduction policy. It would undermine the Hague Convention by substituting a non-binding, preliminary custody review for the clear, mandatory requirement of returning the children to the competent jurisdiction of their habitual residence. The policy of deterrence requires that the Father's wrongful act not be rewarded.

## VI. MANDATORY ICARA FEE-SHIFTING AND ANCILLARY RELIEF

**A. Mandatory Attorney's Fees and Costs**

Under the mandatory fee-shifting provision of ICARA, 22 U.S.C. § 9007(b)(3), a court is required to order the respondent to pay all necessary expenses incurred by the petitioner—including attorney's fees, expert witness fees, transcripts, and travel expenses—unless the respondent establishes that such order would be clearly inappropriate.

The Father has not met this extremely high burden. The Petitioner has presented undisputed testimony regarding the severe financial disparity between the parties.

The Respondent has the means to afford a large firm with 3 attorneys, while the Petitioner has had to navigate this complex international litigation with no money to pay for this case. The mandatory fee provision exists to prevent abduction from becoming a weapon of financial coercion and must be enforced here to cover all Petitioner's costs.

**B. Ancillary Relief to Ensure Prompt Return**

To ensure the prompt and safe execution of the return order, the Court has the jurisdiction to order necessary ancillary relief:

1. Surrender of Passports: The Father must be ordered to immediately surrender his passport and the passports of B.F. and M.F. to prevent any further concealment or flight from the jurisdiction.

2. Facilitation of Contact: The Father must be ordered to facilitate immediate and consistent phone or video contact between the Mother and the children, which is essential to mitigate the psychological distress of separation prior to and during the physical return.

**VII. CONCLUSION AND PROPOSED ORDER OF RETURN**

Petitioner Perl Felberbaum has met her burden of proof by a preponderance of the evidence, establishing Israel as the children's habitual residence and the Father's retention as wrongful.

Respondent Yaakov Felberbaum has failed to meet his clear and convincing burden of proof for the grave risk defense. The evidence demonstrates that the risk lies not in the return of the children to their Mother and their home, but in the ongoing, unlawful retention orchestrated by the Father.

**WHEREFORE,** for the foregoing reasons, Petitioner Perl Felberbaum respectfully requests that this Honorable Court enter a Final Judgment:

1. Declaring that the children, B.F. and M.F., were habitually resident in Israel and were wrongfully retained by the Respondent in New York.

2. Finding that the Respondent failed to meet his burden to prove the Article 13(b) defense.

3. Ordering the immediate and prompt return of B.F. and M.F. to the State of Israel.

4. Ordering the Respondent to be financially responsible for the Petitioner's attorney's fees, expert witness fees, transcripts, and all other necessary expenses associated with this trial pursuant to 22 U.S.C. § 9007(b)(3).

5. Ordering the Respondent to surrender his passport and the children's passports and to facilitate regular contact between the children and the Petitioner pending the return.

Dated: Woodmere, New York
   November 14, 2025

Respectfully submitted,

/s/ Menachem White, Esq.
Menachem White, Esq.
Attorney for Petitioner