**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____
In the Matter of B.F. and M.F.,           )
                                          )
P.F.                                      )
                                          )
       Petitioner,                      )
                                          )
vs.                                       )      No. 7:24-cv-02333-PMH
                                          )
Y.F.                                      )
                                          )
       Respondent.                      )
_____)


## RESPONDENT'S POST-TRIAL BRIEF

Michael Banuchis
Richard Min
Camilla Redmond Costa
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: 212-681-6400
Facsimile: 212-681-6999
Email: rmin@gkmrlaw.com
Email: mbanuchis@gkmrlaw.com

*ATTORNEYS FOR RESPONDENT*
*YAAKOV FELBERBAUM*

I. **Petitioner's Failure to Prove her *Prima Facie* Case**

1. A petitioner who establishes wrongful removal or retention has made out a *prima facie* case under ICARA. *In re D.T.J.*, 956 F. Supp. 2d 523, 528 (S.D.N.Y. 2013). Removal or retention of a child is wrongful when "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005). If the petitioner successfully establishes a *prima facie* case of wrongful removal or retention, then the burden shifts to the respondent to establish one of the Convention's defenses. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir.1999).

2. ICARA sets forth the burdens of proof for both the case in chief and defenses to return.[1] The case in chief (i.e., proof that the child is under sixteen years old, that the child was wrongfully removed from the child's habitual residence, and that removal was in violation of the custody rights of the left-behind parent) requires proof of each element by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(1). Preponderance of the evidence, while "not a high standard ... is not ... a toothless standard either." *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999). A preponderance means more likely than not. *United States v. Mandanici*, 205 F.3d 519, 532 (2d Cir. 2000). A respondent does not bear the burden of disproving an element of a petitioner's case in chief if the petitioner has failed to adequately present it. *See Berenguela-Alvarado v. Castanos*, 950 F.3d 1352 (11th Cir. 2020) (district court reversed for shifting burden of disproving petitioner's *prima facie* case to respondent).

---

[1] 22 U.S.C. § 9003(e), Burdens of Proof: (1) A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence - (A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and (B) in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights. (2) In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing - (A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and (B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

3. The Petition should be denied in its entirety because Petitioner has failed to establish a *prima facie* case in two respects. She has not met her burden of proving that the Children's habitual residence was Israel. The parties' move to Israel was conditional, based on the hope that their marriage would improve. When the marriage failed, the condition was not met, and the absence of a shared intent to unconditionally relocate to Israel weighs heavily against finding Israel to be the Children's habitual residence. Moreover, Petitioner has not offered evidence sufficient to establish that the Children's habitual residence became Israel notwithstanding the lack of shared intent to abandon New York as their home. Second, fatal to Petitioner's *prima facie* case is her failure to present any evidence of what, if any, rights of custody she retained following the parties' divorce, preventing her from identifying which specific custodial right Respondent allegedly breached.

### a. Petitioner Failed to Prove that the Children's Habitual Residence was Israel

4. The purpose of the habitual residence requirement aligns with a core premise of the Hague Convention: that custody be litigated in the country that will best serve the interests of and protect the child. Whether a country is the child's habitual residence is based on the "totality of the circumstances" of each case. *Monasky v. Taglieri*, 589 U.S. 68 (2020). A determination of "habitual residence depends on the specific circumstances of the particular case." *Id*. at 78. Given the circumstances of this case, the interests if the children would be served by litigating custody in New York where there is already a pending custody case, and where the Children have resided continuously since April 2023.

5. The Second Circuit has historically utilized a two-step analysis which is still applicable today as the Supreme Court afforded trial courts "maximum flexibility" to act based on the precise scenario before it. *Monasky*, 589 U.S. at 78–79.

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized

to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 133-34.

6. One consideration in assessing shared intent is if a move was conditional. *Abbott v. Abbott*, 560 U.S. 1, 13, 17 (2010) (parent can place conditions on a move). There is a line of Second Circuit cases that are directly applicable here.

7. In *Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013) the mother and father were physicians living in Canada. They explored the possibility of moving to New York, and they agreed that the mother would take their two sons there. The father claimed that the trip was intended to be temporary while the mother said that it was the first step in the family's permanent relocation. While in New York the parties opened a joint bank account and the older son began attending school. After the move, the mother filed for divorce and the father filed a Hague petition to return the children to Canada. The district court found that the father's consent to the removal of the two children to the United States was conditioned on his living with them as a family. The Second Circuit affirmed.

> Just as in *Mota*, "if the parents [here] did not agree that [the children] would live indefinitely in . . . [the United States] regardless of [their father's] presence, it cannot be said that the parents 'shared an intent'" that New York would be the children's "state of habitual residence." There is evidence in the record, including testimony from both parties, that they intended to relocate to New York as a family to enable the "rebirth" of their marriage. They therefore had a shared intent to relocate to New York, but the extent to which that intent was shared was limited by Hofmann's conditional agreement that the relocation was to be accomplished as a family.

*Id*. at 293 (citations omitted); *See also Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) (the court held that the United States had not become the child's habitual residence despite living there for two years because the ability of the Mexican mother to stay with her child was a condition of the family moving to the United States).

8. This case falls squarely in the category of conditional intent by way of a failed trial period, and the parties did not share an intent to permanently alter the Children's habitual residence to Israel. Under those circumstances, a child's habitual residence typically will not shift. *See, e,g,*

*Gitter*, 396 F.3d at 135 (determining that the parties' move to Israel was on a conditional basis); *Murphy v. Sloan*, 982 F. Supp. 2d 1065, 1074 (N.D. Cal. 2013), aff'd, 764 F.3d 1144 (9th Cir. 2014) (as child's move to Ireland was intended as a "trial period", child's habitual residence in United States was not abandoned); *McKenzie v. McKenzie*, 168 F.Supp.2d 47 (E.D.N.Y. 2001) (child's habitual residence never shifted from Germany to the Unites States when the mother believed that she would be able to return to Germany with the child if she was unhappy in the United States.)

9. The case law in this Circuit is clear – if Respondent's intent was to conditionally move to Israel in an attempt to salvage the marriage and the marriage failed, then the habitual residence should not change regardless of Petitioner's sentiments on the move.

10. This Court can end its analysis there. However, to the extent it examines acclimatization, only in rare circumstances will a child acclimatize such that their habitual residence has shifted in the absence of shared intent. *See Gitter*, 396 F.3d at 134 ("In relatively rare circumstances, however, it is possible that the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence."); *see also Hofmann,* 716 F.3d at 292.

11. The Second Circuit has cautioned that "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (quoting *Mozes*, 239 F.3d at 1079). "A finding that this standard is satisfied is therefore only appropriate in "relatively rare circumstances" in which a child's degree of acclimatization is "so complete that serious harm ... can be expected to result" from ordering them to relocate. *Hofmann*, 716 F.3d at 294 (quoting *Mota*, 692 F.3d at 116).

12. Here, the Court's consideration should be whether there is sufficient evidence to establish that the Children are actively harmed by permitting them to remain in the United States while a New York court resolves the parties' custody dispute. There is not sufficient evidence in this record to prove acclimatization to Israel by a preponderance of the evidence.

13. Petitioner cannot simply rely on the length of time the children lived in Israel, as it alone is not determinative given the *Monasky* totality standard where no single factor is determinative. *Monasky v. Taglieri*, 589 U.S. 68 (2020); *see also Smith v. Smith*, 976 F.3d 558, 560,

563 (5th Cir. 2020) (Argentina was not established as the habitual residence even though the family had moved their belongings there and lived there for two years.); *Ruiz v. Tenorio*, 392 F.3d 1247 (11th Cir. 2004) (habitual residence does not shift during trial period which lasted nearly three years): *Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020) (nearly three years in Mexico did not shift habitual residence because the respondent "always viewed the move as temporary in nature," the parties "retained strong ties to the United States and came back for frequent visits," and "the family members retained U.S. citizenship.").

14. The record supports the parties' move to Israel as conditional. The parties and the Children are all United States citizens. *See* **RXs A and B.**[2] Respondent refused to obtain Israeli citizenship. Tr. 117:9-18. The parties and the Children hold valid New York State Identification Cards *See* **RXs F and G** and they maintain United States passports. *See* **RXs A, B, C** and **D**.

15. Further, the parties maintained a lease for their residence in New York until 2022. *See* **RXs Z and AA**. Despite having moved to Israel in July 2019, the family returned to New York in March 2020 for the coronavirus pandemic and the parties had a dispute over returning to Israel. *See* **CX3 at 10:55**. In order to come to a mutual agreement, on May 24, 2020, the parties signed an agreement to submit to arbitration before the Rabbinical Court of Mechon L'Hoyroa. As part of that agreement, the Petitioner agreed to submit to New York jurisdiction. On May 27, 2020, the parties signed a mediation agreement which memorializes the parties' oral agreement during the arbitration before the Rabbinical Court. *See* **RXII**. The parties stipulated that they would return to Israel for a trial period to attempt to reconcile their marriage. This arrangement was specifically contingent upon the Petitioner improving her mental health conditions and going to therapy. *Id.*

16. The parties and Children also frequently traveled back to New York during their temporary stay in Israel. Petitioner traveled to New York with B.F. for two weeks in or around end of September 2019 (*See* **CX3 at 9:49**); the family returned to New York for a few months in March

---

[2] The abbreviations "PX1, PX2" etc. refer to Petitioner's Exhibits; "RXA, RXB" etc. refer to Respondent's Exhibits, and "CX1, CX2" refers to CXs.

2020 (*See* **CX3 at 10:55**). Further, in 2021, Respondent traveled to New York for two to three weeks. *See* **CX3 at 13:69**. He also travelled to New York from January to February 2022. *Id.*

17. Further, the parties filed for bankruptcy in the Southern District of New York in 2022 and the Petitioner signed a Debtor's statement, filed to this Court, in January 2023. *See* **CX3 at 26-27:130-132 and RXs BB and CC**.

18. The questions before this Court are first, whether the parties had a shared intent to permanently abandon New York as the Children's habitual residence and establish a new habitual residence in Israel, and secondly, whether the Children acclimatized to life in Israel. It is evident from the record that the parties did not share this intent. This is evidenced by the parties signing a written agreement on May 27, 2020, outlining their agreement stipulated to during an arbitration in Monsey to return to Israel temporarily and on a trial basis, on the condition that the parties "receive counseling, and … [go] to therapy or [take] medication." *See* **RXII**.

19. The agreement to return to Israel was "explicitly contingent upon Petitioner demonstrating a meaningful improvement in her mental health and maintaining consistent adherence to her prescribed medication and therapy." *See* **CX3 at 12:63**. Otherwise, the parties would return to the Rabbinical court in New York to re-address their issues. On August 3, 2020, Petitioner served Respondent with a pre-divorce summons in Jerusalem Rabbinical Court. *See* **RXV**. Given that the parties had entered into an arbitration agreement in New York about three (3) months prior, Petitioner had violated it by taking legal action against Respondent in Israel. *Id*. at **13:70**.

20. Petitioner's intent alone cannot unilaterally change the habitual residence of the children. *Gitter*, 396 F.3d at 134 (it is the intent of the parents "at the latest time that their intent was shared," that is relevant to a determination of habitual residence); accord *Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018) ("The 'unilateral intent of a single parent' will not suffice to change a child's habitual residence."); *Darin v. Olivero-Huffman*, 746 F.3d 1, 11 (1st Cir. 2014) ("One parent's wishes are not sufficient, by themselves, to effect a change in a child's habitual residence."). Notwithstanding the objective evidence that the parties' move to Israel was conditional, including but not limited to the parties' arbitration agreement (**RXT**) and

Respondent's testimony that the move to Israel was condition on the Petitioner seeking treatment (**CX3 at 7-9:37-46)**, Petitioner's unilateral intent also cannot shift the Children's habitual residence to Israel.

21. Petitioner has not submitted evidence to suggest that the Children were so acclimatized to Israel that it is actively harmful for them to be in New York. There is no indication that the Children formed meaningful connections or developed strong ties to Israel. In stark contrast, the evidence suggests that their time in Israel was marked by instability and fear of the Petitioner. There is no evidence to the contrary and Petitioner did not enter a single piece of evidence supporting the Children's habitual residence being Israel. *See Headifen v. Harker*, No. A-13-CA-340-SS, 2013 WL 2538897 at *10 (W.D. Tex. June 7, 2013), *aff'd,* 549 F. App'x 300 (5th Cir. 2013) (court held that "because there is no bright-line rule as to the length of time, the Court finds this fact, standing alone or in conjunction with the limited evidence of acclimatization [petitioner] produced, fails to unequivocally indicate habitual residence in New Zealand was established.").

22. Moreover, the reliability and accuracy of Petitioner's direct testimony affidavit is questionable, as it was translated from Yiddish to English without the original being provided and without a certified translation. Tr. 9-10:6-2. On the other hand, Respondent presented evidence that the Children were physically and emotionally terrorized by their mother in Israel and expressed suicidal thoughts at the prospect of return. *See* **RXs X, GG2 and CXs 3, 5 at 21, and 6;** *see also* Tr. 215:18-24.[3] Specifically, Mr. Szatchel testified that the Childre are "shell-shocked, anxious, insecure, and haunted by their experiences" and "their trauma stems from prolonged exposure to a highly dysfunctional and emotionally abusive environment." *See* **CX5 at 20.** The Respondent also presented evidence regarding the Children's life in New York, which they have fully acclimatized to since April 2023. *See* **RXY and CX3**. Essentially the only evidence Petitioner put forth was her affidavit and that affidavit is unreliable.

---

[3] Mr. Szatchel testified regarding the children's experience in Israel "...obviously you have no idea of the torture they went through; emotional torture, physical torture. You have no idea"

23. Further, even assuming arguendo that the Children's habitual residence shifted to Israel during their stay, the Court could reasonably find that by the time the Petition was filed the Children's habitual residence had shifted back to the United States where they were attending school and had a home. *See Goldstein v. Simon,* No. 24-20633-CIV, 2024 WL 2976748 (S.D. Fla. June 13, 2024), *aff'd,* No. 24-12098, 2024 WL 4284921 (11th Cir. Sept. 25, 2024) (the district court found a change in habitual residence to the United States even though the children had only resided in Florida for a few months and even though the parties agreed to relocate temporarily as a result of the terrorist attacks in Israel); *see also Smith,* 976 F.3d at 560–63 (despite spending two years in Argentina, the children's habitual residence shifted to the United States after three months). The same reasoning applies here, as these Children integrated back into life in the United States after a tumultuous stay in Israel.

### b. *Petitioner Failed to Prove What, if Any, Rights of Custody She Possesses*

24. Even if she can establish that Israel was the Children's habitual residence, Petitioner still has the burden of proving by a preponderance of the evidence that her custody rights under Israeli law were violated by Respondent. *See Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *13 (S.D.N.Y. Apr. 19, 2013), aff'd as amended, 758 F.3d 153 (2d Cir. 2014) ("In addition to establishing the right of custody of the children, petitioner bears the burden of establishing by a preponderance of the evidence that the children were retained in breach of those custody rights, and that he was exercising his custodial rights at the time of retention."); *Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1179 (10th Cir. 2020) ("a removal is wrongful only if done 'in breach of rights of custody attributed to' the parent. Hague Convention, art. 3. Thus, to establish the second element, a petitioner must demonstrate by a preponderance of the evidence that he or she possesses rights of custody as that term is defined in the Convention.")

25. In Petitioner's post-trial brief, she argues that she holds a "ne exeat" right and therefore, the retention of the Children in New York violated her custody rights under Israeli law. ECF No. 120 at 5. Petitioner has introduced no evidence that a ne exeat right exits under Israeli law, and the *Abbot* case specifically addressed whether a ne exeat right granted by a Chilean family

court amounted to a right of custody under the Convention. *Abbott*, 560 U.S. at 1. Her argument here demonstrates a fundamental misunderstanding of the issue and assumes a ne exeat right exists with zero evidence suggesting that is the case.

26.    Rights of custody are typically proven through Rule 44.1 or expert testimony. *See Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (establishing proof of foreign law by an affidavit of Mexican attorney); accord *Shalit v. Coppe*, 182 F.3d 1124, 1130 (9th Cir. 1999) (finding that father's filing of declaration of his Israeli attorney is not sufficient); *Poix v. Susibel Altagracia Espaillat Santana*, No. 22 CIV. 4980 (JPC), 2022 WL 9847347, at *7 (S.D.N.Y. Oct. 17, 2022) ("In order to determine the scope of Petitioner's parental rights under Dominican law, the Court takes judicial notice of certain translated provisions of Dominican law…and further relies on the testimony of Plaintiff's expert witness… a practitioner of Dominican family law.")

27.    Respondent acknowledges that the Court may view this argument as putting form over substance; however, the record is completely devoid of any evidence regarding what, if any, post-divorce rights of custody Petitioner holds. Even if she did have custody rights on the date of alleged wrongful retention (there is no evidence of this either), a subsequent change in those rights stemming from the parties' divorce could render the case moot. *See, e.g. Tatari v. Durust*, No. 24-CV-6930 (CBA) (LKE), 2025 WL 327984, at *8 (E.D.N.Y. Jan. 29, 2025), aff'd, No. 25-253-CV, 2025 WL 947009 (2d Cir. Mar. 28, 2025) (court assessed father's custody rights conferred by divorce judgment).

28.    The reality of this case may be that neither Petitioner nor her counsel has a grasp on what rights of custody Petitioner has as of today. She was not even able to direct the Court to a particular Israeli statute in her post trial brief. Despite this failure of proof, the Court does not necessarily need to get to this question as Petitioner has not proven that Israel is the Children's habitual residence.

    II.    **<u>Respondent's Affirmative Defenses</u>**

        *a.  Return to Israel Would Pose a Grave Risk of Harm*

29. Grave risk must be proven by clear and convincing evidence, a standard which must "satisf[y] the factfinder that it is highly probable" (*In re Gail R.*, 67 A.D.3d 808 (2d Dep't 2009)) or produce a "firm belief or conviction" of what is being asserted. *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014).

30. It is uncontroverted that these children have Post Traumatic Stress Disorder ("PTSD"). Courts have routinely found that potential harm subsequent to return due to PTSD constitutes grave risk under Article 13(b). *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (holding that evidence regarding PTSD can have "a direct bearing on grave risk determinations"); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (affirming district court's grave risk determination based on a finding the children would suffer from a recurrence of PTSD); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (there was grave risk of harm where children had experienced physical abuse from father, had witnessed his abuse of their mother, and expert testified that their return to Israel would trigger post-traumatic stress disorders, as well as 14-year-old's suicidal ideations); *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 JG, 2005 WL 67094, at *6-8 (E.D.N.Y. Jan. 13, 2005) (denying petition on record of frequent violence in front of the children and expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child). *See also, Simcox,* 511 F.3d 594, 608–09 (grave risk of harm where children suffered from post-traumatic stress disorder due to father's "serious" physical and psychological abuse); *Walsh*, 221 F.3d at 221–22 (grave risk of harm where child diagnosed with post-traumatic stress disorder due to father's conduct). This should leave the Court with a firm conviction that there is an unacceptable risk of harm associated with returning the Children to Israel.

31. The Children's PTSD was caused by physical and psychological abuse inflicted by the Petitioner. Mr. Szatchel testified that he "diagnosed both children with [PTSD]." *See* **CX5 at 19**. To that end, Mr. Szatchel testified at trial that the Children had been exposed to numerous traumatic experiences, prompting his recommendation that none of them should be returned to such an environment. Tr. 198–199. He described the prospect of the Children's return to Israel as a "death sentence." *Id.* Mr. Szatchel further expressed concern after B.F. confided that, if

compelled by this Court to return to Israel, she would "throw herself under a bus." Tr. 190:15–21; *see also* **CX5** at 21. According to Mr. Szatchel, this extreme distress was a direct result of the fear instilled in her by the Petitioner. *Id.* Furthermore, Dr. Stoltzfus, Respondent's forensic expert, cautioned against returning the Children to Israel or to their mother's custody, opining that such action would likely exacerbate their PTSD symptoms and cause significant long-term psychological damage. To that point, Dr. Stoltzfus testified that "the children have expressed a clear belief, grounded in their past experiences, that returning to Petitioner's custody would expose them to further physical and emotional abuse, creating an intolerable and damaging environment." *See* **CX6 at 13:58**. Petitioner's expert did not evaluate the Children, nor the father for that matter, rendering her opinion of little weight. Tr. 51:1-14.

32. The Court should also consider that the situation on the ground in Israel is completely unknown and there is no understanding of what the Children's situation will be in Israel. Petitioner could simply take custody of the Children, Respondent may be arrested, and there is complete uncertainty as to what will happen. The Court should not take the chance that these children will be subjected to that type of trauma. *See Saada v. Golan*, 712 F. Supp. 3d 361, 378 (E.D.N.Y. 2024), (court denies petition as "the mere process of uprooting this fragile seven-year-old, diagnosed with PTSD …as well as the uncertainty about what would happen if he were returned to Italy, would expose him to a grave risk of psychological harm and put him in an intolerable situation).

33. Furthermore, Petitioner claims in her post-trial brief that she has "proactively presented specific, feasible undertakings that confirm the safety and stability of the return." ECF No. 120 at 11. "[A] district court has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties ...." *Golan v. Saada*, 596 U.S. 666, 679 (2022). At no point during trial has Petitioner provided evidence or mentioned ameliorative measures for the Children. What she offers now are unenforceable promises which are disfavored. *See Saada v. Golan,* 930 F.3d 533 (2d Cir. 2019) (district court erred in granting petitioner's petition after finding that grave risk would be ameliorated by protective measures that were unenforceable and not otherwise accompanied by sufficient guarantees of performance).

34. Ameliorative measures are inappropriate in this case as Respondent has established that the Children suffer from PTSD (*See* **CX5 at 19**) and it would severely psychologically harm the Children if they were returned to the country which caused all their traumatic experiences (*See* **CX6 at 13:58**). Returning these Children to Israel in and of itself poses a grave risk of harm. *See Blondin*, 238 F.3d at 163 (affirming grave risk finding based on uncontroverted evidence that returning children to France will cause harm due to PTSD).

### b. *The Children's Objection to Return Should be Considered*

35. Article 13 of the Hague Convention permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." This defense must be established by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B). "[A] district court can decline to order return of a wrongfully retained or removed child on [this] ground alone." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y.), aff'd, 401 F. App'x 567 (2d Cir. 2010). The Second Circuit, unlike other circuits, has not held that the court should apply a higher standard if it denies a petition solely due to this exception. *Cf. Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007) (Courts "apply a stricter standard" when return of a child is based solely on that child's objection than if the child's objection is just one part of a broader analysis).

36. In *Matovski v. Matovski,* No. 06 CIV. 4259 (PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007*)*, the Court denied the petitioner's request to return the children, in large part due to the wishes of the children, two of whom, aged eleven and twelve, had reached the requisite maturity level. The Court found that the children understood the difference between telling the truth and a lie and honestly preferred to stay in the United States. *See also BISMARK BOA-BONSU, Plaintiff-Petitioner, v. DEBORAH OWUSU, Defendant-Respondent.*, No. 2:25-CV-00632, 2025 WL 2896377 (S.D. Ohio Oct. 10, 2025) (court found eight year old to be sufficiently mature for his views to be considered as he confirmed the importance of telling the truth and stated that everything he said was the truth); *Valles Rubio v. Veintimilla Castro,* No. 19-CV-2524(KAM)(ST), 2019 WL 5189011 (E.D.N.Y. Oct. 15, 2019), aff'd, 813 F. App'x 619 (2d Cir. 2020)

37. *In re Ochoa v. Perez,* No. 24 CV 4736 (NSR), 2025 WL 2172646 (S.D.N.Y. July 31, 2025) is instructive here. The court found the 11-year-old child to be mature because "he was able to distinguish between right from wrong, and truth from fiction." *Id* at *5. The court also noted that the child "coherently articulated [her] objections to [Mexico] and [her] reasons to want to remain in the United States ... [her] reasoning [was] sensible, well-analyzed, and grounded in experience." *Id*. The Court in *In Re Ochoa* found similarities with the subject child in *Swett v. Bowe*, where the district court found the child to be "thoughtful, intelligent, poised, and direct" and concluded that his "articulation of his reasoning was rational, logical, and clear." *Swett v. Bowe*, 733 F. Supp. 3d 225 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe,* 120 F.4th 335 (2d Cir. 2024), cert. *denied*, No. 24-1205, 2025 WL 2823750 (U.S. Oct. 6, 2025).

38. In the present case, the Children "fundamentally object to returning to Israel." *See* **CX3 at 2**. Dr. Stoltzfus testified that the Children "exhibit maturity beyond their age" (**CX3 at 5:19**) and they "both demonstrated a clear and articulate understanding of the dynamics within their home." *See* **CX3 at 13:59**. Further, Dr. Stoltzfus testified that "[e]ach child presented as notably insightful and expressive, and both were unequivocal in their desire not to return to a setting marked by abuse." *Id*. As such, he opined that the children are sufficiently mature and their wishes and objection not to return to Israel ought to be taken into account. *Id* at **14:63**. These conclusions were unrebutted by Petitioner's rebuttal expert, Dr. Yael Ratner. There is no evidence in the record suggesting that the Children are not sufficiently mature for this Court to credit their objections to return.[4]

39. In the case at bar, Dr. Stotlzfus evaluated the subject Children in July 2025, with an interpreter present. Dr. Stotlzfus noted that he discussed with the Children "both happy and sad feelings [and] the difference between the two." *See* **CX6 at 7**. During this evaluation, the Children expressed what they enjoyed about New York, including "trips to amusement parks and water

---

[4] This Court conducted an in-camera interview of the subject Children. Transcripts from that said interview have not been disclosed and the Court has reserved its ruling in this regard. Therefore, at this stage, there is no evidence on the record suggesting that the Children are not mature and that their wishes should not be considered.

slides." *Id* at 8. In stark contrast, B.F. noted to Dr. Stoltzfus that her life in Israel was plagued by her stepbrother who was "not a good brother" and who would "hit [her]." *Id.* B.F. concluded her interview with Dr. Stotlzfus by expressly stating that she did not want to return to Israel and that she wanted to remain in New York. *Id* at 10. M.F., similarly, noted that the Petitioner would "hit them ... on their back, feet and face." *Id* at 11. *See Royal Borough of Kensington & Chelsea v. Bafna-Louis,* No. 22-CV-8303 (PKC), 2023 WL 2387385 (S.D.N.Y. Mar. 7, 2023), aff'd, No. 23-470, 2023 WL 6173335 (2d Cir. Sept. 22, 2023), *and aff'd*, No. 23-470, 2023 WL 6867135 (2d Cir. Oct. 18, 2023) (court denied petition where child "articulated concrete and well-considered reasons for his desire to remain in New York and not to return to the United Kingdom.")

40. Even if this Court were to find only one child sufficiently mature for this exception to apply, it should still decide to deny the petition in its entirety as in *Lomanto v. Agbelusi,* No. 22-CV-7349, 2023 WL 4118124 (S.D.N.Y. June 22, 2023), *aff'd,* No. 23-993, 2024 WL 3342415 (2d Cir. July 9, 2024), where the court held that the separation of the siblings "would cause significant hardship and psychological harm, and ought to be avoided at all costs" when only one child was of sufficient age and maturity for his views to be taken into account. *Id* at *17.

41. For all the foregoing reasons, the Petition must be denied in its entirety. Petitioner failed to meet her burden of proving that Israel was the Children's habitual residence or that any of her custody rights were breached under Israeli law. Even if she had, the overwhelming evidence establishes that returning these Children to Israel would expose them to a grave risk of physical and psychological harm and that both Children, each of whom demonstrated maturity, insight, and consistency, fundamentally object to such a return. The Hague Convention was never intended to compel the return of children to the very environment that caused their trauma or to reward a parent whose own conduct precipitated that harm. The applicable law and the record all point in one direction: these Children are safe, stable, and thriving in New York. Their continued safety and wellbeing require that the Petition be denied.

*Respectfully submitted,*

/s/ Michael Banuchis
Michael Banuchis, *Attorneys for Respondent*