UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PERL FELBERBAUM,

                        Petitioner,

         -against-

YAAKOV FELBERBAUM,

                   Respondent.

**<u>OPINION AND ORDER</u>**

24-CV-02333 (PMH)

PHILIP M. HALPERN, United States District Judge:

Perl Felberbaum ("Petitioner") seeks an order, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001, *et seq.*, directing the return of her daughter, B.F., and son, M.F. (together, the "Children"), to Israel. (Doc. 10).

The Court conducted a bench trial in this action on October 27 and 28, 2025. The parties subsequently filed, at the Court's direction, their post-trial briefs. (Doc. 120; Doc. 121).

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, the Amended Petition is DENIED.

## **BACKGROUND**

I.    Procedural History

On March 27, 2024, Petitioner commenced this proceeding for the return of the Children to Israel by filing a Petition against her ex-husband, Yaakov Felberbaum ("Respondent"). (Doc. 1). Petitioner also moved by order to show cause seeking certain provisional relief. (Doc. 3). On March 29, 2024, the Court issued an order denying the request for an *ex parte* temporary restraining order and order to show cause. (Doc. 4). The Court explained, in that order, that Petitioner had failed to establish the elements of the emergency equitable relief she had requested; and had not satisfied any of the requirements of Rule 65(b) so as to permit issuance of the order to show cause without notice to Respondent. (*Id.*). The Court also detailed how Petitioner could remedy the defects in the proposed order to show cause and other papers filed in support; what information she could provide to cure the deficiencies in the record before the Court; and instructed Petitioner to amend the petition to eliminate the full names and dates of birth of the minors in accordance with Federal Rule of Civil Procedure 5.2(a). (*Id.*).

Petitioner took no further or immediate steps to proceed with her Petition or application for provisional injunctive relief.

Almost three months later, on June 24, 2024, Petitioner attempted to file a document entitled "Complaint/Petition" but the Office of the Clerk of Court rejected the filing due to various deficiencies. (Doc. 6; June 25, 2024 Doc. Entry). Nothing further was filed thereafter.

On July 8, 2024, the Court issued an order noting that the docket was devoid of any indication that Respondent had been served, no summons had been requested by Petitioner, and Respondent had not appeared in this case. (Doc. 7). Accordingly, the Court directed Petitioner to either prove service had been effectuated upon Respondent or show cause for the failure to comply

with Rule 4(m), by July 15, 2024. (*Id.*). On July 11, 2024, Petitioner filed a document entitled "Amended Complaint/Petition" (Doc. 11)[1] as well as a proposed order to show cause with attachments (Doc. 12); and a letter requesting the Court sign the proposed order to show cause and extend the time to serve Respondent with the order to show cause (Doc. 13). The Court then, on July 12, 2024, issued an order clarifying to Petitioner that the July 8, 2024 order did not direct service of any order to show cause, but rather that it directed Petitioner to prove timely service of process on Respondent. (Doc. 14). The order went on to explain why service of process was necessary; provided guidance on how to request a summons; and granted an extension of time to effectuate service to August 26, 2024. (*Id.*). The Court warned Petitioner that failure to timely and properly effectuate service on Respondent by August 26, 2024 would result in dismissal of this action. (*Id.*). The Court also explained again the various deficiencies with the proposed order to show cause, its accompanying memorandum of law in support, and the record before the Court. (*Id.*).

On August 23, 2024, Petitioner filed an attorney affirmation stating that counsel sent "the Rule 65B Emergency Notice, Proposed Emergency Order to Show Cause, Petition, Memorandum of Law, Exhibits and other documents related to the instant case" by Federal Express to the Respondent. (Doc. 15). On August 25, 2024, Petitioner filed an affidavit of service indicating that the "Order to Show Cause with Exhibits" was served upon Respondent personally on August 23, 2024. (Doc. 16). Petitioner still had not requested the issuance of a summons; and the Court had not signed any order to show cause.

---

[1] Petitioner, disregarding the Court's instruction to eliminate the full names and dates of birth of the Children, instead redacted the parties' full names and continued to include the minor's full dates of birth in the Amended Petition, in violation of Rule 5.2(a).

On August 26, 2024, the Court issued an order recounting the foregoing, and *sua sponte* extended the time for Petitioner to comply with the July 12, 2024 order to September 6, 2024. (Doc. 18). The Court again warned Petitioner that failure to obtain a summons and serve it personally upon Respondent would result in the dismissal of this case. (*Id.*). The Court also addressed Petitioner's letter that requested the Court sign the proposed order to show cause, explaining that the July 12, 2024 order already detailed why the Court could not sign it, and as Petitioner had not produced a sufficient record nor corrected the deficiencies noted in the Court's prior orders, the request was again denied. (*Id.*).

On September 3, 2024, Petitioner filed an affidavit of service indicating that the "Summons with Amended Complaint Petition and Exhibits" was served upon Respondent by service upon a person of suitable age and discretion at Respondent's actual place of residence, and mailing to his residence by first class mail. (Doc. 23). On September 27, 2024, Respondent filed a letter advising that he learned of this pending action through his counsel in a separate Rockland County Family Court proceeding, that he had not been served, and had not resided at the address listed in the affidavit of service for almost two months. (Doc. 24). Respondent did not appear in this action or answer the Petition.

On October 9, 2024, Petitioner obtained a Clerk's Certificate of Default against Respondent (Doc. 31), and Respondent filed another letter contesting the accuracy of the affidavit of service (Doc. 32). Petitioner thereafter, on November 19, 2024, filed a motion for default judgment in accordance with the Court's Individual Practices. (Docs. 35-38). The Court issued an Order to Show Cause, returnable on January 10, 2025, directing Respondent to show cause why default judgment should not be entered against him; directing Petitioner to serve a copy of the Order to Show Cause and the papers upon which it was based upon Respondent by personal service

and by e-mail on or before December 4, 2024; and directing Petitioner to file proof of such service by December 9, 2024. (Doc. 39). Petitioner did not file proof of service. Accordingly, on December 10, 2024, the Court issued an order *sua sponte* extending the time *nunc pro tunc* to December 13, 2024 for Petitioner to file proof that service of the order to show cause and papers upon which it was based were served upon Respondent by December 4, 2024 in accordance with the Court's order. (Doc. 40). The Court again warned Petitioner that failure to comply with the Court's orders may result in dismissal of this action. (*Id.*). On December 11, 2024, the Court granted an extension for Petitioner to effectuate service to December 18, 2024. (Doc. 11). On December 17, 2024, Petitioner filed two copies of an unsigned attorney affirmation requesting that the Court grant an application for an alternative method of service by email. (Doc. 43). The Court denied the request without prejudice to renewal due to a variety of deficiencies, which were carefully detailed in the Court's December 19, 2024 order. (Doc. 44).

On December 20, 2024, Petitioner attempted to file documents titled on the docket as motions "for Service by Publication" (Doc. 45, Doc. 46), but each were rejected by the Clerk's Office due to filing deficiencies. On December 24, 2024, Petitioner filed a document captioned "Notice of Motion," improperly formatted as an order to show cause why an order of default should not be issued; and requested an order for alternative service by email or publication and a 60-day extension of time to serve Respondent. (Doc. 47). On December 27, 2024, the Court again thoroughly explained, with ample citation to case law, why Petitioner's application could not be granted on the record before the Court. (Doc. 48). The Court also detailed specifically what Petitioner would need to establish in the event she elected to file another motion for alternative service. (*Id.*). The Court recommended that Petitioner review the case law cited in that order as well as the December 19, 2024 order for further guidance. (*Id.*).

On January 10, 2025, Petitioner filed another motion seeking an extension of time to effectuate service of the order to show cause for default judgment. (Doc. 49). The Court, finding good cause existed for an extension, granted the request and issued a Revised Order to Show Cause to account for the passing of all the deadlines in the prior Order to Show Cause. (Doc. 50; Doc. 51). The Court warned Petitioner that there would be no further extensions to serve the Revised Order to Show Cause in accordance with its terms. (Doc. 51).

According to the affidavit of service, on March 11, 2025, the final deadline to serve Respondent, Petitioner served Respondent with the order to show cause and exhibits. (Doc. 52). Counsel appeared on behalf of Respondent on the return date of the Revised Order to Show Cause and filed a response thereto. (Doc. 53; Doc. 54). The Court found that good cause existed to vacate the Clerk's entry of default under Rule 55(c) and noted that even a cursory review of the record demonstrated that Petitioner contributed to the delayed resolution of this matter by repeatedly failing to comply with the Court's orders, ignoring the Federal Rules of Civil Procedure and disregarding deadlines in this case (Doc. 55 (citing Docs. 7, 14, 18, 40, 44, 48)). The Court therefore denied Petitioner's motion for a default judgment, granted Respondent's request to vacate the Clerk's entry of default, directed Respondent to respond to the Amended Petition, and scheduled an initial conference. (*Id.*).

Respondent filed his Response to the Amended Petition on April 18, 2025 (Doc. 57) and an initial conference was held via telephone on April 29, 2025. Petitioner's counsel, Menachem White, represented that no discovery was necessary in this case and the parties were prepared to proceed directly to an evidentiary hearing in June. Respondent, on the other hand, argued that limited discovery was necessary and anticipated a need to retain an expert in connection with his

affirmative defenses. The Court, accordingly, set down expedited deadlines for the completion of discovery, pretrial filings, and scheduled trial for August 25, 2025. (Doc. 58).

Approximately two weeks later, on May 15, 2025, Menachem White filed a proposed order to show cause, which he erroneously made returnable before Judge Cathy Seibel, seeking to be relieved as counsel and for a 30-day stay of the action to permit Petitioner to obtain new counsel. (Doc. 61). The Court declined to sign the proposed order to show cause, but construed the filing as a motion to withdraw as counsel. (Doc. 63). Though the Court relieved Menachem White as counsel, it denied the requested stay as unnecessary because attorney Asher Brian White entered an appearance on behalf of Petitioner and had not sought to be relieved by Court order. (*Id.*). On May 28, 2025, Asher Brian White filed a proposed order to show cause seeking to be relieved as counsel and for a 30-day stay of the action to permit Petitioner to obtain new counsel. (Doc. 64). The Court denied the request in light of the procedural history and posture of the case, including the imminently scheduled trial. (Doc. 65).

On May 29, 2025, Menachem White reappeared as counsel for Petitioner. (Doc. 66). Petitioner moved by order to show cause to extend discovery deadlines. (Doc. 67). Respondent filed a letter seeking a pre-motion conference in anticipation of moving for sanctions, to compel, or to dismiss, in connection with Petitioner's failure to abide by the deadlines in the Civil Case Discovery Plan and Scheduling Order. (Doc. 68). The Court granted in part Petitioner's requested extension and warned that there would be no further adjournments of those dates. (Doc. 69).

Respondent, on June 16, 2025, filed a letter advising that Petitioner failed to comply with the discovery deadlines. (Doc. 73). Petitioner responded, seeking an additional extension of time to comply, citing the ongoing war in Israel. (Doc. 75 ("In light of the circumstances with Petitioner residing in a country that is subject to attack by missiles, there exists both good cause and excusable

neglect sufficient for this Court to exercise its discretion in favor of granting the requested extension.")). The Court held a conference on June 26, 2025 in light of Petitioner's failure to comply with the discovery deadlines as directed. (Doc. 81). When asked why Petitioner's counsel has disregarded the Court's orders, Mr. White stated: "I worked to the best of my ability. I actually took your Honor's advice and I brought on co-counsel to help me with the discovery who has more knowledge of the federal law than I do . . . we have a lot of discovery . . . . (*Id.* at 3:3-12). Mr. White also represented that Petitioner was not engaging an expert in connection with her case.

The Court warned Mr. White that continued failure to comply with the Court's orders would result in dismissal of this action. In light of the discovery delays and Petitioner's request for extensions of time to complete discovery, the Court extended the deadlines to complete discovery and file pretrial materials, and set a new trial date for October 27, 2025. (Doc. 79).

The Court held a pretrial conference on September 17, 2025. Mr. White was assisted by co-counsel, Emanuel Kataev, who subsequently entered an appearance on behalf of Petitioner on September 22, 2025.[2] The Court reviewed with the parties the pretrial materials it had received and that which it had not yet received, and issued an order directing revised filings and submissions. (Doc. 89). Respondent, pursuant to the Court's Individual Practices and in compliance with the Court's orders, submitted to the Court two copies of the affidavits constituting the direct testimony of his witnesses. Petitioner, however, did not so comply and on October 7, 2025, after the deadline had already passed, first requested an extension of time to do so. (Doc. 102). The Court reserved decision on that request until the October 20, 2025 final pretrial conference. The Court also reserved decision on Respondent's request for leave to move under

---

[2] Mr. Kataev explained his role as follows: "I came on for the sole purpose of assisting Mr. White, who's a State Court practitioner, and I looked at the docket and I see he's had a lot of trouble figuring out how things work in the Federal Court." (Sept. 17, 2025 Tr. at 4:22-25).

Rule 41(b) to dismiss the case due to Petitioner's failures to comply with the Court's orders, and to deem cross-examination of Respondent's witnesses waived due to Petitioner's failure to identify which, if any, of the witnesses she intended to cross-examine pursuant to the Court's rules. (Doc. 101; Doc. 104).

The Court signed and entered the Amended Joint Pretrial Order on October 20, 2025. (Doc. 110). At the final pre-trial conference on October 20, 2025, the Court, *inter alia*, denied without prejudice Respondent's request for leave to move to dismiss under Rule 41(b), but granted leave to move under Rule 16(f) for sanctions and/or attorneys' fees incurred because of Petitioner's repeated failures to obey orders that have issued in this case. (Doc. 111). The Court denied as moot Petitioner's belated request for an extension to submit direct testimony affidavits and declined to deem her cross-examination of Respondent's witnesses waived. (*Id.*). The Court also directed Petitioner to deliver two courtesy copies of her proposed trial exhibits and a second copy of her direct testimony affidavits so as to be received by Chambers by 5:00 p.m. on October 22, 2025. (*Id.*). Unfortunately, Petitioner did not comply with the Court's directives. The exhibits that Petitioner did produce to the Court did not align with the exhibits listed in the Amended Joint Pretrial Order. That defect has not been remedied to date.

As described *supra*, the Court took all steps within its power from the commencement of this case seeking the return of the Children to Israel to act expeditiously, mindful of the exigency of the issues in these types of cases. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1020 (2013). Petitioner has been given every opportunity since March of 2024 to have her day in Court.

Ultimately, the matter proceeded to a bench trial on October 27, 2025. The Court took all direct testimony of the trial witnesses by affidavit, which were marked at trial as Court Exhibits. During Respondent's cross-examination of Petitioner which was translated by a certified Hebrew

9

translator, Petitioner testified that she has difficulty with English, that she did not write her affidavit in English, that she wrote it in Hebrew, and could not remember who translated it. (Tr. at 9:6-19). No Hebrew version or any Hebrew original of Petitioner's affidavit was ever furnished to the Court, and Respondent noted for the record that only an English version was ever produced. (*Id.* at 9:20-24). No certified interpreter ever attested to a true and accurate translation of Petitioner's affidavit. Notwithstanding these defects, the Court accepts the affidavit as Petitioner's direct testimony and gives that testimony the weight to which the Court deems it entitled. The Court, in addition to the witnesses' affidavits and testimony given in open court, has also drawn its findings of fact herein from the parties' undisputed Joint Stipulation of Facts (Doc. 98) and the admitted exhibits.

II.    Petitioner's Proof at Trial

A.  Petitioner's Testimony

Petitioner is the Children's mother. (JS ¶ 3).[3] Petitioner testified that she was born and raised in Israel, specifically in the religious community of Bnei Brak. (CE 1 ¶ 3).[4] She raised her first son, who is now eighteen years old, in Israel. (*Id.* ¶ 4). Petitioner married Respondent in Israel on November 2, 2011 when she was twenty-eight years old. (*Id.* ¶ 6; JS ¶ 6; Pl. Ex. 4).[5] Petitioner and Respondent moved to the United States in October 2012, establishing their home and starting a family in New York. (JS ¶ 7). The parties' first child, B.F., was born in 2014, followed by the

---

[3] The parties submitted a Joint Stipulation of Facts and Conclusions of Law. (Doc. 98). The Court cites to the parties' stipulated facts and law as "JS ___."

[4] The affidavits constituting direct testimony of the witnesses were each marked at trial as Court Exhibits. Accordingly, the Court cites to the affidavits as "CE ___."

[5] As noted *supra*, Petitioner did not produce to the Court copies of all the exhibits as identified in the Amended Joint Pretrial Order which were admitted at trial. (*See* Doc. 110; *see also* Docs. 89, 111). Only the exhibits which were admitted and furnished to the Court have been considered. The Court cites to Petitioner's exhibits as "Pl. Ex. ___" and to Respondent's exhibits as "Resp. Ex. ___."

birth of M.F. in 2015. (*Id.* ¶ 8). Both Children were born in New York. (*Id.* ¶ 9). From 2012 through 2019, the family exclusively lived in New York. (*Id.* ¶ 10).

The parties thereafter moved to Israel, though they stipulated that the family lived exclusively in New York through 2019 (*id.*), Petitioner testified that she and Respondent moved to Israel in 2018. (CE 1 ¶ 6). Respondent contends they moved in July 2019. (CE 3 ¶¶ 46-47). Petitioner testified that during the time they lived in Israel, the Children attended local, religious Bnei Brak schools daily. (CE 1 ¶ 7). They were fully integrated into their Hasidic Bnei Brak community life, which encompassed their religious, social, and cultural identities. (*Id.*). The Children's medical care, religious education, and friendships were centered in Israel. (*Id.* ¶ 8). The Children had established teachers, a fixed curriculum, and a daily routine that was consistent and predictable. (*Id.* ¶ 10). The Children had local friends with whom they played after school daily, attended Shabbat meals, and participated in community functions. (*Id.* ¶ 11).

Petitioner contends that Respondent's Crohn's disease "became a license for him to develop a severe pattern of abuse with his [use of] psychotropic medications, often taking far more than prescribed." (*Id.* ¶ 20). Petitioner states that Respondent was harsh, controlling, and emotionally and verbally abusive to her. (*Id.* ¶ 21).

Petitioner referred to an incident when she "had to restrain our son (who had grabbed a knife), following a specific instruction from a family therapist." (*Id.* ¶ 23). On cross examination, Petitioner testified about that incident, clarifying that she held M.F.'s arms and legs because he was throwing items; he did not grab a knife. (*Compare id. with* Tr. at 18:24-19:5).[6]

On April 4, 2023, Respondent brought the Children to New York for the Passover holiday with round trip tickets from Israel to the United States. (JS ¶ 11). Respondent and the Children did

---

[6] The Court cites to the transcript of proceedings held on October 27 and 28, 2025 as "Tr. ___."

not thereafter return to Israel. (*Id.* ¶ 12). Petitioner testified that Respondent was hospitalized while he and the Children were in New York. (CE 1 ¶ 36). She immediately began attempts to secure the Children's return. (*Id.* ¶ 38). In December 2024, Petitioner traveled to New York and walked into the Children's therapy session. (Tr. at 32:2-5). The police were called and they asked her to leave. (*Id.* at 11-19).

The Children have remained in New York since April 4, 2023. (*Id.* ¶ 13). On November 15, 2023, an application was made pursuant to the Hague Convention on behalf of Petitioner for the return of the Children to Israel. (Pl. Ex. 5). Petitioner filed a petition for the return of the Children on March 27, 2024. (CE 1 ¶ 14).

B.  Dr. Yael Ratner's Testimony

Dr. Yael Ratner, M.D., is a certified specialist in psychiatry in Israel.[7] (CE 2 ¶ 1; Tr. at 46:15-20). She performed two clinical evaluations of Petitioner and reviewed a medical letter from Petitioner's treating psychiatrist. (CE 2 ¶ 15). Dr. Ratner concluded that Petitioner is in a normal psychiatric state now. (*Id.* ¶ 29; Tr. at 49:6-7). Petitioner suffered from mild depression two years ago and was treated successfully. (CE 2 ¶ 31). She does not believe that Petitioner is a danger to anyone or her children. (Tr. at 49:5-10).

Dr. Ratner had not conducted a forensic psychiatric evaluation of the Children. (Tr. at 50:23-51:5). Although she opined that "[t]he grave risk defense is a narrow exception requiring proof of an intolerable situation or serious harm" and that Petitioner's "past, treated condition does not meet this threshold" (CE 2 ¶ 34), she testified that she does not know what a Hague Convention case is. (Tr. at 47:20-25).

---

[7] Although it appears that Dr. Ratner was retained by Petitioner to offer an expert opinion in this case, she was not qualified as an expert witness at trial. (*See* Tr. at 45:10-59:5). Accordingly, the Court considers her testimony as a fact witness only.

C.  Miriam Gross' Testimony

Ms. Gross identified herself as a close friend of Petitioner, having known her since she was a little girl. (CE 4 ¶¶ 2, 3). Ms. Gross testified that the two became closer when Petitioner was in Monsey, New York. (*Id.* ¶ 3). Ms. Gross testified that the last time she saw the Children was two years ago in Israel. (Tr. at 71:4-7). She had previously seen them four of five times when they were in New York, before they went to Israel. (*Id.* at 71:11-13). Ms. Gross testified that the Children's social and community life is in Israel, and Petitioner has no family support in New York. (CE 4 ¶¶ 17, 18). She testified that because Petitioner speaks Yiddish and Hebrew and has difficulty speaking English, the language barrier confirms that the Children's primary linguistic and cultural environment is Israel. (*Id.* ¶ 20).

III.    Respondent's Proof at Trial

A.  Respondent's Testimony

Respondent is the Children's father. (JS ¶ 1). Respondent testified that he is a United States citizen, born in Brooklyn, New York, and is currently residing in New York. (CE 3 ¶¶ 5, 12). Respondent explained that he, the Petitioner, and the Children are all Hasidic Jews. (*Id.* ¶ 14). There are a number of Hasidic sects, called Dynasties. (*Id.* ¶ 16). Due to his personal background and family dynamics, including a change in affiliation from one Hasidic Dynasty to another, he is not a member of one of the larger or more established Dynasties. (*Id.*).

The parties met through a matchmaker in Israel in August or September, 2011, and were married on November 2, 2011 in Israel. (*Id.* ¶¶ 17, 18). They lived together in Israel and took one two-month trip to New York beginning in December 2011. (*Id.* ¶¶ 20, 21). They considered at that time moving to New York, and began conversations about starting a family a few months later.

(*Id.* ¶ 22). Ultimately, the parties made the decision to relocate to New York and build their lives there, and in October 2012, they relocated to New York. (*Id.* ¶¶ 24-26).[8]

Respondent testified that he and Petitioner shared a clear and mutual understanding that the relocation to New York was intended to be permanent. (*Id.* ¶ 27). Beginning in 2018, and for over a year, Petitioner said she wanted to go back to Israel, while Respondent did not want to return to Israel. (*Id.* ¶¶ 38-40). After Respondent's mother passed away, he agreed to move with Petitioner to Israel in July 2019. (*Id.* ¶¶ 43, 44). As is customary, Respondent was granted Israeli citizenship upon arrival. (*Id.* ¶ 45). However, Respondent submitted a letter refusing Israeli citizenship in October 2019 because he did not intend to live in Israel permanently. (*Id.*). Respondent testified that the relocation to Israel was done on a trial basis, with the explicit agreement that they would only remain if the Petitioner's mental health and their lives improved. (*Id.* ¶ 46). Because the Children spoke primarily in Yiddish, they struggled in school in Israel where they were forced to speak Hebrew. (*Id.* ¶ 52).

The family returned to New York in March 2020 for a few months with no plan as to when they would return to Israel. (*Id.* ¶¶ 55, 56). On May 24, 2020, the parties signed an arbitration agreement in New York pursuant to which they submitted their marital issues to arbitration before the Rabbinical Court of Mechon L'Hoyroa in Monsey, New York. (*Id.* ¶ 59; Resp. Ex. T). Respondent testified that following a mediation before Rabbi Mordcho Babad, Rabbi Abraham Braunstein, and Rabbi Moshe Fleischman, Respondent agreed to return to Israel for three to four months on the condition that Petitioner seek psychiatric help and get better. (CE 3 ¶ 61). The

---

[8] On Sunday October 26, 2025 at 10:18 p.m., without prior authorization, Petitioner's counsel sent via e-mail to Chambers copies of the affidavits of direct testimony of Respondent's witnesses, marked-up with purported objections to certain paragraphs. The Court disregards those belated and unauthorized objections in their entirety. (*See also* Tr. at 5-22).

agreement was reduced to writing and signed by each of the parties in New York on May 27, 2020. (*Id.* ¶ 62; Resp. Ex. II). The agreement provides that the parties would return to Israel and make a genuine effort to reconcile their marriage by participating in marriage counseling for a minimum of four months; that they were to do "everything they are commanded, including but not limited to going to therapy or taking medication"; and that if one of the parties were to withdraw or cease to obey the terms of the agreement, the other party could request a return to the Rabbinical Court in Monsey, New York, to address their issues. (*See* Resp. Ex. II).

Respondent testified that Petitioner's behavior grew increasingly erratic. (CE 3 ¶ 64). Petitioner traveled to Israel with the Children on May 28, 2020, and Respondent traveled to Israel approximately a month and a half later. (*Id.* ¶ 65). On August 3, 2020, Respondent was served by Petitioner with a pre-divorce summons in the Jerusalem Rabbinical Court. (*Id.* ¶ 66; Resp. Ex. V). The pre-divorce summons contained a travel restriction, restricting Respondent's ability to leave Israel. (CE 3 ¶ 67). The restriction was lifted in February 2021. (*Id.* ¶ 69). Respondent then traveled to New York at least three times between February 2021 and February 2022. (*Id.*).

Respondent testified that Petitioner became neglectful, abusive, and disconnected from the Children in the summer of 2022. (*Id.* ¶ 80). He testified that M.F. in particular was smacked, hit, and pinched often. (*Id.* ¶ 81). Petitioner confirmed that she pinched M.F. or B.F., though she testified it was seldom, and when asked if she slapped them, she testified "[a] little slap on the hand." (Tr. at 31:9-14).

Respondent also referred to an incident that occurred in November 2022. (CE 3 ¶ 82). He testified that he had to physically intervene to stop Petitioner from choking M.F. and holding him down. (*Id.* ¶ 83). Respondent then pushed Petitioner, which resulted in Petitioner calling the police and stating that M.F. had a knife during the incident. (*Id.*). A temporary order of protection was

issued against Respondent. (*Id.* ¶ 86). The Children stayed with a neighbor for four days while Petitioner stayed with her parents until the order of protection expired and Respondent returned home. (*Id.* ¶¶ 86, 88).

Respondent testified that Petitioner also withheld food from the Children as punishment. (*Id.* ¶ 100). Neighbors frequently found the Children wandering in search of food, and B.F. was stealing food from local grocery stores. (*Id.* ¶ 103). Respondent also testified that Petitioner spoke harshly to the Children; locked them in the bathroom; forced them into the shower while they screamed; and forced the Children to take freezing cold showers. (*Id.* ¶¶ 109, 111).

Respondent testified that despite living in Israel until April 2023, the parties maintained strong and continuous ties to New York. (*Id.* ¶ 122). The Children maintain valid U.S. passports and New York State Identification Cards. (Resp. Exs. C, D, F). The parents likewise have U.S. citizenship (JS ¶¶ 2, 3) and valid New York State Identification Cards (Resp. Exs. G, KK). The parties maintained an active lease for a 4-bedroom apartment in Monsey from July 1, 2018 to June 30, 2020 (Resp. Ex. Z) and for a 2-bedroom apartment in Monsey from August 1, 2020 to July 31, 2022 (Resp. Ex. AA). (CE 3 ¶¶ 126, 127). The parties also filed jointly for bankruptcy in New York in November 2022. (*Id.* ¶ 130). They were discharged in bankruptcy on February 17, 2023, with an address listed for both of them in Monsey, New York. (*Id.* ¶ 132; Resp. Ex. CC).

Respondent testified that from the fall of 2022 onwards, Petitioner's behavior showed no signs of improvement and in an effort to protect the Children, he contacted the Israeli Child Protective Services. (CE 3 ¶¶ 133, 134). He maintains that the system was not willing to help. (*Id.* ¶ 134). He then purchased flights from Israel to New York for April 4, 2023. (*Id.* ¶ 135). The return flights were scheduled for April 25, 2023. (*Id.* ¶ 141). Respondent was then hospitalized for ten to twelve days and was released in the beginning of May 2023. (*Id.*). Respondent testified that he

spoke with Petitioner thereafter, who demanded the Children be returned within three days or she would call the police. (*Id.* ¶ 142). Petitioner, in or around August 2023, vacated the family home in Israel, disposed of Respondent's belongings, and moved into her parents' house in another district in Israel. (*Id.* ¶ 144). By September 2023, Petitioner advised Respondent that the home in Israel was rented to someone else. (*Id.* ¶ 148). Respondent testified that he decided to remain in New York at that time in the interest of protecting the Children and ensuring their safety and emotional well-being. (*Id.* ¶ 150).

The parties ultimately divorced in January of 2025. (*Id.* ¶ 195).

B. <u>Harry Szachtel</u>

The Children's therapist, Harry Szachtel, is a Licensed Clinical Social Worker. (CE 5 ¶¶ 1, 2). He first met Petitioner and Respondent approximately in 2017, in their individual and marital capacities as part of his private practice. (*Id.* ¶ 12). On June 7, 2023, Respondent sought him out for therapeutic support for the Children. (*Id.* ¶ 13). The Children attended therapy sessions regularly, typically once per week, with some variation depending on scheduling and clinical need. (*Id.* ¶ 14). He saw M.F. for 28 sessions and B.F. for 34 sessions. (*Id.*). As they were individual therapy sessions, his sessions with the Children were conducted separately. (Tr. at 221:10-13).

Based on his clinical evaluation and ongoing therapeutic engagement, he diagnosed both Children with Post-Traumatic Stress Disorder ("PTSD"). (*Id.* ¶ 19). He testified that the Children are shell-shocked, anxious, insecure, and haunted by their experiences, stemming from prolonged exposure to a highly dysfunctional and emotionally abusive environment. (*Id.* ¶ 20). He testified that both Children have reported abuse by Petitioner as well as Petitioner's son from her prior marriage. (*Id.* ¶¶ 23, 24). He testified the Children also recall tremendous discomfort and fear being around their maternal grandfather, with whom Petitioner now resides. (*Id.* ¶ 25). They also

exhibit a fear of law enforcement, as Petitioner would threaten to call the police on the Children, several times a week, if they did not comply with her directives. (*Id.* ¶ 26; Tr. at 216:19-217:3). According to the Children, Petitioner would stay up late in the night and then wake up late in the day, so that Respondent was responsible for feeding them, dressing them, and bathing them. (Tr. at 217:8-11). As a result of their PTSD, the Children have flashbacks and emotional chaos. (*Id.* at 217:7). Consequently, Mr. Szachtel testified, returning the children to the environment in which their traumatic experiences occurred would pose a serious risk to their personal safety, psychological safety, and well-being. (CE 5 ¶ 28).

    C.  Dr. Paul Stoltzfus

    Dr. Stoltzfus is a forensic expert retained by Respondent to evaluate both Respondent and the Children. (CE 6 ¶¶ 1, 6). He also interviewed Rabbi Hirsch Unger, who had been involved with Respondent and Petitioner around six years ago and more recently throughout this instant litigation. (*Id.* ¶ 23). Dr. Stoltzfus testified in detail as to his education and credentials, the evaluations he performed for this case, the information he gathered, the medical documents and assessments he reviewed, and the diagnostic criteria he relied upon to reach his conclusions. (*Id.* ¶¶ 2-58; Tr. at 245:22-4). He was qualified as an expert at trial over Petitioner's objection. (Tr. at 249:12-25).[9]

    Dr. Stoltzfus' findings were consistent with the PTSD diagnosis of the Children's therapist, Harry Szachtel. (CE 6 ¶ 56). His opinion, based on the clinical findings, is that the Children should not be returned to Israel as doing so would likely exacerbate their PTSD symptoms and result in

---

[9] Just before midnight on the Friday before trial, Petitioner also filed a motion *in limine* seeking to preclude expert testimony by Respondent's witnesses Harry Szachtel and Dr. Paul Stoltzfus. (Doc. 113). As Szachtel was not offered as an expert, that branch of the motion was denied as moot. (Tr. at 3:9-19). After hearing from Respondent, the Court denied Petitioner's motion to preclude Dr. Stoltzfus from testifying as an expert. (*Id.* at 3:20-5:15). Petitioner renewed his objection at trial, and the motion was again denied. (*Id.* at 204:15-229:4).

significant long-term psychological harm. (*Id.* ¶ 58). He also concluded that both Children possess the maturity and insight necessary for their views to be taken into account. (*Id.* ¶ 63). Dr. Stoltzfus did consider that alienation could impact their feelings about their mother, and noted that the presence of Rabbi Unger during his interview of the Children was a deviation from his standard practice. (Tr. at 241:13-242:1; *id.* at 242:21-243:16).

IV.    The Children's Interview at Trial

The Court also conducted an *in camera* interview of each of the Children separately.[10] The Court invited the parties to suggest questions to be asked of the Children. (Doc. 105). Respondent timely complied (Doc. 106); Petitioner did not (Doc. 107; Doc. 111). The Court spoke with the Children at length with a Yiddish translator available, although each child appeared quite comfortable understanding English. B.F. spoke in English, while M.F. spoke English as able but mostly relied on the interpreter. Some of the questions asked were those supplied by the parties, and some were the Court's own questions. The interviews covered a wide range of subjects. These topics primarily related to their experiences living in New York with Respondent, their experiences living in Israel with Petitioner, their perception of their parents' roles and relationship with the Children when they lived in Israel, and their pastimes and goals. The Children presented as articulate, thoughtful, intelligent, detailed, oriented, and direct.

The Children both unequivocally objected to being returned to Israel.

---

[10] The *in camera* interviews were transcribed by the Court Reporter. The transcripts will remain under seal.

**STANDARD OF REVIEW**

This case is governed by the Hague Convention, the provisions of which have been implemented in the United States through the ICARA. "Both the United States and Israel are signatories to the Hague Convention." *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). The objects of the Convention are: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. (JS 18 (citing Hague Convention, Art. 1)). The Hague Convention applies to cases in which one parent wrongfully removes or retains her or his child, who is under the age of sixteen (16) years, from the child's "habitual residence." (JS 19 (citing Hague Convention, Art. 3)). The removal or retention must be in breach of the other parent's custodial rights, which custodial rights were being exercised at the time of the wrongful retention of the child. (*Id.*).

A parent seeking the return of a child under the Convention must prove by a preponderance of the evidence that: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130-31.

The first element, habitual residence, is not defined in the Convention. *Monasky v. Taglieri*, 589 U.S. 68, 76-77 (2020). Thus, its meaning as interpreted by the courts, depends on the totality of the circumstances and requires courts to remain "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 77-78, 84. A child's habitual residence may turn on a variety of facts, none of which will be dispositive in every case. *Id.* at 78. These facts include "where a child has lived, the length of time there, acclimatization, and the purposes and intentions

of the parents." *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020). Habitual residence takes into account the parents' last shared intention. *Gitter*, 396 F.3d at 132. Courts are to focus on whether a "child's presence at a given location is intended to be temporary, rather than permanent." *Id.* Where a move, though indefinite, is not of a "trial nature" or for a "trial period," it may change the habitual residence of the children. The question is whether the family intended to "shift the locus of their family life . . . for a span of years." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014) (considering whether Italy was the habitual residence in light of the parents' intention to move to the U.S. only for a period of two to three years, even though the parents leased a house in the U.S. and put the Italy house on the market; enrolled the children in school and activities in the U.S.; planned to open a business in the U.S.; prepared to move all their belongings to the U.S.; and shifted the child's medical care and treatment to the U.S.).

"Wrongful removal or retention, however, does not end the matter. If a parent establishes that the removal or retention was wrongful, the child is to be returned unless the defendant establishes one of four defenses." *Id.* at 161. As relevant here, Article 13(b) of the Convention relieves a court from the obligation to order repatriation where "there is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). Pursuant to ICARA, to invoke the grave risk defense, a responding parent must establish by "clear and convincing evidence" that such a risk exists. 22 U.S.C. § 9003(e)(2)(A).

Under Article 13(b), a grave risk of harm from repatriation arises in two situations: "(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason,* may be incapable or unwilling to give the child

adequate protection." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013). "The potential harm to the child must be severe, and the '[t]he level of risk and danger required to trigger this exception has consistently been held to be very high.'" *Id.* (quoting *Norden–Powers v. Beveridge,* 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) (citing cases)). "The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.*

The Second Circuit has described the grave risk determination as falling on a spectrum: "[A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do." *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). The Second Circuit has also held that Article 13(b) relief could be granted if repatriation posed a grave risk of causing unavoidable psychological harm to the child. *Souratgar*, 720 F.3d at 104 (citing *Blondin*, 238 F.3d at 160-61, and explaining the Circuit therein "affirm[ed] denial of petition to repatriate after an expert psychologist opined that returning the boy and girl to France, where they had been abused by their father, would likely trigger recurrence of PTSD, and that no arrangement could mitigate this risk").

Article 13 of the Hague Convention also permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." *Swett v. Bowe*, 733 F. Supp. 3d 225, 263 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024). "Under Article 13, a child's views concerning the essential question of his or her return or retention may be conclusive provided the child has attained an age and degree of maturity sufficient for its

views to be taken into account." *Id.* at 263-64 (cleaned up). "No particular age automatically confers maturity on a child." *Id.* at 264 (quoting *Broca v. Giron*, No. 11-CV-05818, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013), *aff'd*, 530 F. App'x 46 (2d Cir. 2013)). "Simply put, there are no established objective criteria or tests for assessing 'maturity' in the context of the mature child exception, although the Second Circuit has observed as a general matter that the standard should be a relatively demanding one." *Id.* In addition, "[t]he exception must not be applied where the opinion of the child is the product of undue influence by either parent." *Id.* This defense must be established by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

## ANALYSIS

### I.   Petitioner Fails to Establish a *Prima Facie* Case

Petitioner has the burden to establish by a preponderance of evidence that the Children's habitual residence is Israel. *See Monasky*, 589 U.S. at 76-77. Although the Court did not find either party particularly credible, Respondent's testimony was corroborated by additional evidence whereas Petitioner's case suffered from a lack of credibility and/or an utter failure of proof. Very little of Petitioner's testimony rang true; and none of it was corroborated. In other instances, Petitioner offered no proof whatsoever and left the Court to surmise or independently determine the issues associated with her burden of proof. The Court has carefully reviewed the evidence, including where the Children have lived, the length of time in each location, their acclimatization, and the parents' last shared intention regarding the trial nature of their residences and concludes that Petitioner has failed to establish that the Children's habitual residence is Israel. *See Grano*, 821 F. App'x at 27; *Gitter*, 396 F.3d at 132; *Ermini*, 758 F.3d at 164.

Both Children were born in New York and from 2012 through 2019, the family exclusively lived in New York. (JS ¶¶ 9, 10). The family moved to Israel in the summer of 2019. (CE 3 ¶ 43).

Respondent never obtained Israeli citizenship. (*Id.* ¶ 45). The Children maintain valid U.S. passports and New York State Identification Cards. (Resp. Exs. C, D, F). The Children's state identification cards were issued on May 29, 2019 and do not expire until 2027 and 2028, respectively. (*See* Resp. Ex. F). Respondent testified that the cards were issued that summer because even though they knew "that we were moving to Israel in July of that year, we wanted to make sure that both Children had NYS ID because we intended to come back to New York [at] some stage." (CE 3 ¶ 124). The parties maintained a leased apartment for their residence in New York until 2022. (Resp. Exs. Z, AA). It also appears that the parties both maintained a residence address in Monsey, New York until at least February 17, 2023. (*See* Resp. Ex. CC).

When the family returned to New York in March 2020, they stayed for two months. On May 24, 2020, Respondent and Petitioner signed an agreement in New York to submit to arbitration their marital issues before the Rabbinical Court in Monsey, New York. (Resp. Ex. T). On May 27, 2020, they also signed in New York a mediation agreement wherein they stipulated that they would return to Israel for a period of at least four months to attempt to reconcile their marriage; and in the event one of the parties were to withdraw or fail to obey the agreement, the other party could request the court in New York to "arrange the matter for the benefit of the parties and the children." (Resp. Ex. II). Petitioner testified that she agreed to sign this document "because [she] wanted to move back to Israel." (Tr. at 14:15-23). Within the four-month trial period in Israel, Petitioner served Respondent with a pre-divorce summons and a travel restriction preventing him from returning to New York. (Resp. Ex. V; CE 3 ¶ 67). Respondent testified that after he traveled to New York with the Children, Petitioner rented out the family's house in Israel to third parties, discarded Respondent's belongings, and moved to a different district where the Children would be without a home or school enrollment. (CE 3 ¶¶ 144, 148).

Although it is clear that Petitioner intended for Israel to become a permanent residence, Petitioner's intent alone cannot unilaterally change the habitual residence of the Children. *See Gitter*, 396 F.3d at 134 (it is the intent of the parents "at the latest time that their intent was shared," that is relevant to a determination of habitual residence). The last shared intent of the parents in 2019 was to move to Israel on a temporary basis, hoping that their marriage would survive. After that time in 2019, their shared intent in 2020 was to move to Israel temporarily, and for four months, in the hopes that the marriage would improve and that Petitioner's mental health would improve.

Further, Petitioner has not submitted any evidence beyond her testimony alone that the Children were so acclimatized to Israel that it is actively harmful for them to be in New York. Indeed, while her position is that the Children's medical care, religious education, and friendships were centered in Israel for five years (CE 1 ¶ 8), she has not submitted any proof to support this contention. Rather, the proof is clear that the Children struggled in Israel due to a language barrier, as their native language is Yiddish; and Respondent testified that they were forced to speak their non-native language, Hebrew, in school. (CE 3 ¶ 52; *see also* Tr. at 10:20-22; CE 5 ¶ 17; CE 6 ¶ 26). The proof adduced also indicates that that their time in Israel was marked by instability and fear of Petitioner and the Children's maternal-side family. (*See, e.g.*, CE 5 ¶¶ 20, 23-26; CE 6 ¶¶ 35-44, 46-53; Resp. Exs. X, GG-1).

The Court concludes based upon the testimony of the parties and the evidence admitted at trial, that the parents' last shared intention regarding the family's residence was to move to Israel only for a trial period, and that Israel was not the habitual residence of the Children. *See Ermini*, 758 F.3d at 164.

Because Petitioner has failed to marshal sufficient evidence demonstrating the Children's habitual residence shifted to Israel, she has not established a *prima facie* case for the return of the Children to Israel.[11]

## II. Respondent's Affirmative Defenses

Even if Petitioner established a *prima facie* case for repatriation of the Children to Israel, shifting the burden of proof to Respondent—which she has not—Respondent has established two of his affirmative defenses that the Children would face a grave risk of harm if returned and that they are of sufficient age and maturity for their views to be considered.

### A. Grave Risk of Physical or Psychological Harm

The Court finds that the Children have been exposed to significant psychological trauma and that there is a very real and serious risk that such psychological trauma would continue and increase if the Children were returned to Israel. The uncontroverted proof at trial, including the opinion of a qualified expert, demonstrates that the Children have PTSD and that returning them to Israel would expose them to further physical and emotional abuse and neglect, and trigger long-term psychological harm. Dr. Stoltzfus, a forensic psychologist with thirty years of clinical and academic experience, testified as an expert at trial. The Court found Dr. Stoltzfus to be qualified

---

[11] Assuming *arguendo* that Petitioner did establish that Israel was the Children's habitual residence, she did not offer any proof that the removal or retention was in breach of her custody rights under Israeli law and that she was exercising those rights at the time of the removal or retention as required by the Hague Convention. Based upon the Court's independent research, it would appear that Petitioner had custodial rights pursuant to the Israeli Legal Competency and Guardianship Law, 5722-1962, verses 14-15, which provide: "[p]arents are the natural guardians of their minor children . . . [and have] the duty and the right to . . . determine their [children's] place of residence." Legal Capacity and Guardianship Law, 5722–1962, 16 LSI 105 (1962) (Isr.) §§ 14-15. "[P]arents possess custodial rights as to their children, including, *inter alia*, the right to determine the residency of their children under Israeli law." *Hala v. Anteby*, No. 24-CV-03633, 2025 WL 2987448, at *5 (E.D.N.Y. Oct. 22, 2025). As the Children's natural mother, it would appear that Petitioner possessed custody rights over the Children under Israeli law, including the right to determine the Children's residency, at the time of their removal. However, as set forth herein, she failed to establish that Israel was the Children's habitual residence so as to make out a *prima facie* case.

to testify on the matters at issue in this case. Based on his observations, Dr. Stoltzfus concluded that returning the Children to Israel would likely exacerbate their PTSD symptoms. (CE 6 ¶ 58). He further concluded that returning them to Petitioner's custody would expose them to further physical and emotional abuse, creating an intolerable and damaging environment. (*Id.*).

The Court credits and fully accepts these conclusions. In particular, in light of the undisputed evidence of Petitioner's pinching and slapping the Children, and the incident in which she restrained and/or choked M.F. (Tr. at 31:9-14, 18:24-19:5; CE 1 ¶ 23), coupled with the allegations that Petitioner withheld food from the Children as punishment (CE 3 ¶ 100), spoke harshly to the Children, locked them in the bathroom while they screamed, regularly threatened to call the police on the Children, and forced them to take freezing cold showers (*id.* ¶¶ 109, 111), the Children are at serious risk of physical and psychological trauma if they were returned to Israel. These conclusions are also corroborated by the Children's therapist, Mr. Szachtel. He testified based upon his 34 sessions with B.F. and 28 sessions with M.F., that the Children are shell-shocked, anxious, insecure, and haunted by their experiences. Additionally, he testified that the Children have been abused by Petitioner's son from a prior marriage. Mr. Szachtel's testimony was credible and fully corroborates Dr. Stoltzfus' conclusions.

Courts have routinely found that circumstances involving domestic violence and abuse can present a grave risk of harm to an abducted child. *See, e.g.*, *Ermini*, 758 F.3d at 164-65; *see also Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) (finding grave risk of harm where the petitioner subjected children to "repeated beatings, hair pulling, ear pulling, and belt-whipping," as well as psychological abuse); *Walsh v. Walsh*, 221 F.3d 204, 221 (1st Cir. 2000) (finding grave risk of harm where petitioner had abused respondent and "was harsh with the[ir] son, including pinching his legs so hard as to leave bruises and other forms of abuse"). The grave risk affirmative

27

defense has been established in cases involving a child with PTSD who would be caused real harm if returned to that environment. *See Saada v. Golan*, 712 F. Supp. 3d 361, 375 (E.D.N.Y. 2024).

"[A] court considering an exception under Article 13(b) [should] take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." *Blondin v. Dubois*, 189 F.3d 240, 248 (2d Cir. 1999). Courts must remain mindful that "any consideration of ameliorative measures must prioritize the child's physical and psychological safety." *Golan v. Saada*, 596 U.S. 666, 680 (2022). This Court has considered "the range of remedies that might allow both the return of the [Children to Israel] and [their] protection from harm, pending a custody award in due course by a [court in Israel] with proper jurisdiction." *Blondin*, 189 F.3d at 249.

The only evidence in this record concerning Israel's capability or willingness to reduce the risk to the Children is Respondent's testimony that he sought help from the Israeli Child Protective Services but "they were not interested at all in helping." (CE 3 ¶ 134). Arguably, other arrangements might be available that would allow the children to return to Israel in some other person's care, pending a long-term custody adjudication. However, and as an initial matter, returning the Children to Israel to some other person's care does not reduce or eliminate the risk of harm that might otherwise be associated with granting the relief that Petitioner seeks. Both Respondent's expert and the Children's psychologist have testified that returning the Children to Israel—regardless of whether they are in Petitioner's care—would place them in a situation triggering their PTSD, which remedy certainly does not prioritize the Children's psychological safety. Further, and importantly, Petitioner did not offer at trial what other arrangements would even be available to the Children. "[A] district court has no obligation under the Convention to

consider ameliorative measures that have not been raised by the parties . . . ." *Golan*, 596 U.S. at 679.

The Court concludes Respondent has satisfied his burden of proof on this affirmative defense, and that returning the Children to Israel would put them at grave risk of psychological harm.[12]

B. <u>Age and Maturity</u>

As set forth *supra*, the Court conducted an *in camera* interview of each of the Children. The Court finds that the children understood the imperative of telling the truth, coherently articulated their objections to living in Israel, their reasons for wanting to stay in the United States, and presented as thoughtful and mature children for their ages. There were certainly times throughout the interview in which the Court questioned whether there had been any coaching by Respondent. For example, neither of the Children acknowledged any positive memories of Israel, which the Court finds highly improbable especially in light of Dr. Stolfus' recounting his interview of the Children who "recalled enjoying visits to religious sites in Israel. B.F. mentioned the Western Wall and the Tomb of Maimonides, while M.F. noted that there are 'many happy places'

---

[12] The Court finds as well that returning the Children to a zone of war constitutes grave risk. *Tereshchenko v. Karimi*, 102 F.4th 111, 129 (2d Cir. 2024). The Court takes judicial notice under Federal Rule of Evidence 201 of the fact that on June 16, 2025, Bnei Brak was one of the sites of Iranian missile attacks, resulting in at least one casualty (*see* https://www.australianjewishnews.com/8-killed-300-injured-as-iranian-missiles-hit-israel/ (last accessed Nov. 21, 2025)), and on June 20, 2025, missiles were intercepted above Beit Shemesh (*see* https://www.israelhayom.com/2025/06/20/several-wounded-after-barrage-from-iran/ (last accessed Nov. 21, 2025)). Petitioner's family home is in Bnei Brak (CE 1 ¶¶ 3, 10-12; CE 3 ¶¶ 19, 20, 23, 47), and the family lived in Beit Shemesh beginning in September 2019 (CE 3 ¶ 48). Petitioner also used the war zone as a reason she could not comply with one of the Court's directives. (*See* Doc. 75). Additionally, there is an active Travel Advisory issued by the United States Department of State recommending that travel to Israel be reconsidered due to terrorism and civil unrest. (*See* https://travel.state.gov/content/ travel/en/international-travel/International-Travel-Country-Information-Pages/IsraeltheWestBankandGaza .html (last accessed Nov. 21, 2025)). While the Court cannot predict whether the zone of war classification will change, it appears that the wiser course, given the instability in the region, is to continue to consider that placing children in this area of Israel still creates a grave risk of harm to them.

. . . ." (CE 6 ¶ 34). The Court concludes, however, "[s]uch exaggerated testimony presented as outcome-driven, reflecting the depth of [the Children's] desire to persuade the Court not to order [their] return," *Swett*, 733 F. Supp. 3d at 272, is not enough to detract from their overall credibility. Each child was sufficiently mature for the Court to consider their views.

The expert testimony of Dr. Stoltzfus corroborates the Court's assessment of the Children as mature for their age. He testified that the Children each "presented as notably insightful and expressive, and both were unequivocal in their desire not to return to a setting marked by abuse." (CE 6 ¶ 59). He opined that the children are sufficiently mature and their wishes and objection to returning to Israel ought to be taken into account. (*Id.* ¶ 63). The Court further notes that there is no evidence in the record suggesting that the Children are not sufficiently mature for this Court to credit their objections to return.

Accordingly, the Court finds the Children to be of sufficient age and maturity for their views to be taken into account. Based on their fundamental objections to returning to Israel, the Court finds that Respondent has met his burden of proof on this affirmative defense. The Children's views are taken into account; and each is clear that they wish to remain in New York.

## CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner has failed to establish by a preponderance of the evidence that the Children's habitual residence is Israel. The Court alternatively concludes that even if Petitioner had established a *prima facie* case for repatriation, Respondent has established by clear and convincing evidence that if the Children were returned to Israel, they would be exposed to a grave risk of harm. The Court further concludes that Respondent has established by a preponderance of the evidence that the Children are of sufficient age and maturity that their fundamental objections to returning to Israel should be taken into account.

The Court declines to order the return of B.F. and M.F. to Israel and any of the other relief sought in the Amended Petition.

The Amended Petition is therefore DENIED.

The Clerk of Court is respectfully directed to enter judgment in Respondent's favor and close this case.

**SO ORDERED:**

Dated:    White Plains, New York
          December 1, 2025

_____

PHILIP M. HALPERN
United States District Judge